# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DONALD J. TRUMP,

Plaintiff,

- against -

CYRUS R. VANCE, JR., in his official capacity as District Attorney of the County of New York;

and

MAZARS USA, LLP,

Defendants.

Case No. 1:19-cv-8694-VM

**COMPLAINT**

Plaintiff Donald J. Trump brings this complaint against Defendants for violations of the U.S. Constitution and alleges as follows:

## INTRODUCTION

1.      Virtually "all legal commenters agree" that a sitting President of the United States is not "subject to the criminal process" while he is in office. Memorandum for the U.S. Concerning the Vice President's Claim of Constitutional Immunity 17, *In re Proceedings of the Grand Jury Impaneled Dec. 5, 1972*, No. 73-cv-965 (D. Md.) (Bork Memo). "[N]o county prosecutor is allowed to 'arrest[] all the [executive powers] of the government and prostrate[] it at the foot of the states.'" Akhil Reed Amar & Brian C. Kalt, *The Presidential Privilege Against Prosecution*, 2-SPG NEXUS: J. Opinion 11, 14 (1997) (quoting *M'Culloch* v. *Maryland*, 17 U.S. 316, 432 (1819)).

2.      Yet a county prosecutor in New York, for what appears to be the first time in our nation's history, is attempting to do just that. The District Attorney of New York County has launched a criminal investigation of the President. As part of his investigation, the District Attorney issued a grand jury subpoena to the President's business for records concerning the President. Unsatisfied with that subpoena, the District Attorney issued another subpoena to the President's accountant that

specifically names the President and requests his personal records—including, among other private documents, his federal tax returns.

3.　　The Framers of our Constitution understood that state and local prosecutors would be tempted to criminally investigate the President to advance their own careers and to advance their political agendas. And they likewise understood that having to defend against these actions would distract the President from his constitutional duties. That is why the Framers eliminated this possibility and assigned the task to supermajorities of Congress acting with the imprimatur of the nation as a whole, *see* U.S. Const., Art. II, §4, Art. I, §§2-3, rather than "unaccountable state official[s]." Amar & Kalt 20.

4.　　Because the Mazars subpoena attempts to criminally investigate a sitting President, it is unconstitutional. This Court should declare it invalid and enjoin its enforcement until the President is no longer in office.

**PARTIES**

5.　　Plaintiff Donald J. Trump is the 45th President of the United States. He is the grantor and beneficiary of The Donald J. Trump Revocable Trust ("the Trust"). The Trust is the sole ultimate owner of The Trump Organization, Inc.; Trump Organization LLC; The Trump Corporation; DJT Holdings LLC; DJT Holdings Managing Member LLC; Trump Acquisition, LLC; Trump Acquisition Corp. The Trust is the majority ultimate owner of the Trump Old Post Office LLC.

6.　　Defendant Cyrus R. Vance, Jr., is the District Attorney for the County of New York. The subpoena to Mazars was issued by his office and under his authority. Vance is sued in his official capacity.

7.　　Defendant Mazars USA LLP is a New York accounting firm and the recipient of the subpoena. It is sued in its capacity as custodian of the President's records and is a defendant to ensure that the President can obtain effective relief.

## JURISDICTION & VENUE

8.      The Court has subject-matter jurisdiction because this case arises under the Constitution and laws of the United States. 28 U.S.C. §§1331, 2201. And because the President brings this suit to vindicate the deprivation of "rights, privileges, or immunities secured by the Constitution," 42 U.S.C. §1983, this Court also has jurisdiction under 28 U.S.C. §1343.

9.      Venue is proper because Defendants reside in this district and because a substantial part of the events or omissions giving rise to the President's claim occurred in this district. 28 U.S.C. §1391(b).

## BACKGROUND

### I.      The Constitutional Prohibition on Criminal Prosecutions of a Sitting President

10.      Though no court has had to squarely consider the question, the U.S. Department of Justice and "[a]lmost all legal commenters agree" that the President cannot be "subject to the criminal process" while in office. Bork Memo 17. This principle stems from Article II, the Supremacy Clause, and the overall structure of the Constitution.

11.      Article II vests "[t]he executive Power" in one "President of the United States of America." §1. The President thus "occupies a unique position in the constitutional scheme," *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982); he "is the only person who is also a branch of government," Jay S. Bybee, *Who Executes the Executioner?*, 2-SPG NEXUS: J. Opinion 53, 60 (1997). Because "the President is a unitary executive," "[w]hen the President is being prosecuted, the presidency itself is being prosecuted." Akhil Reed Amar & Brian C. Kalt, *The Presidential Privilege Against Prosecution*, 2-SPG NEXUS: J. Opinion 11, 12 (1997).

12.      Article II also gives the President immense authority over foreign and domestic affairs. He must, among other things, command the armed forces, negotiate treaties and receive ambassadors, appoint and remove federal officers, and "take Care that the Laws be faithfully executed." §§2-3. The President is "the chief constitutional officer of the Executive Branch, entrusted with supervisory and

policy responsibilities of utmost discretion and sensitivity." *Fitzgerald*, 457 U.S. at 750. "Unlike federal lawmakers and judges, the President is at 'Session' twenty-four hours a day, every day. Constitutionally speaking, the President never sleeps. The President must be ready, at a moment's notice, to do whatever it takes to preserve, protect, and defend the Constitution and the American people." Akhil Reed Amar & Neal Kumar Katyal, *Executive Privileges and Immunities: The Nixon and Clinton Cases*, 108 Harv. L. Rev. 701, 713 (1995).

13.     "'[N]ecessarily implied'" from the grant of these duties is "'the power to perform them.'" *Fitzgerald*, 457 U.S. at 749 (quoting 3 J. Story, *Commentaries on the Constitution of the United States* §1563). "'The president cannot, therefore, be liable to arrest, imprisonment, or detention, while he is in the discharge of his office.'" *Id.* Nor can he be investigated, indicted, or otherwise subjected to criminal process. *See A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 O.L.C. Op. 222, 246-60 (Oct. 16, 2000); *accord* Brett M. Kavanaugh, *Separation of Powers During the Forty-Fourth Presidency and Beyond*, 93 Minn. L. Rev. 1454, 1461 (2009) ("Even the lesser burdens of a criminal investigation—including preparing for questioning by criminal investigators—are time-consuming and distracting.… [C]riminal investigations take the President's focus away from his or her responsibilities to the people. And a President who is concerned about an ongoing criminal investigation is almost inevitably going to do a worse job as President."); *Nixon v. Sirica*, 487 F.2d 700, 757 (D.C. Cir. 1973) (MacKinnon, J., concurring in part and dissenting in part) (explaining that "*all* aspects of criminal prosecution of a President must follow impeachment" and that "removal from office must precede *any* form of criminal process against an incumbent President" (emphases added)).

14.     Notably, the Framers' debates at the Philadelphia Convention "strongly suggest an understanding that the President, as Chief Executive, would not be subject to the ordinary criminal process." Bork Memo 6. They understood "that the nation's Chief Executive, responsible as no other single officer is for the affairs of the United States, would not be taken from duties that only he can perform unless and until it is determined that he is to be shorn of those duties by the Senate." *Id.* at

17. Oliver Ellsworth and John Adams, for example, stated that "'the President, personally, was not the subject to any process whatever…. For [that] would … put it in the power of a common justice to exercise any authority over him and stop the whole machine of Government.'" *Fitzgerald*, 457 U.S. at 750 n.31. Later, Thomas Jefferson opined that the Constitution would not tolerate the President being "'subject to the commands of the [judiciary], & to imprisonment for disobedience; if the several courts could bandy him from pillar to post, keep him constantly trudging from north to south & east to west,'" they could "'withdraw him entirely from his constitutional duties.'" *Id.*

15. While the Supreme Court has held that a private litigant can sue the President in federal court for his unofficial conduct, *Clinton v. Jones*, 520 U.S. 681 (1997), criminal process comes with a "distinctive and serious stigma" that "imposes burdens fundamentally different in kind from those imposed by the initiation of a civil action"—burdens that would intolerably "threaten the President's ability to act as the Nation's leader in both the domestic and foreign spheres." 24 O.L.C. Op. at 249. "A civil complaint filed by a private person is understood as reflecting one person's allegations," while the "stigma and opprobrium associated with a criminal charge" is "a public rather than private allegation of wrongdoing" that would "undermin[e] the President's leadership and efficacy both here and abroad." 24 O.L.C. Op. at 250-51. The "burdens of responding" to criminal proceedings, moreover, "are different in kind and far greater than those of responding to civil litigation," given their intensely personal nature, their "unique mental and physical burdens" on the suspect, and the "substantial preparation" they demand. *Id.* at 251-54.

16. In short, "[t]o wound [the President] by a criminal proceeding is to hamstring the operation of the whole governmental apparatus, both in foreign and domestic affairs." Memorandum from Robert G. Dixon, Jr., Asst. Att'y Gen., O.L.C., *Re: Amenability of the President, Vice President, and Other Civil Officers to Federal Criminal Prosecution While in Office* 30 (Sept. 24, 1973) (Dixon Memo). The President thus cannot be subject to criminal process, for any conduct of any kind, while he is serving as President.

17.     Other provisions of the Constitution bolster this conclusion. Beyond creating a unitary executive and granting him immense powers and responsibilities, Article II also states that the President "shall hold his Office during the Term of four Years" and contemplates his "remov[al]" only via "Impeachment." §§1, 4. Removal by impeachment, in turn, requires conviction by two-thirds of the Senate. Art. I, §3. Indeed, the Constitution states that a President "convicted" by the Senate can then be "liable and subject to Indictment, Trial, Judgment, and Punishment, according to Law." *Id.* The use of the past-tense "convicted" reinforces that the President cannot be subject to criminal process *before* that point. *See* Bybee 54-65. Prominent Founders agreed. *See, e.g.*, Federalist No. 69, at 416 (Alexander Hamilton) (Rossiter ed., 1961) ("The President … would be liable to be impeached, tried, and, upon conviction … would *afterwards* be liable to prosecution and punishment in the ordinary course of law." (emphasis added)); 2 Farrand, *Records of the Federal Convention* 500 (rev. ed. 1966) (Gouverneur Morris: "A conclusive reason for making the Senate instead of the Supreme Court the Judge of impeachments, was that the latter was to try the President *after* the trial of the impeachment." (emphasis added)); Federalist No. 77 at 464 (Alexander Hamilton) (discussing impeachment and "*subsequent* prosecution in the common course of law" (emphasis added)).

18.     Any other rule is untenable. It would allow a single prosecutor to circumvent the Constitution's specific rules for impeachment. *See Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 610 (1838); 24 O.L.C. Op. at 246. The Constitution's assignment of the impeachment power to Congress and its supermajority requirement for removal ensure that "the process may be initiated and maintained only by politically accountable legislative officials" who represent a majority of the entire nation. 24 O.L.C. Op. at 246; *see also* Dixon Memo 32 ("[T]he presidential election is the only national election, and there is no effective substitute for it…. The decision to terminate [the President's nationwide electoral] mandate, therefore, is more fittingly handled by the Congress than by a jury"); Amar & Kalt 12 ("The President is elected by the entire polity and represents all 260 million citizens of the United States of

America. If the President were prosecuted, the steward of *all* the People would be hijacked from his duties by an official of *few* (or none) of them.”); Amar & Katyal 713.

19.     The constitutional prohibition on subjecting a sitting President to criminal process is even stronger when applied to state and local governments.

20.     “Because the Supremacy Clause makes federal law ‘the supreme Law of the Land,’ Art. VI, cl. 2, any direct control by a state court over the President, who has principal responsibility to ensure that those laws are ‘faithfully executed,’ Art. II, §3,” raises serious constitutional concerns even in civil cases. *Jones*, 520 U.S. at 691 (citing *Hancock v. Train*, 426 U.S. 167, 178-79 (1976); and *Mayo v. United States*, 319 U.S. 441, 445 (1943)). But in criminal cases, where the State is not acting as a mere forum for private litigation but is *itself* interfering with the President’s duties, investigating the President plainly violates the Supremacy Clause.

21.     Under the Supremacy Clause, States cannot “defeat the legitimate operations” of the federal government. *M‘Culloch*, 17 U.S. at 427. “It is of the very essence of supremacy, to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence.” *Id*. Because the President is the solitary head of the executive branch, subjecting him to criminal process would “arrest[] all the [executive powers] of the government, and … prostrat[e] it at the foot of the states.” *Id*. at 432; *see* Amar & Kalt 13-16.

22.     The threat that state criminal process poses to a President cannot be overstated. He is an “easily identifiable target,” and “[c]ognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve.” *Fitzgerald*, 457 U.S. at 752-53. State and local prosecutors have massive incentives to criminally investigate the President to advance their careers or to damage a political opponent. And given the heavy burdens associated with criminal process, “all you need is one prosecutor, one trial judge, the barest amount of probable cause, and a supportive

local constituency, and you can shut down a presidency." Jed Shugerman, *A Sitting President Generally Can't Be Indicted*, ShugerBlog (May 22, 2018), bit.ly/2kCYb0w.

23.     The prohibition on criminally prosecuting a sitting President cannot be circumvented by limiting the investigation to a grand-jury subpoena, or by not subpoenaing the President directly. Any state criminal process that seeks "a finding that it is probable that the President has committed a crime"—even if "obliquely"—would "vitiate the sound judgment of the Framers that a President must possess the continuous and undiminished capacity to fulfill his constitutional obligations." *Sirica*, 487 F.2d at 758 (MacKinnon, J., concurring in part and dissenting in part).

24.     For all of these reasons, the Constitution prohibits States from subjecting the President to criminal process while he is in office. The notion that this prohibition "places the President 'above the law'" is "wholly unjustified." *Fitzgerald*, 457 U.S. at 758 n.41. "It is simply error to characterize an official as 'above the law' because a particular remedy is not available against him." *Id.* Again, "[a] sitting President who engages in criminal behavior falling into the category of 'high Crimes and Misdemeanors' always subject to removal from office upon impeachment by the House and conviction by the Senate, and is thereafter subject to criminal prosecution." 24 O.L.C. Op. 257; *see also* Bybee 63 ("[T]hat the President is not above the law … is a red herring…. [The relevant constitutional] clauses do not give the President immunity from prosecution; rather, they specify an order in which things are to occur."). We of course have "a government of laws, not men," but "the People have a right to vigorous Executive who protects and defends them, their country, and their Constitution. Temporary immunity is the only way to ensure both of these things." Amar & Kalt 20-21.

## II.     The Campaign of Bad-Faith Investigations and Harassment of the President

25.     Throughout President Trump's time in office, government institutions, both federal and state, controlled by or aligned with the Democratic Party have attempted to use their power to obtain and expose his confidential financial information in order to harass him, intimidate him, and prevent his reelection.

26.     After the 2018 midterm elections, Democrats won a majority of seats in the U.S. House of Representatives. They now control every House committee.

27.     The "focus" of the new House, according to the incoming Majority Leader, would be examining "the President in terms of what [business] interests he has." As Chairwoman Maxine Waters declared: "We're going to find out where [the President's] money has come from."

28.     House Democrats are executing this plan in earnest. Numerous House committees have issued a flurry of subpoenas and requests for information about the President's personal finances and businesses.

29.     The House Ways and Means Committee, for example, is currently pursuing the President's federal tax returns.

30.     In May 2019, Chairman Richard Neal subpoenaed the IRS for several years' worth of tax returns regarding President Trump and eight Trump entities. He justified his request in terms of "the Federal tax laws"—specifically, determining "the extent to which the IRS audits and enforces the Federal tax laws against a President."

31.     Chairman Neal's rationale was pretextual. While House Democrats had offered countless justifications for obtaining the President's tax returns, no one had ever mentioned a desire to find out how the IRS audits Presidents. The Chairman's request, moreover, bore little resemblance to an effort to investigate how the IRS audits Presidents. It asked for the information of only one President, asked for open files for which audits have not been completed, and never asked the IRS for the most relevant information—namely, how it audits Presidents.

32.     The Treasury Department did not comply with the Committee's request for the President's federal tax returns. After compiling and reviewing over 40 pages of Democrats' public statements, Secretary Steven Mnuchin concluded that the Committee's request was a partisan effort to expose the President's private tax information. The Department of Justice agreed. *See Congressional*

*Committee's Request for the President's Tax Returns Under 26 U.S.C. § 6103(f)*, 43 Op. O.L.C. __, __ (June 13, 2019) (slip op. 26).

33.     The House Oversight Committee, for its part, is pursuing several other aspects of the President's finances.

34.     In April 2019, Chairman Elijah Cummings subpoenaed Mazars—the longtime accountant for the President and his businesses—for eight years' worth of financial information about the President and several of his businesses. Though his rationales changed over time, Chairman Cummings claims that the subpoena to Mazars would help the Oversight Committee "to investigate whether the President may have engaged in illegal conduct before and during his tenure in office, to determine whether he has undisclosed conflicts of interest that may impair his ability to make impartial policy decisions, to assess whether he is complying with the Emoluments Clauses of the Constitution, and to review whether he has accurately reported his finances to the Office of Government Ethics and other federal entities."

35.     Chairman Cummings' subpoena to Mazars, Ranking Member Jim Jordan observed, "is an unpreceded abuse of the Committee's subpoena authority to target and expose the private financial information of the President of the United States" for "political gain." It is an impermissible attempt to "expose the private affairs of individuals," as "Chairman Cummings has cited no specific law or legislative proposal for which he requires eight years of sensitive, personal financial information about President Trump." The subpoena, the Ranking Member added, "is an act of raw partisan politics meant only to further your obsession with attacking the President of the United States." Chairman Cummings "did not dispute the fact that [his] subpoena to Mazars is part of a coordinated and carefully managed campaign to use congressional oversight for political gain," and he never "articulated how the sensitive, personal financial information [he] seek[s] will advance a legitimate legislative purpose."

36.     The Department of Justice agreed that there was "strong reason to doubt that the subpoena's real object was legitimate." U.S. Amicus Br. 17, *Trump v. Mazars USA, LLP*, No. 19-5142

(D.C. Cir.) (cleaned up). "If, for example, the central purpose of the Committee's investigation were to aid the House in drafting legislation aimed at more 'accurate reporting of the President's finances,' it is not apparent why detailed information about the President's finances from years before he became even a Presidential candidate would be reasonably relevant and necessary to such an investigation." *Id.* at 21.

37.     The State of New York has been a willing and eager participant in this campaign to harass the President—both as an instrument to achieve the House's partisan agenda, and in direct pursuit of its own.

38.     For example, Letitia James—the Attorney General of New York and the State's "'chief law officer'" who oversees the district attorneys, *People v. Fuller*, 282 N.Y.S. 28, 49 (Gen. Sess. 1935)— took office in 2019 following a campaign where she promised to "begin … an investigation into the Trump Administration with respect to his finances in the State of New York" and bring "the days of Donald Trump … to an end." On several occasions she stated, "The president of the United States has to worry about three things: 1. Mueller 2. Cohen, and 3. Tish James. We're all closing in on him." She promised that, if elected, "we will join with law enforcement and other attorneys general across this nation in removing this president from office." "I will be shining a bright light into every dark corner of his real estate dealings." "[W]e're going to definitely sue him. We're going to be a real pain in the ass. He's going to know my name personally." The Attorney General pledged to "root out corruption" in "DC" by "[i]nvestigat[ing] Trump businesses." She released a three-point plan explaining how she would "[f]ight[] corruption in the Trump Administration." The Attorney General also tweeted to Democrats in Congress, promising "to help Democrats take on Donald Trump" and "investigate" him.

39.     The New York Legislature has been equally relentless. Shortly before the President's inauguration, Senator Brad Hoylman (D-Manhattan) introduced Senate Bill S8217. His bill would have required candidates for President to publicly disclose their federal income tax returns from the last

five years, or else their names would not appear on the New York ballot and they could not receive New York's electoral votes. Lest anyone be confused about the target of S8217, Senator Hoylman named it the Tax Returns Uniformly Made Public Act, or TRUMP Act.

40.     When the TRUMP Act failed to pass, Senator Hoylman quickly devised another plan to expose the President's finances. Working with Assemblymember Buchwald (D-Westchester), the two introduced Assembly Bill A7462 and Senate Bill S5572—the Tax Returns Uphold Transparency and Honesty Act, or TRUTH Act. The TRUTH Act would have required the Commissioner to publish the President's state income tax returns from the last five years. Although the TRUTH Act would have applied to other officials who run for statewide office, its true target was President Trump. After introducing the legislation, Senator Hoylman, Assembly Member Buchwald, and others held a press conference where they stood in front of a red banner with white lettering that said "#ReleaseTheReturns." Assemblymember Buchwald remarked: "If lawmakers in Washington won't force President Trump to release his returns," Senator Hoylman added, "lawmakers in Albany should instead." "Trump broke over four decades worth of tradition by not releasing his returns, by thumbing his nose at the American people"; "[w]e want to reverse that, and we think we are in a unique position as New Yorkers to do so."

41.     When the TRUTH Act failed to pass, Senator Hoylman and Assembly Member Buchwald devised a third way to target the President. By this time, the House Ways and Means Committee had formally requested the President's federal returns and the Treasury Department had suggested that the request was illegal. So Senator Hoylman and Assembly Member Buchwald devised legislation that would use the Committee's request for the President's federal returns as grounds for New York to disclose his state returns to Congress. They named the legislation the Tax Returns Released Under Specific Terms Act, or TRUST Act. It passed on party lines. Both opponents and supporters acknowledged that the TRUST Act was "obviously political in nature" and "a law that is clearly designed to help a Democratic Congress access Donald Trump's tax returns."

### III.   The Subpoena to Mazars

42.     In recent months, the District Attorney of New York County has joined this campaign of harassing the President by obtaining and exposing his financial information.

43.     On August 1, 2019, the District Attorney issued a grand jury subpoena to The Trump Organization for the following documents and communications concerning the President:

1.  For the period of June 1, 2015, through September 20, 2018, any and all documents and communications that relate to, reference, concern, or reflect:

    a.  payments made for the benefit of or agreements concerning Karen McDougal,

    b.  payments made for the benefit of or agreements concerning Stephanie Clifford aka Stormy Daniels aka Peggy Peterson,

    c.  payments made to or agreements with Michael Cohen or American Media, Inc. that concern Karen McDougal or Stephanie Clifford aka Stormy Daniels aka Peggy Peterson,

    including but not limited to documents and communications involving:

    - Resolution Consultants LLC
    - Essential Consultants LLC aka EC LLC
    - Entities owned or controlled by Michael Cohen
    - Michael Cohen
    - David Dennison
    - Keith Davidson
    - Keith M. Davidson & Associates
    - American Media, Inc.
    - National Enquirer
    - David Pecker
    - Dylan Howard
    - Hope Hicks
    - Jill Martin
    - Jeffrey McConney
    - Deborah Tarasoff
    - Donald Trump, Jr.
    - Allen Weisselberg.

    The items sought by this demand include without limitation: emails, memoranda, and other communications; invoices; agreements, including without limitation retainer agreements; accounting and other book entries or backup documents; general ledger records; wire transfer requests and related records, check images, bank statements, and any other evidence of payments or installments; and organizational documents and agreements, including

13

without limitation articles of incorporations, limited liability agreements, and minutes of director or member meetings.

2. For the period of June 1, 2015, through September 20, 2018, any and all documents and communications that relate to, reference, concern, or reflect Michael Cohen's employment by or work on behalf of Donald Trump or the Trump Organization at any time, including without limitation:

   invoices, payment records, human resource records, W2s, 1099s, emails, memoranda, and other communications.

44. The subpoena did not call for tax returns.

45. The President's attorneys immediately opened a dialogue with the District Attorney's Office and began collecting, and eventually, producing documents called for by the subpoena. But the District Attorney's Office soon revealed that it read the subpoena to cover The Trump Organization's tax returns. When the President's attorneys resisted that implausible interpretation, the District Attorney's office decided to circumvent the President by issuing a new subpoena to Mazars, a neutral third-party custodian, instead.

46. On August 29, 2019, the District Attorney issued a grand-jury subpoena to Mazars.

47. The subpoena orders Mazars to produce a list of records concerning the President:

1. For the period of January 1, 2011 to the present, with respect to Donald J. Trump, the Donald J. Trump Revocable Trust, the Trump Organization Inc., the Trump Organization LLC, the Trump Corporation, DJT Holdings LLC, DJT Holdings Managing Member LLC, Trump Acquisition LLC, Trump Acquisition, Corp., the Trump Old Post Office LLC, the Trump Foundation, and any related parents, subsidiaries, affiliates, joint ventures, predecessors, or successors (collectively, the "Trump Entities"):

   a. Tax returns and related schedules, in draft, as-filed, and amended form;

   b. Any and all statements of financial condition, annual statements, periodic financial reports, and independent auditors' reports prepared, compiled, reviewed, or audited by Mazars USA LLP or its predecessor, WeiserMazars LLP;

   c. Regardless of time period, any and all engagement agreements or contracts related to the preparation, compilation, review, or auditing of the documents described in items (a) and (b);

   d. All underlying, supporting, or source documents and records used in the preparation, compilation, review, or auditing of documents described in items (a) and (b), and any summaries of such documents and records; and

e. All work papers, memoranda, notes, and communications related to the preparation, compilation, review, or auditing of the documents described in items (a) and (b), including, but not limited to,

   i. All communications between Donald Bender and any employee or representative of the Trump Entities as defined above; and

   ii. All communications, whether internal or external, related to concerns about the completeness, accuracy, or authenticity of any records, documents, valuations, explanations, or other information provided by any employee or representative of the Trump Entities.

48. Quite remarkably, the District Attorney's subpoena to Mazars is identical to the House Oversight Committee's subpoena to Mazars (except for a few stylistic edits). The only exception is paragraph 1.a. The House Oversight Committee did not ask Mazars for the President's tax returns, but the District Attorney (following the lead of the House Ways and Means Committee) did. Essentially, then, the District Attorney cut-and-pasted the House Oversight and House Ways and Means subpoenas into a document and sent them to Mazars.

49. The following table illustrates how each provision of the District Attorney's subpoena (other than paragraph 1.a) precisely tracks the House Oversight Committee's subpoena.

| House Oversight Committee | District Attorney |
|---|---|
| Unless otherwise noted, the time period covered by this subpoena includes calendar years 2011 through 2018. | 1. For the period of January 1, 2011 to the present, |
| With respect to Donald J. Trump, Donald J. Trump Revocable Trust, the Trump Organization Inc., the Trump Organization LLC, the Trump Corporation, DJT Holdings LLC, the Trump Old Post Office LLC, the Trump Foundation, and any parent, subsidiary, affiliate, joint venture, predecessor, or successor of the foregoing: | with respect to Donald J. Trump, the Donald J. Trump Revocable Trust, the Trump Organization Inc., the Trump Organization LLC, the Trump Corporation, DJT Holdings LLC, DJT Holdings Managing Member LLC, Trump Acquisition LLC, Trump Acquisition, Corp., the Trump Old Post Office LLC, the Trump Foundation, and any related parents, subsidiaries, affiliates, joint ventures, predecessors, or successors (collectively, the "Trump Entities"):<br><br>*a. Tax returns and related schedules, in draft, as-filed, and amended form;* |
| 1. All statements of financial condition, annual statements, periodic financial reports, and | b. Any and all statements of financial condition, annual statements, periodic financial reports, |

| | |
|---|---|
| independent auditors' reports prepared, compiled, reviewed, or audited by Mazars USA LLP or its predecessor, WeiserMazars LLP; | and independent auditors' reports prepared, compiled, reviewed, or audited by Mazars USA LLP or its predecessor, WeiserMazars LLP; |
| 2. Without regard to time, all engagement agreements or contracts related to the preparation, compilation, review, or auditing of the documents described in Item Number 1; | c. Regardless of time period, any and all engagement agreements or contracts related to the preparation, compilation, review, or auditing of the documents described in items (a) and (b); |
| 3. All underlying, supporting, or source documents and records used in the preparation, compilation, review, or auditing of documents described in Item Number 1, or any summaries of such documents and records relied upon, or any requests for such documents and records; and | d. All underlying, supporting, or source documents and records used in the preparation, compilation, review, or auditing of documents described in items (a) and (b), and any summaries of such documents and records; and |
| 4. All memoranda, notes, and communications related to the preparation, compilation, review, or auditing of the documents described in Item Number 1, including, but not limited to: | e. All work papers, memoranda, notes, and communications related to the preparation, compilation, review, or auditing of the documents described in items (a) and (b), including, but not limited to, |
| a. all communications between Donald Bender and Donald J. Trump or any employee or representative of the Trump Organization; and | i. All communications between Donald Bender and any employee or representative of the Trump Entities as defined above; and |
| b. all communications related to potential concerns that records, documents, explanations, or other information, including significant judgments, provided by Donald J. Trump or other individuals from the Trump Organization, were incomplete, inaccurate, or otherwise unsatisfactory. | ii. All communications, whether internal or external, related to concerns about the completeness, accuracy, or authenticity of any records, documents, valuations, explanations, or other information provided by any employee or representative of the Trump Entities. |

50.     The District Attorney's subpoena directs Mazars to produce the information by 2:00 p.m. on September 19, 2019.

51.     As with the first subpoena, the President's attorneys—the true party-in-interest—contacted the District Attorney's office to engage in good-faith negotiations concerning the Mazars subpoena.

52.     Yet the District Attorney's office refused to narrow the subpoena, allow more time for negotiations, or (unlike the House Oversight and Intelligence Committees) even stay enforcement

of the subpoena while the parties litigate over its validity. Yesterday, the District Attorney offered to give Mazars until September 23, 2019 to produce the portion of the subpoena calling for tax records—an extension of only two business days for a mere subset of the requested documents.

53.     The subpoena is a bad faith effort to harass the President by obtaining and exposing his confidential financial information, not a legitimate attempt to enforce New York law. It precisely mirrors the House Oversight Committee's subpoena to Mazars and the House Ways and Means Committee's subpoena for the President's tax returns—themselves blatant efforts to obtain the President's confidential information to score political points. The District Attorney is duplicating the House's efforts even though New York has no jurisdiction over the topics that the House (falsely) claims to be studying: federal financial-disclosure laws and federal tax law. One particularly egregious example of this is the subpoena's request for information about the Trump Old Post Office—a *D.C.*-based company that operates the President's *D.C.*-based hotel.

54.     The District Attorney's efforts are aimed directly at the President. His first subpoena sought information about the President and was issued to the company that the President solely owns and that bears his name. As the House General Counsel admitted when defending the same subpoena, "you do have to look at this in terms of these are the records of the President." O.A. Transcript 77, *Trump v. Mazars USA, LLP*, No. 19-5142 (D.C. Cir. July 12, 2019). The District Attorney's subpoena to Mazars, moreover, was issued to the President's accountant for the sole purpose of obtaining documents about the President from a party with little incentive to challenge it. The Mazars subpoena specifically names the President as a target; and it seeks, among other things, his individual tax returns.

55.     But Mazars cannot disclose any of the President's information unless the District Attorney's subpoena is valid and enforceable. Under its contracts with the President, Mazars must abide by the American Institute of CPAs' ethical rules, which prohibit accountants from "disclos[ing] any confidential client information without the specific consent of the client." AICPA Code of Prof'l Conduct §1.700.001.01. New York and federal law impose the same duty. *See* 8 N.Y.C.R.R. §29.10(c);

26 U.S.C. §7216. A subpoena does not relieve Mazars from these duties, unless the subpoena is "validly issued and enforceable." AICPA Code §1.700.001.02.

56.     The President brings this suit to challenge the validity and enforceability of the District Attorney's subpoena. Mazars now faces a Hobson's choice: ignore the subpoena and risk contempt, or comply with the subpoena and risk liability to the President if the subpoena is invalid or unenforceable. To resolve these conflicting commands, courts instruct third-party accountants like Mazars to not disclose the subpoenaed materials until the dispute over the subpoena's validity is finally resolved in court: "[AICPA] Rule 301 … explains that it 'shall not be construed ... to affect in any way the member's obligation to comply with a validly issued and enforceable subpoena or summons.' But [the client] challenges the enforceability of a subpoena …. Thus [the accountant] c[an] refuse to produce the documents, thereby allowing [the client to litigate the subpoena], without violating its obligation to comply with enforceable subpoenas." *United States v. Deloitte LLP*, 610 F.3d 129, 142 (D.C. Cir. 2010). The District Attorney thus cannot be allowed to take any action against Mazars until this litigation is finally resolved.

## CLAIM FOR RELIEF

57.     The President incorporates all his prior allegations.

58.     The U.S. Constitution, including Article II and the Supremacy Clause, prohibits the District Attorney from criminally investigating, prosecuting, or indicting the President while he is in office.

59.     The subpoena to Mazars is an attempt to criminally investigate and prosecute the President. That is, after all, the whole point of a grand-jury subpoena. The subpoena, moreover, names the President, seeks his records, and was issued to his accountant for the purpose of circumventing his rights. The subpoena also targets the President's businesses—precisely because it is the President who owns them.

60.     The subpoena thus violates the Constitution. It cannot be enforced until after the President leaves office.

**WHEREFORE**, The President asks this Court to enter judgment in his favor and provide the following relief:

a.      A declaratory judgment that the subpoena is invalid and unenforceable while the President is in office;

b.      A permanent injunction staying the subpoena while the President is in office;

c.      A permanent injunction prohibiting the District Attorney's office from taking any action to enforce the subpoena, from imposing sanctions for noncompliance with the subpoena, and from inspecting, using, maintaining, or disclosing any information obtained as a result of the subpoena, until the President is no longer in office;

d.      A permanent injunction prohibiting Mazars from disclosing, revealing, delivering, or producing the requested information, or otherwise complying with the subpoena, until the President is no longer in office;

e.      A temporary restraining order and preliminary injunction prohibiting Mazars from disclosing, revealing, delivering, or producing the requested information, or otherwise complying with the subpoena, until the subpoena's validity has been finally adjudicated on the merits;

f.      A temporary restraining order and preliminary injunction prohibiting the District Attorney's office from taking any action to enforce the subpoena, until the subpoena's validity has been finally adjudicated on the merits;

g.      The President's reasonable costs and expenses, including attorney's fees; and

h.      All other preliminary and permanent relief to which the President is entitled.

Dated: September 19, 2019

Respectfully submitted,

_s/ William S. Consovoy_

Marc L. Mukasey
MUKASEY FRENCHMAN & SKLAROFF LLP
Two Grand Central Tower
140 East 45th Street, 17th Floor
New York, NY 10177
(212) 466-6400
marc.mukasey@mukaseylaw.com

William S. Consovoy (*pro hac vice* forthcoming)
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com
cam@consovoymccarthy.com

Alan S. Futerfas
LAW OFFICES OF ALAN S. FUTERFAS
565 Fifth Ave., 7th Floor
New York, NY 10017
(212) 684-8400
asfuterfas@futerfaslaw.com

Patrick Strawbridge
CONSOVOY MCCARTHY PARK PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
patrick@consovoymccarthy.com

*Counsel for President Donald J. Trump*