```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  10/7/19
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
DONALD J. TRUMP,                     :
                                     :
                    Plaintiff,       :
                                     :     19 Civ. 8694 (VM)
        - against -                  :
                                     :     <u>DECISION AND ORDER</u>
CYRUS R. VANCE, JR., in his official :
capacity as District Attorney of the :
County of New York, and              :
MAZARS USA, LLP,                     :
                                     :
                    Defendants.      :
------------------------------------X

**VICTOR MARRERO, United States District Judge.**

Plaintiff Donald J. Trump ("Plaintiff" or the "President"), filed this action seeking to enjoin enforcement of a grand jury subpoena (the "Mazars Subpoena") issued by Cyrus R. Vance, Jr., in his official capacity as the District Attorney of the County of New York (the "District Attorney"), to the accounting firm Mazars USA, LLP ("Mazars"). (See "Complaint," Dkt. No. 1; "Amended Complaint," Dkt. No. 27.)[1]

---

[1] The Court notes a measure of ambiguity regarding whether the President purports to bring this suit in his official capacity as President. The President never explicitly states that he does so, yet his arguments depend on his status as the sitting President. Whether privately retained, non-government attorneys accountable only to the President as an individual are entitled to invoke an immunity allegedly derived from the office of the Presidency, raises questions not addressed here. In any event, the Court finds resolution of this ambiguity unnecessary to its analysis.

**INTRODUCTION**

The President asserts an extraordinary claim in the dispute now before this Court. He contends that, in his view of the President's duties and functions and the allocation of governmental powers between the executive and the judicial branches under the United States Constitution, the person who serves as President, while in office, enjoys absolute immunity from criminal process of any kind. Consider the reach of the President's argument. As the Court reads it, presidential immunity would stretch to cover every phase of criminal proceedings, including investigations, grand jury proceedings and subpoenas, indictment, prosecution, arrest, trial, conviction, and incarceration. That constitutional protection presumably would encompass any conduct, at any time, in any forum, whether federal or state, and whether the President acted alone or in concert with other individuals.

Hence, according to this categorical doctrine as presented in this proceeding, the constitutional dimensions of the presidential shield from judicial process are virtually limitless: Until the President leaves office by expiration of his term, resignation, or removal through impeachment and conviction, his exemption from criminal proceedings would extend not only to matters arising from performance of the President's duties and functions in his

official capacity, but also to ones arising from his private affairs, financial transactions, and all other conduct undertaken by him as an ordinary citizen, both during and before his tenure in office.

Moreover, on this theory, the President's special dispensation from the criminal law's purview and judicial inquiry would embrace not only the behavior and activities of the President himself, but also extend derivatively so as to potentially immunize the misconduct of any other person, business affiliate, associate, or relative who may have collaborated with the President in committing purportedly unlawful acts and whose offenses ordinarily would warrant criminal investigation and prosecution of all involved.

In practice, the implications and actual effects of the President's categorical rule could be far-reaching. In some circumstances, by raising his protective shield, applicable statutes of limitations could run, barring further investigation and prosecution of serious criminal offenses, thus potentially enabling both the President and any accomplices to escape being brought to justice. Temporally, such immunity would operate to frustrate the administration of justice by insulating from criminal law scrutiny and judicial review, whether by federal or state courts, not only matters occurring during the President's tenure in office,

3

but potentially also records relating to transactions and illegal actions the President and others may have committed before he assumed the Presidency.

This Court cannot endorse such a categorical and limitless assertion of presidential immunity from judicial process as being countenanced by the nation's constitutional plan, especially in the light of the fundamental concerns over excessive arrogation of power that animated the Constitution's delicate structure and its calibrated balance of authority among the three branches of the national government, as well as between the federal and state authorities. Hence, the expansive notion of constitutional immunity invoked here to shield the President from judicial process would constitute an overreach of executive power.

The Court recognizes that subjecting the President to some aspects of criminal proceedings could impermissibly interfere with or even incapacitate the President's ability to discharge constitutional functions. Certainly lengthy imprisonment upon conviction would produce that result. But, as elaborated below, and contrary to the President's immunity claim as asserted here, that consequence would not necessarily follow every stage of every criminal proceeding. In particular that concern would not apply to the specific set of facts presented here to which the Court's holding is

4

limited: the President's compliance with a grand jury subpoena issued in the course of a state prosecutor's criminal investigation of conduct and transactions relating to third persons that occurred at least in part prior to the President assuming office, that may or may not have involved the President, but that at this phase of the proceedings demand review of records the President possesses or controls.

Alternatives exist that would recognize such distinctions and reconcile varying effects associated with a claim of presidential immunity in different criminal proceedings and at different stages of the process. The Court rejects the President's theory because, as articulated, such sweeping doctrine finds no support in the Constitution's text or history, or in germane guidance charted by rulings of the United States Supreme Court.

Questions and controversy over the scope of presidential immunity from judicial process, and unqualified invocations of such an exemption as advanced by some Presidents, are not new in the nation's constitutional experience. In fact, disputes concerning the doctrine arose during the Constitutional Convention in 1787 and the Framers' deliberations gave it some consideration. The underlying issues, however, were not explicitly articulated in the text of the charter that emerged from the Convention and thus have

5

remained largely unresolved. Consequently, the only thing truly absolute about presidential immunity from criminal process is the Constitution's silence about the existence and contours of such an exemption, a void the President seeks to fill by the expansive theory he proffers.

Nonetheless, the Founders and courts and legal commentators have repeatedly expressed one overarching concern about the breadth of the President's immunity from judicial process, a fear that served as a vital principle for subsequent court and scholarly review of the question: whether while in office the President stands above the law and absolutely beyond the reach of judicial process in any criminal proceeding. Shunning the concept of the inviolability of the person of the King of England and the bounds of the monarch's protective screen covering the Crown's actions from legal scrutiny, the Founders disclaimed any notion that the Constitution generally conferred similarly all-encompassing immunity upon the President. They gave expression to that rejection by recognizing the duality the President embodied as a unique figure, serving as head of the nation's government, but also existing as a private citizen.[2] As detailed below, the wisdom of that view has been

---

[2] See Memorandum from Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, Re: Amenability of the President, Vice President and Other Civil Officers to Federal Criminal Prosecution While in Office

tested before the courts on various occasions and has been roundly and consistently reaffirmed by the Supreme Court and lower courts.

In numerous rulings, the courts have circumscribed claims of presidential immunity in multiple ways. Specifically, they have held that such protection from judicial process does not extend to civil suits regarding private conduct that occurred before the President assumed office, to responding to subpoenas regarding the conduct of third-persons, and to providing testimony in court proceedings relating to private disputes involving third persons.

The notion of federal supremacy and presidential immunity from judicial process that the President here invokes, unqualified and boundless in its reach as described above, cuts across the grain of these constitutional precedents. It also ignores the analytic framework that the Supreme Court has counseled should guide review of presidential claims of immunity from judicial process. Of equal fundamental concern, the President's claim would tread

---

at 20 n.14 (Sept. 24, 1973) ("The Framers of the Constitutions made it abundantly clear that the President was intended to be a Chief Executive, responsible, subject to the law, and lacking the prerogatives and privileges of the King of England . . . and that the President would not be above the law, nor have a single privilege annexed to his character.") (citing sources).

upon principles of federalism and comity that form essential components of our constitutional structure and the federal/state balance of governmental powers and functions. Bared to its core, the proposition the President advances reduces to the very notion that the Founders rejected at the inception of the Republic, and that the Supreme Court has since unequivocally repudiated: that a constitutional domain exists in this country in which not only the President, but, derivatively, relatives and persons and business entities associated with him in potentially unlawful private activities, are in fact above the law.

Because this Court finds aspects of such a doctrine repugnant to the nation's governmental structure and constitutional values, and for the reasons further stated below, it ABSTAINS from adjudicating this dispute and DISMISSES the President's suit. In the alternative, in the event on appeal abstention were found unwarranted under the circumstances presented here, the Court DENIES the President's motion for injunctive relief.

## I.   BACKGROUND

The Court begins by briefly recounting some facts that appear to be uncontested. The District Attorney is investigating conduct that occurred in New York State. As part of that investigation, the District Attorney served a

grand jury subpoena on the Trump Organization, LLC (the "Trump Organization") on August 1, 2019. That subpoena seeks various documents and records of the Trump Organization covering the period from June 2015 through September 2018. The Trump Organization proceeded to respond, at least in part, to that subpoena without court involvement. On August 29, 2019, the District Attorney served the Mazars Subpoena on Mazars. The Mazars Subpoena seeks various documents and records, including tax returns of the President and possibly third persons, covering the period from January 2011 through the present. In mid-September, counsel for the President informed the District Attorney that the President would seek to prevent .enforcement of and compliance with the Mazars Subpoena as it related to the production of tax records. The President has now done so through this action.

On September 19, 2019, the President filed the Complaint in this action. On the same day, the President filed an emergency motion for a temporary restraining order and a preliminary injunction. (See "Pl.'s Motion," Dkt. No. 6; "Pl.'s Mem.," Dkt. No. 10-1[3]; "Consovoy Decl.," Dkt. No. 6-2.) Upon receipt of the President's motion and supporting

---

[3] Citations to the memorandum of law in support of the President's motion for injunctive relief herein shall be citations to Dkt. No. 10-1. The Court notes, however, that the memorandum of law at that docket entry is an amended version of the memorandum of law originally filed with the Court at Dkt. No. 6-3. (See Dkt. No. 10.)

documents, the Court directed the parties to confer on a briefing schedule and hearing date. Consistent with the Court's request, the parties submitted a joint letter with a proposed briefing schedule and hearing date, which the Court endorsed. (See Dkt. No. 4.) At the same time, the District Attorney agreed to stay enforcement of and compliance with the Mazars Subpoena until Wednesday, September 25, 2019 at 1:00 p.m. (See id.)

On September 23, 2019, the District Attorney filed a memorandum of law in opposition to the President's motion for injunctive relief and in favor of the District Attorney's motion to dismiss the Complaint. (See "September 23 Letter," Dkt. No. 15; "Def.'s Mem.," Dkt. No. 16; "Shinerock Decl.," Dkt. No. 17.)

On September 24, 2019, the President filed an opposition to the District Attorney's motion to dismiss and a reply in further support of the President's motion for injunctive relief. (See "Pl.'s Reply," Dkt. No. 22.)

On the same day, the United States filed a statement in support of the entry of a temporary restraining order. (See Dkt. No. 24.) Specifically, the United States supported the granting of a temporary restraining order in order to afford the United States additional time to consider whether to participate in this action. (See id.)

10

Also on the same day, the Court received a letter from
Mazars, which indicated that Mazars "takes no position on the
legal issues raised by Plaintiff." (See Dkt. No. 26.)

The Court heard oral arguments from the President and
the District Attorney on September 25, 2019. (See Dkt. Minute
Entry dated 9/25/2019; Transcript ("Tr.").) At the conclusion
of oral argument, the Court extended the stay of enforcement
of and compliance with the Mazars Subpoena to September 26,
2019 at 5:00 p.m.; ordered the parties to meet and confer
regarding their concerns, and to inform the Court by September
26, 2019 at 4:00 p.m. whether they had agreed upon a process
for proceeding; and granted the request of the United States
for additional time to consider whether to participate in the
action. (See Dkt. No. 25.)

By letter dated September 26, 2019, the District
Attorney informed the Court that the parties had agreed that
the District Attorney would forbear from enforcement of the
Mazars Subpoena until 1:00 p.m. two business days after the
Court's ruling (or until 1:00 p.m. on Monday, October 7, 2019,
whichever is sooner) and Mazars would gather and prepare
responsive documents in the interim. (See Dkt. No. 28.)

By letter dated September 30, 2019, the United States
indicated its intent to file a submission. (See Dkt. No. 30.)
On October 2, 2019, the United States filed a Statement of

11

Interest, urging the Court not to abstain, but to exercise jurisdiction over this dispute and, following additional briefing, to reach the merits of the President's claimed immunity. (See "Statement of Interest," Dkt. No. 32.) By letter dated October 3, 2019, the District Attorney responded to the Statement of Interest. (See "Def.'s Response," Dkt. No. 33.)

## II.  DISCUSSION

A.  ANTI-INJUNCTION ACT

The Court begins its analysis by considering the District Attorney's argument that the Anti-Injunction Act, 28 U.S.C. Section 2283 (the "AIA"), forecloses the injunctive relief the President seeks. (See Def.'s Mem. 5-6, 8-9.) Dating to the 18th century and designed "to forestall the inevitable friction between the state and federal courts that ensues from the injunction of state judicial proceedings by a federal court," Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 630 (1977), the AIA provides that a "court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. The President has amended his complaint to clarify that he brings suit under 42 U.S.C. Section 1983 ("Section 1983") (see Amended

12

Complaint ¶ 8), meaning this case fits squarely into the first
of the AIA's three exceptions.[4] See Mitchum v. Foster, 407
U.S. 225, 243 (1972) ("[Section] 1983 is an Act of Congress
that falls within the 'expressly authorized' exception of
[the AIA]."). Because Mitchum allows the Court to conclude
that the AIA is no bar to injunctive relief here, the Court
finds it unnecessary to reach the President's alternative
arguments for the inapplicability of the AIA.

B.   ABSTENTION

The District Attorney also submits that, under the
abstention doctrine set forth in Younger v. Harris, 401 U.S.
37 (1971), the Court must decline to exercise jurisdiction
over the President's suit. (See Def.'s Mem. at 5-9.) Younger
abstention is grounded in

> the notion of "comity," that is, a proper respect for
> state functions, a recognition of the fact that the
> entire country is made up of a Union of separate state
> governments, and a continuance of the belief that the
> National Government will fare best if the States and
> their institutions are left free to perform their
> separate functions in their separate ways. This . . . is
> referred to by many as "Our Federalism" . . . . What the
> concept . . . represent[s] is a system in which there is
> sensitivity to the legitimate interests of both State

---

[4] The District Attorney argues that the President's claimed immunity is
"too vague and amorphous" to be cognizable under Section 1983. (Def.'s
Response at 2 (quoting Golden State Transit Corp. v. City of Los Angeles,
493 U.S. 103, 106 (1989)).) The Court shares the District Attorney's
doubts on this score. However, because the Court declines to exercise
jurisdiction on other grounds, it will assume without deciding that the
claim is properly brought under Section 1983. See Spargo v. New York State
Comm'n on Judicial Conduct, 351 F.3d 65, 74 (2d Cir. 2003) (noting that
federal courts may "choose among threshold grounds for disposing of a
case without reaching the merits" (internal quotation marks omitted)).

and National Governments, and in which the National
Government, anxious though it may be to vindicate and
protect federal rights and federal interests, always
endeavors to do so in ways that will not unduly interfere
with the legitimate activities of the States.

401 U.S. at 44. Hence notwithstanding federal courts'
"virtually unflagging obligation . . . to exercise the
jurisdiction given them," Colorado River Water Conserv. Dist.
v. United States, 424 U.S. 800, 817 (1976), Younger requires
federal courts to decline jurisdiction when a plaintiff seeks
to enjoin one of the following three kinds of state
proceedings: (1) "ongoing state criminal prosecutions," (2)
"certain civil enforcement proceedings," and (3) "civil
proceedings involving certain orders . . . uniquely in
furtherance of the state courts' ability to perform their
judicial functions." Sprint Commc'ns, Inc. v. Jacobs, 571
U.S. 69, 78 (2013) (quoting New Orleans Pub. Serv., Inc. v.
Council of City of New Orleans, 491 U.S. 350, 368 (1989)
(internal quotation marks omitted)).

If the federal plaintiff seeks to enjoin one of these
three types of proceedings, a federal court may consider three
additional conditions that further counsel in favor of
Younger abstention, first laid out in Middlesex County Ethics
Commission v. Garden State Bar Association. See 457 U.S. 423,
432 (1982). The "Middlesex conditions" are "(1) [whether]
there is a pending state proceeding, (2) that implicates an

14

important state interest, and (3) the state proceeding
affords the federal plaintiff an adequate opportunity for
judicial review of his or her federal constitutional claims."
Falco v. Justices of the Matrimonial Parts of Supreme Ct. of
Suffolk Cty., 805 F.3d 425, 427 (2d Cir. 2015).[5] Moreover,
Younger also provides for an exception, pursuant to which a
federal court may entertain a suit from which it must
otherwise abstain, upon a showing of "bad faith, harassment,
or any other unusual circumstance that would call for
equitable relief" in federal court. 401 U.S. at 54.

   For the reasons set forth below, the Court concludes
that it must abstain under Younger.

   1.   Ongoing State Criminal Prosecution

   Although the District Attorney views the Mazars Subpoena
as part of an ongoing state criminal prosecution (see Def.'s
Mem. at 6-7), the President disputes that contention. (See
Pl.'s Reply at 10-11.) Hence the President denies the
existence of either an "ongoing state criminal prosecution"
under Sprint or a "pending state proceeding" per the first
Middlesex condition. No party argues that there is a
distinction between an "ongoing" proceeding and a "pending"

---

[5] Federal courts previously treated the Middlesex conditions as
dispositive of the abstention inquiry, but it is unclear how much weight
they should be given after the Sprint Court's clarification that they are
merely "additional factors" appropriately considered in an abstention
inquiry. See Falco, 805 F.3d at 427.

one, and the Court finds no such distinction in the law. The Court consequently considers these two terms identical for the purpose of its abstention analysis and concludes that the Mazars Subpoena does qualify as part of an ongoing state criminal prosecution for Younger purposes -- though not necessarily a prosecution of the President himself.

In the spirit of comity, the Court begins its analysis by observing that New York law considers the issuance of a grand jury subpoena to be a criminal proceeding. C.P.L. Section 1.20(18) defines a "[c]riminal proceeding" to cover "any proceeding which . . . occurs in a criminal court and is related to a prospective, pending or completed criminal action, . . . or involves a criminal investigation." C.P.L. Section 10.10(1) explains that the "'criminal courts' of [New York] state are comprised of the superior courts and the local criminal courts." Finally, C.P.L. Section 190.05 defines a grand jury as "a body . . . impaneled by a superior court and constituting a part of such court." Because the Mazars Subpoena relates to a criminal investigation and was issued by the grand jury, which constitutes a part of a criminal court, the Court finds as a matter of New York law that the Mazars Subpoena constitutes a criminal proceeding.

State law aside, the President correctly notes that the United States Courts of Appeals are divided on whether the

issuance of a grand jury or investigative subpoena
constitutes a pending state proceeding for Younger purposes.
Compare Monaghan v. Deakins, 798 F.2d 632, 637 (3d Cir.
1986)(holding that grand jury subpoenas do not constitute a
pending state proceeding), vacated in part, 484 U.S. 193
(1988), with Craig v. Barney, 678 F.2d 1200, 1202 (4th Cir.
1982) (abstaining because of "Virginia's interest in the
unfettered operation of its grand jury system"), Kaylor v.
Fields, 661 F.2d 1177, 1182 (8th Cir. 1981), and Kingston v.
Utah County, 161 F.3d 17, *4 (10th Cir. 1998) (Table). The
United States Court of Appeals for the Second Circuit appears
not to have yet ruled on the question.

     The President asks the Court to agree with the Monaghan
Court and hold that no ongoing criminal prosecution exists
here because a state grand jury does not "adjudicate anything"
and "exists only to charge that the defendant has violated
the criminal law." (Pl.'s Reply at 11 (internal quotation
marks omitted).) He also cites Google, Inc. v. Hood for the
proposition that "Sprint undermined prior cases applying
Younger abstention to grand-jury subpoenas." (Id. (citing 822
F.3d 212, 224 & n.7 (5th Cir. 2016)).)

     However, the Sprint Court did not address what makes a
criminal proceeding an ongoing prosecution. Instead, it
reaffirmed that Younger applies only to criminal prosecutions

17

and state civil proceedings that are "akin to a criminal prosecution," and not to other civil proceedings. Sprint, 571 U.S. at 80. Here, there is no doubt that grand jury proceedings are criminal in nature. Moreover, the Hood Court explicitly observed that abstention was merited where Texas law reflected that a grand jury was "an arm of the court by which it is appointed." 822 F.3d at 223. As noted above, New York law similarly considers grand juries a part of the criminal court that impanels them. See also People v. Thompson, 8 N.E.3d 803, 810 (N.Y. 2014) ("[G]rand jurors are empowered to carry out numerous vital functions independently of the prosecutor, for they 'ha[ve] long been heralded as the shield of innocence . . . and as the guard of the liberties of the people against the encroachments of unfounded accusations from any source.'") (quoting People v. Sayavong, 635 N.E.2d 1213, 1215 (N.Y. 1994) (internal quotation marks omitted)). The Second Circuit has further confirmed that "Grand Juries exist by virtue of the New York State Constitution and the Superior Court that impanels them; they are not arms or instruments of the District Attorney." United States v. Reed, 756 F.3d 184, 188 (2d Cir. 2014).

Although the Second Circuit has not explicitly addressed whether grand jury proceedings constitute an ongoing state prosecution under Younger, judges of this district have

18

"routinely applied Younger where investigatory subpoenas have been issued," even prior to a "full-fledged state prosecution" and outside of the criminal context. Mir v. Shah, No. 11 Civ. 5211, 2012 WL 6097770, at *3 (S.D.N.Y. Dec. 4, 2012); aff'd, 569 F. App'x 48, 50–51 (2d Cir. 2014) (affirming on basis that "abstention is still appropriate here under the Sprint framework"); see also Mirka United, Inc. v. Cuomo, No. 06 Civ. 14292, 2007 WL 4225487, at *4 (S.D.N.Y. Nov. 27, 2007) ("Numerous courts have held that investigatory proceedings that occur pre-indictment and that are an integral part of a state criminal prosecution may constitute 'ongoing state proceedings' for Younger purposes."); J. & W. Seligman & Co. Inc. v. Spitzer, No. 05 Civ. 7781, 2007 WL 2822208, at *5 (S.D.N.Y. Sept. 27, 2007) ("[T]he issuance of compulsory process, including subpoenas, in criminal cases, initiates an 'ongoing' proceeding for the purposes of Younger abstention."); Nick v. Abrams, 717 F. Supp. 1053, 1056 (S.D.N.Y. 1989) ("[C]ommon sense dictates that a criminal investigation is an integral part of a criminal proceeding. . . . Permitting the targets of state criminal investigations to challenge subpoenas . . . in federal court prior to their indictment or arrest, therefore, would do . . . . much damage to principles of equity, comity, and federalism . . . ."). The Court declines to contradict over thirty years'

worth of settled and well-reasoned precedent of courts in this district and instead concludes that this case involves an ongoing state criminal prosecution.

### 2. The Second Middlesex Condition

The second Middlesex condition favors abstention if the pending state proceeding implicates an important state interest. See Falco, 805 F.3d at 427. The Court finds this condition satisfied. A state's interest in enforcement of its criminal laws undoubtedly qualifies as an important state interest, particularly considering that Younger itself concerned a challenge to state criminal proceedings. See Arizona v. Manypenny, 451 U.S. 232, 243 (1981); see generally Younger, 401 U.S. 37.

### 3. The Third Middlesex Condition

The third Middlesex condition favors abstention if "the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of his or her federal constitutional claims." Falco, 805 F.3d at 427 (internal quotation marks omitted). "[A]ny uncertainties as to the scope of state proceedings or the availability of state remedies are generally resolved in favor of abstention. . . . [I]t is the plaintiff's burden to demonstrate that state remedies are inadequate." Spargo, 351 F.3d at 78. In this respect, federal courts may not "assume that state judges

20

will interpret ambiguities in state procedural law to bar presentation of federal claims." Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 15 (1987).

The President argues that state proceedings are inadequate because "under current New York law, it does not appear that the President could move to quash a subpoena he did not receive." (Pl.'s Reply at 9.) However, the Court's review of New York law suggests otherwise. A non-recipient can challenge a subpoena under certain circumstances. See Beach v. Oil Transfer Corp., 199 N.Y.S.2d 74, 76 (Sup. Ct. Kings Cty. 1960) ("In situations where witnesses served with subpoenas are not parties, nevertheless, upon a claim of privilege, the defendant being the party principally concerned by the adverse effect of the subpoenas served upon the witnesses and being the party whose rights are invaded by such process may apply to the court whose duty it is to enforce it, to set aside such process if it is invalid." (internal quotation marks omitted)); see also In re Roden, 106 N.Y.S.2d 345, 347-48 (Sup. Ct. N.Y. Cty. 1951) ("Any party affected by the process of the court or its mandate may apply to the court for its modification, vacatur, quashal or other relief he feels he is entitled to receive."); accord Colfin Bulls Funding B, LLC v. Ampton Invs., Inc., No. 151885/2015, 2018 WL 7051063, at *8 (Sup. Ct. N.Y. Cty. Nov. 26, 2018)

(quoting <u>In re Roden</u> for same proposition); <u>People v. Grosunor</u>, 439 N.Y.S.2d 243, 246 (Crim. Ct. Bronx Cty. 1981) (same).

The preceding decisions indicate that the President can challenge the Mazars Subpoena in a state forum on the basis of his asserted immunity. At the very least, they reflect an ambiguity in state law that the Court must resolve in favor of abstention.[6]

The President raises a closer question by arguing that, even if available, a state forum would "not be truly adequate" given that the federal and state governments are already in conflict. (Pl.'s Reply at 9.) As the President notes, some sources suggest that <u>Younger</u> is inapplicable to suits the federal government chooses to bring against state governments in federal court, on the theory that in those situations the federal-state conflict <u>Younger</u> seeks to preempt will occur even if the federal court abstains. See <u>United States v. Morros</u>, 268 F.3d 695, 707 (9th Cir. 2001); <u>United States v.</u>

---

[6] Even if the President could not challenge the Mazars Subpoena in state proceedings, it is unclear why he could not raise his constitutional arguments in a challenge to the subpoena served upon the Trump Organization (the "Trump Organization Subpoena"). As the President's counsel noted at oral argument, "there's not a document Mazars has that [the Trump Organization does not] have in [its] possession," Tr. 47:22–23. Counsel further stated that the Mazars Subpoena was prompted by the Trump Organization's refusal to comply with the Trump Organization Subpoena. Tr. 47:24-48:3. If the President views both subpoenas as attempts to criminally prosecute him, he could litigate his claimed immunity in a challenge to the Trump Organization Subpoena and incidentally render compliance with the Mazars Subpoena a moot point.

Composite State Bd. of Med. Examiners, 656 F.2d 131, 135-36
(5th Cir. 1981). The United States echoes these arguments,
contending that the "principles of comity and federalism . .
. lose their force when the federal government's own Chief
Executive invokes federal constitutional law to challenge a
state grand jury subpoena demanding his records." (Statement
of Interest at 4.)

As an initial note, as pointed out above, the Court is
not certain that attorneys privately retained by the person
who is President can bring suit on behalf of the United
States. Indeed, the Justice Department has filed a Statement
of Interest on behalf of the United States pursuant to 28
U.S.C. Section 517, rather than formally intervening as a
party, or explicitly stating that it is appearing on behalf
of the President in connection with official presidential
business implicating United States interests.

Even assuming that this action is brought by the federal
government, however, the Supreme Court appears not to have
addressed the impact of this consideration on Younger
analysis, and there is precedent to the contrary. See Colorado
River, 424 U.S. at 816 n.23 (declining to consider "when, if
at all, abstention would be appropriate where the Federal
Government seeks to invoke federal jurisdiction"); United
States v. Ohio, 614 F.2d 101, 104 (6th Cir. 1979) ("Abstention

from exercise of federal jurisdiction is not improper simply because the United States is the party seeking a federal forum."); United States v. Oregon, No. 10 Civ. 528, 2011 WL 11426, at *5 (D. Or. Jan. 4, 2011) ("[T]he United States' role as plaintiff is not dispositive to this question. Comity principles can justify abstention even when the United States is the plaintiff."), aff'd, 503 F. App'x 525, 527 (9th Cir. 2013) (affirming abstention on basis that the distinction between the federal government and a private citizen "is not material given the [Supreme Court's] comity rationale" in Levin v. Commerce Energy, Inc., 560 U.S. 413 (2010)).

The Court cannot agree that the President's filing of this action renders the principles of comity and federalism a nullity. While the Second Circuit does not appear to have directly addressed this "difficult question with regard to federal-state relations" in the Younger context, it has denied "that a stay [should be] automatically granted simply on the application of the United States." United States v. Certified Indus., Inc., 361 F.2d 857, 859 (2d Cir. 1966); see also United States v. Augspurger, 452 F. Supp. 659, 668 (W.D.N.Y. 1978) ("[T]he general rules of comity do apply even when the United States is the plaintiff.").

Instead, it is "necessary to inquire 'whether the granting of an injunction [is] proper in the circumstances of

24

this case.'" Certified Indus., 361 F.2d at 859 (quoting Leiter Minerals, Inc. v. United States, 352 U.S. 220, 226 (1957)). This circumstantial test better accords with the vision of a federal court system "in which there is sensitivity to the legitimate interests of both State and National Governments . . . anxious though [the Court] may be to vindicate and protect federal rights and federal interests." Younger, 401 U.S. at 44. Automatically deferring to federal interests in suits brought by the federal government is as incompatible with our federalism as unthinkingly deferring to states' interests in state proceedings.[7]

Further, the President provides no compelling proof that New York courts would fail to adequately adjudicate his immunity claim, relying instead on the unsubstantiated allegation that he would risk "local prejudice." (Pl.'s Reply at 9 (quoting Clinton v. Jones, 520 U.S. 681, 691 (1997)).) Absent a much more compelling showing, the Court declines to conclude that New York courts will treat the President with

---

[7] The Court does not believe that the cases cited by the President compel a contrary conclusion. The Composite State Court specifically distinguished its set of facts from a case where, as here, "the state and federal governments are not in direct conflict" even though the federal government might have "an interest in the outcome of the action to the extent that a federal right is implicated." 656 F.2d at 136. And the Morros Court found that the federal-state conflict inhered where the two governments were locked in a contentious dispute spanning over ten years. See 268 F.3d at 708. By contrast, a direct or inherent conflict is not inevitable in this case, where the state grand jury has merely requested records pertaining to a broad set of facts and actors and may not ultimately target the President.

prejudice. Similarly, the United States misses the mark when it argues that "the state's interest in litigating such an unusual dispute in a state forum is minimal." (Statement of Interest at 8.) To the contrary, "[u]nder our federal system, it goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government. Because the regulation of crime is pre-eminently a matter for the States, we have identified a strong judicial policy against federal interference with state criminal proceedings." Manypenny, 451 U.S. at 243 (internal alterations, citations, and quotations omitted). The President's interest in adjudicating an alleged immunity from state criminal process in federal court, with respect to a state investigation that may or may not ultimately target the President, cannot outweigh the State interest without much stronger proof of State judicial inadequacy.[8]

---

[8] The United States also argues against abstention by analogizing to 28 U.S.C. Section 1442, which authorizes a federal officer to remove a state court action to federal court if she is directly sued "for or relating to any act under color of" her office. (Statement of Interest at 9.) But Mazars's duties and services with respect to the President's personal financial records do not appear to relate to any act taken under the color of the President's office, and no party argues otherwise. Nor has any party pointed to a federal defense that Mazars could bring, as might otherwise justify removal under the statute. See Watson v. Philip Morris Cos., 551 U.S. 142, 151 (2007); Isaacson v. Dow Chem. Co., 517 F.3d 129, 139 (2d Cir. 2008). Far from being directed to a federal officer for her federal acts, the Mazars Subpoena requests private records from a private third party. The Court declines to upend its broader Younger analysis on the basis of an inapposite hypothetical.

Even if the law regarding suits brought by the federal government is ultimately unclear, the Court cannot disregard the principles underlying Younger on this basis alone. And in any event, "it remains unclear how much weight [the Court] should afford [the Middlesex conditions] after Sprint." Falco, 805 F.3d at 427. Because the Court finds that there is an ongoing state criminal prosecution, an important state interest is implicated, and the state proceeding would afford the President at least a procedurally adequate opportunity for judicial review of his federal claims, the weight of the Court's analysis under Sprint and the Middlesex conditions requires abstention.[9]

### 4.   The Bad Faith or Harassment Exception

Although the Court finds that a state criminal prosecution is ongoing and the Middlesex conditions further discourage the Court's exercise of jurisdiction, abstention may still be inappropriate if the President can demonstrate "bad faith, harassment, or any other unusual circumstance

---

[9] The Court is sensitive to the President's argument that abstention under these circumstances might embolden state-level investigation of future Presidents, especially by elected prosecutors in jurisdictions strongly opposed to a given incumbent. However, the Court cannot conclude that this argument merits the exercise of jurisdiction here, where the District Attorney has subpoenaed a third party in a broad investigation that may not ultimately target the President. If future criminal investigations by state prosecutors more clearly target a President on politicized grounds or invade on the prerogatives of the Presidency, then either such exceptional circumstances or evidence that the investigations lacked a good-faith basis could potentially warrant the exercise of federal court jurisdiction to consider such a challenge.

27

that would call for equitable relief." Younger, 401 U.S. at 54. "However, a plaintiff who seeks to head off Younger abstention bears the burden of establishing that one of the exceptions applies." Diamond "D" Constr. Corp. v. McGowan, 282 F.3d 191, 198 (2d Cir. 2002). To invoke the bad faith exception, "the party bringing the state action must have no reasonable expectation of obtaining a favorable outcome." Id. at 199 (internal quotation marks omitted). "[R]ecent cases concerning the bad faith exception have further emphasized that the subjective motivation of the state authority in bringing the proceeding is critical to, if not determinative of, this inquiry." Id.

The President argues that the Mazars Subpoena was issued in bad faith because it essentially copies two congressional subpoenas which cover subject matter allegedly exceeding the District Attorney's jurisdiction. The President also cites numerous statements by federal and state officials indicating their intent to investigate the President's finances and remove him from office. (See Amended Complaint ¶¶ 25-41.) The President further relies on Black Jack Distributors, Inc. v. Beame to claim that this evidence raises an inference that the District Attorney's "activities have a secondary motive" and are "going beyond good faith enforcement of the [criminal]

laws." (Pl.'s Reply at 10 (quoting 433 F. Supp. 1297, 1304-07 (S.D.N.Y. 1977)).)

The District Attorney acknowledges that the Mazars Subpoena is substantially identical to the congressional subpoenas, but he argues that the Mazars Subpoena remains appropriate because it would encompass documents relevant to the state's investigation and enable Mazars to produce those documents promptly, as Mazars had already begun collecting the same documents in order to respond to the congressional subpoenas. (Tr. 30:16-25.) The District Attorney adds that although the documents covered by the subpoenas may relate to matters of federal law, they nevertheless "certainly pertain to potential issues under state law," which would be the "exclusive focus" of his investigation. (Tr. 30:1-5.)

And although the statements cited in the President's complaint certainly reflect that a number of New York State elected officials may wish the President's tenure in office to end, those statements do not reveal the "subjective motive" of the District Attorney in initiating these particular proceedings -- particularly when the District Attorney made none of these statements himself, and they cannot otherwise be attributed to him. To hold otherwise and impute bad faith to the District Attorney on the basis of statements made by various legislators and the New York Attorney General would

be "incompatible with federal expression of 'a decent respect' for" the state authority's functions. Glatzer v. Barone, 614 F. Supp. 2d 450, 460 (S.D.N.Y. 2009).

This case is thus distinguishable from Black Jack Distributors, where the court's finding of bad faith relied on a police department's consistent and repeated use of arrest procedures that had been "long ago held invalid under New York law," pursuant to the head of the enforcement project's declaration that the department would "undertake activities knowing that they are illegal" and "despite all constitutional limitations . . . stop at nothing" to put the plaintiff out of business. 433 F. Supp. at 1306. The President has not shown that the District Attorney is acting with anywhere near the same level of disregard for the law at this point in the investigation.

Moreover, the President has not alleged that the District Attorney lacks any "reasonable expectation of obtaining a favorable outcome," Diamond "D" Constr. Corp., 282 F.3d at 199, in the criminal prosecution of which the Mazars Subpoena is part -- a proceeding which, after all, need not necessarily lead to an indictment of the President himself. Indeed, the Declaration of Solomon Shinerock reflects that the District Attorney's investigation relates at least in part to "'hush money' payments to Stephanie

30

Clifford and Karen McDougal, how those payments were reflected in the Trump Organization's books and records, and who was involved in determining how those payments would be reflected in the Trump Organization's books and records." (See Shinerock Decl. ¶ 9.)

The Declaration also reflects that a variety of investigations related to similar conduct are either ongoing or resolved, including a non-prosecution agreement between federal prosecutors and American Media, Inc. related to an investigation of the lawfulness of the "hush money" payments; the conviction of Michael D. Cohen for tax fraud, false statements, and campaign finance violations during the period he was counsel to the President; and investigations by multiple other New York regulatory authorities concerning alleged insurance and bank fraud by the Trump Organization and its officers. (See id. ¶ 17.) None of these investigations necessarily involve the President himself, and the President fails to show that the District Attorney could not reasonably expect to obtain a favorable outcome in a criminal investigation that is substantially related to the topics and targets listed above. Barring a stronger showing from the President, the Court declines to impute bad faith to the District Attorney in relation to these proceedings.

5.   The Extraordinary Circumstances Exception

Even if bad faith and harassment do not apply, a district court that would otherwise abstain under Younger may hear the federal plaintiff's claims if the claimant can prove that extraordinary or unusual circumstances justify enjoining the state court proceeding. See Younger, 401 U.S. at 54. "[S]uch circumstances must be 'extraordinary' in the sense of creating an extraordinarily pressing need for immediate federal equitable relief, not merely in the sense of presenting a highly unusual factual situation." Kugler v. Helfant, 421 U.S. 117, 124-25 (1975). The Second Circuit has construed Kugler and related Supreme Court precedent to require "(1) that there be no state remedy available to meaningfully, timely, and adequately remedy the alleged constitutional violation; and (2) that a finding be made that the litigant will suffer 'great and immediate' harm if the federal court does not intervene" for the exception to apply. Diamond "D" Const. Corp., 282 F.3d at 201.

As noted in Section II.B.3 supra, New York state courts appear to provide an at least procedurally adequate avenue for remedying the alleged constitutional violation at issue. While the Court is mindful of "the special solicitude due to claims alleging a threatened breach of essential Presidential prerogatives," Nixon v. Fitzgerald, 457 U.S. 731, 743 (1982),

32

the President's claims nevertheless fail to demonstrate an "extraordinarily pressing need for immediate federal equitable relief." Kugler, 421 U.S. at 125. As described further in Section II.C.3.i infra, the President fails to show irreparable harm. The double jeopardy cases that the President cites are likewise inapposite to support his proposition that a claim of Presidential immunity would be "irreparably lost if . . . not vindicated immediately." (Pl.'s Reply at 8.) The President has not been the subject of any of the criminal proceedings he lists as grounds showing irreparable harm; he has not been indicted, arrested, or imprisoned, or even been identified as a target of the District Attorney's investigation -- let alone been tried once before, as required in the double jeopardy context.

Though the President and the United States devote significant attention to the President's unique constitutional position, these arguments reflect the highly unusual factual underpinning of this case rather than the "extraordinarily pressing need for immediate federal equitable relief" demanded by Kugler. Far from requesting immediate relief, the United States asks that this Court schedule additional briefing on the merits of the President's

33

claims.[10] (See Statement of Interest at 10.) The President's claim that his absolute immunity defense must be "vindicated immediately" also runs counter to his counsel's representations at oral argument that the President is not currently "seeking a permanent resolution of this dispute" but is instead merely asking for "an orderly process that allows the serious constitutional questions to be adjudicated carefully and thoughtfully[,] that preserves the [P]resident's right to be heard and allows him a reasonable chance to appeal any adverse decision that might alter the status quo." (Tr. 11:4, 10-14.)

The President fails to show that New York courts would not afford him such an orderly process, and his claim to absolute immunity simply does not demonstrate "an extraordinarily pressing need for immediate federal equitable relief" where the District Attorney has not identified the President as a target of the state investigation, let alone actually indicted him. On the contrary, the President's prophecies that he will be indicted and denied due process in state proceedings are, at best, speculative and unripe. The Second Circuit has previously held that "[t]he exceptional

---

[10] The Court denies this request, as the Court fails to see how further briefing on the merits of the President's immunity arguments would add to the parties' already extensive treatment of the subject, including a lengthy oral argument.

circumstances exception does not apply [where] the likelihood of immediate harm is speculative." See Miller v. Sutton, 697 F. App'x 27, 28 (2d Cir. 2017). This Court now so holds.

For these reasons, the Court abstains from exercising jurisdiction over the President's suit.

C.   PRESIDENTIAL IMMUNITY

Notwithstanding the Court's decision to abstain, and mindful of the complexities and uncharted ground that the Younger doctrine presents, the Court will proceed to examine the merits of the President's claimed immunity and articulate an alternative holding, so as to obviate a remand in the event on appeal the Second Circuit disagrees with the Court's abstention holding. For the reasons stated below, the Court would deny the motion of the President for a temporary restraining order and a preliminary injunction (collectively, "injunctive relief").

At the outset, the Court notes that the question it addresses in this Order is narrower than the one upon which the President urges the Court to focus. Based on the record before it, and as noted in the preceding section of the Court's decision, the Court finds no clear and convincing evidence that the President himself is the target -- or, at minimum, the sole target -- of the investigation by the District Attorney. Rather, the record before the Court

35

indicates that the District Attorney is investigating a set of facts, and a number of individuals and business entities, in relation to which conduct by the President, lawful or unlawful, may or may not be a part. Accordingly, the question before the Court narrows to whether the District Attorney may issue a grand jury subpoena to a third person or entity requiring production of personal and business records of the President and other persons and entities? The Court's answer to that question is yes.

### 1. Legal Standard

Temporary restraining orders and preliminary injunctions are among "the most drastic tools in the arsenal of judicial remedies." Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (per curiam). To obtain this extraordinary remedy,

> [a] party seeking a preliminary injunction must ordinarily establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest.

New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation marks omitted). Because it is well-recognized that the legal standards governing preliminary injunctions and temporary restraining

36

orders are the same, the Court addresses them together. See
AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc., 740 F. Supp.
2d 465, 471 (S.D.N.Y. 2010).

On the second element, the President advocates for the
standard requiring "sufficiently serious questions going to
the merits." (Pl.'s Reply at 17-18.) The Court finds, however,
that the proper test here is the "likelihood of success"
standard. The grand jury issued its subpoena in the course of
an investigation into violations of New York law; the
President's motion is thus an attempt to "stay government
action taken in the public interest pursuant to a statutory
. . . scheme." Able v. United States, 44 F.3d 128, 131 (2d
Cir. 1995). It is of no consequence that the proposed
injunction would not restrain the State's financial laws
themselves: "As long as the action to be enjoined is taken
pursuant to a statutory or regulatory scheme, even government
action with respect to one litigant requires application of
the 'likelihood of success' standard." Id.; see also Plaza
Health Labs., Inc. v. Perales, 878 F.2d 577, 580-81 (2d Cir.
1989). Nevertheless, given the Court's holding on the other
prongs of the preliminary injunction standard, the President
would not prevail even under the different but no less
stringent "sufficiently serious questions" analysis.

Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010).

    2.   Parties' Arguments

The President advances two fundamental reasons for why he is entitled to injunctive relief. First, he argues that he will suffer an irreparable harm in the absence of injunctive relief, because "there will be no way to unring the bell once Mazars complies with the District Attorney's subpoena." (Pl.'s Mem. at 3.) Second, the President argues that he has demonstrated a likelihood of success on the merits, because, according to the President, it is clear that "[n]o State can criminally investigate, prosecute, or indict a President while he is in office." (Id.)

The District Attorney counters that the President's motion for injunctive relief should be denied, because the President has failed to carry his burden of showing entitlement to the requested relief. The District Attorney primarily maintains that the President has failed to demonstrate that he will suffer irreparable harm in the absence of injunctive relief for three reasons. First, the District Attorney contends that compliance with the Mazars Subpoena could be "undone" if the Court were to find the Mazars Subpoena to be invalid and unenforceable. (Def.'s Mem. at 12-13.) Second, the District Attorney notes that both his

office and the grand jury are obligated to maintain confidential any documents produced in response to the Mazars Subpoena. (See id. at 13.) Third, the District Attorney argues that no irreparable harm will ensue "if it becomes public that there is an ongoing criminal investigation that includes requests from third-parties about business transactions that relate to the President," in part because other entities have already been investigating conduct related to the President and those investigations have been public. (Id. at 13-14.)

The District Attorney also argues that the President has failed to demonstrate a likelihood of success on the merits. According to the District Attorney, there exists no law supporting a presidential immunity as expansive as the one claimed by the President in this action. (See id. at 15.) Finally, the District Attorney argues that the balance of equities and public interest both weigh in favor of denying the requested injunctive relief, because there is a public interest in having the grand jury investigation at issue proceed expeditiously. (See id. at 19.)

3.    Analysis

The Court is not persuaded that the immunity claimed by the President in this action is so expansive as to encompass enforcement of and compliance with the Mazars Subpoena. As such, the President has not satisfied his burden of showing

39

entitlement to the "extraordinary and drastic remedy" of injunctive relief. Grand River Enter., 481 F.3d at 66. The Court turns to each element of the preliminary injunction standard in turn.

i.    Irreparable Harm

The first element is irreparable harm, which is "an injury that is not remote or speculative but actual and imminent, and 'for which a monetary award cannot be adequate compensation.'" Dexter 345 Inc. v. Cuomo, 663 F.3d 59, 63 (2d Cir. 2011) (quoting Tom Doherty Assocs. v. Saban Entm't, Inc., 60 F.3d 27, 37 (2d Cir. 1995)). This high standard reflects courts' "traditional reluctance to issue mandatory injunctions." North Am. Soccer League, LLC v. United States Soccer Fed'n, Inc., 883 F.3d 32, 38 n.8 (2d Cir. 2018) (quoting Jacobson & Co., Inc. v. Armstrong Cork Co., 548 F.2d 438, 441 n.3 (2d Cir. 1977)).

The Court finds that enforcement of and compliance with the Mazars Subpoena would not cause irreparable harm to the President. The President urges the Court to find otherwise on the basis that public disclosure of his personal records would cause irreparable harm, first, to the confidentiality of the President's tax and financial records and, second, to the President's opportunity for judicial review of his claims in this action.

The Court is not persuaded that disclosure of the
President's financial records to the office of the District
Attorney and the grand jury would cause the President
irreparable harm. The President relies on a number of cases
to support his argument that mere disclosure -- without more
-- of the documents requested by the Mazars Subpoena would
cause irreparable harm, but none of those cases relate to
ongoing criminal investigations, let alone to the disclosure
of documents and records to a grand jury bound by law and
sworn official oath to keep such documents and records
confidential. See Merrill Lynch, Pierce, Fenner & Smith, Inc.
v. Bishop, 839 F. Supp. 68 (D. Me. 1993) (disclosure of
plaintiff's business records to competitor by a former
employee); Providence Journal Co. v. Fed. Bureau of
Investigation, 595 F.2d 889 (1st Cir. 1979) (disclosure of
FBI documents to plaintiff); PepsiCo, Inc. v. Redmond, No. 94
Civ. 6838, 1996 WL 3965 (N.D. Ill. Jan. 2, 1996) (disclosure
of plaintiff's trade secrets or confidential information to
competitor defendant); Metro. Life Ins. Co. v. Usery, 426 F.
Supp. 150 (D.D.C. 1976) (disclosure -- to a chapter of the
National Organization for Women -- of certain forms and plans
submitted by insurance companies to federal offices); Airbnb,
Inc. v. City of New York, No. 18 Civ. 7712, 2019 WL 91990

(S.D.N.Y. Jan. 3, 2019) (disclosure of data regarding businesses' customers to Mayor's Office).

The Court agrees with the District Attorney that the grand jury is a "constitutional fixture." United States v. Williams, 504 U.S. 36, 47 (1992). As such, the Court finds that disclosure to a grand jury is different from disclosure to other persons or entities like those identified in the cases cited by the President. And because a grand jury is under a legal obligation to keep the confidentiality of its records, the Court finds that no irreparable harm will ensue from disclosure to it of the President's records sought here. See, e.g., People v. Fetcho, 698 N.E.2d 935, 938 (N.Y. 1998) ("[S]ecrecy has been an integral feature of Grand Jury proceedings since well before the founding of our Nation. . . . The reasons for this venerable and important policy include preserving the reputations of those being investigated by and appearing before a Grand Jury, safeguarding the independence of the Grand Jury, preventing the flight of the accused and encouraging free disclosure of information by witnesses.") (internal citation and quotation marks omitted); People v. Bonelli, 945 N.Y.S.2d 539, 541 (N.Y. Sup. Ct. 2012) ("Grand Jury secrecy is of paramount public interest and courts may not disclose these materials lightly." (internal quotation marks omitted)).

Further, as explained in Section II.B.3 supra, the Court finds that a state forum exists for judicial review of the President's claim.

### ii.   Likelihood of Success on the Merits

Even if the President had made a sufficient showing that enforcement of the Mazars Subpoena and the President's compliance with it would cause the President irreparable harm -- and, to be clear, the Court finds it would not -- the Court would nonetheless deny the President's motion for injunctive relief because the President has failed to demonstrate a likelihood of success on the merits.

The Court disagrees with the President's position that a third person or entity cannot be subpoenaed requesting documents related to an investigation concerning potentially unlawful transactions and conduct of third parties in which records possessed or controlled by the sitting President may be critical to establish the guilt or innocence of such third parties, or of the President. The Court also rejects the President's contention that the Constitution, the historical record, and the relevant case law support such a presidential claim.

As a threshold matter, the Court underscores several vital points. First, the President recognizes that the precise constitutional question this action presents -- the

core boundaries of the President's immunity from criminal process -- has not been presented squarely in any judicial forum, and thus has never been definitively resolved. (See Amended Complaint ¶ 10 ("no court has had to squarely consider the question" of whether a President can be subject to criminal process while in office).)

The President urges the Court to conclude that the powers vested in the President by Article II and the Supremacy Clause necessarily imply that the President cannot "be investigated, indicted, or otherwise subjected to criminal process" while in office (Pl.'s Mem. at 9), and that "criminal process" encompasses investigations of third persons concerning matters that may relate to conduct or transactions of third persons, or of the President. (Id. at 8, 13.) As the Court reads the proposition, the President's definition of "criminal process" is all-encompassing; it would extend a blanket presidential and derivative immunity to all stages of federal and state criminal law enforcement proceedings and judicial process: investigations, grand jury proceedings, indictment, arrest, prosecution, trial, conviction, and punishment by incarceration and perhaps even by fine. The Court will proceed to canvas the various relevant authorities to assess that proposition.

a. Department of Justice Memoranda

As authority for the absolute immunity doctrine he proclaims, the President points to and rests substantially upon two documents issued by the Justice Department's Office of Legal Counsel ("OLC"). The first memorandum appeared in 2000. See Memorandum Opinion for the Attorney General, from Randolph D. Moss, Assistant Attorney General, Office of Legal Counsel, A Sitting President's Amenability to Indictment and Criminal Prosecution (Oct. 16, 2000) (the "Moss Memo"). The Moss Memo in turn contains a review and reaffirmation of an OLC memorandum from 1973. See Memorandum from Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, Re: Amenability of the President, Vice President and Other Civil Officers to Federal Criminal Prosecution While in Office (Sept. 24, 1973) (the "Dixon Memo"). In addition, the President relies upon a 1973 brief filed by Solicitor General Robert Bork in the United States District Court for the District of Maryland in connection with a federal grand jury proceeding regarding misconduct of Vice President Spiro Agnew.[11] See Memorandum for the United States Concerning the

---

[11] The Moss Memo reexamined and updated the Dixon and Bork Memos and essentially reaffirmed their conclusion that indictment and prosecution of a President while in office would be unconstitutional because "it would impermissibly interfere with the President's ability to carry out his constitutionally assigned functions and thus would be inconsistent with the constitutional structure." See Moss Memo at 223.

Vice President's Claim of Constitutional Immunity (filed Oct. 5, 1973), In re Proceedings of the Grand Jury Impaneled December 5, 1972: Application of Spiro T. Agnew, Vice President of the United States, No. 73 Civ. 965 (D. Md. 1973) (the "Bork Memo"). The Dixon, Moss, and Bork Memos are here referred to collectively as the "DOJ Memos." The gist of these documents is that a sitting President is categorically immune from criminal investigation, indictment, and prosecution.

The Court is not persuaded that it should accord the weight and legal force the President ascribes to the DOJ Memos, or accept as controlling the far-reaching proposition for which they are cited in the context of the controversy at hand. As a point of departure, the Court notes that many statements of the principle that "a sitting President cannot be indicted or criminally prosecuted" typically cite to the DOJ Memos as sole authority for that proposition. Accordingly, the theory has gained a certain degree of axiomatic acceptance, and the DOJ Memos which propagate it have assumed substantial legal force as if their conclusion were inscribed on constitutional tablets so-etched by the Supreme Court. The Court considers such popular currency for the categorical concept and its legal support as not warranted.

Because the arguments the President advances are so substantially grounded on the supposed constitutional doctrine and rationale the DOJ Memos present, a close review of the DOJ Memos is called for. On such assessment, the Court rejects the DOJ Memos' position. It concludes that better-calibrated alternatives to absolute presidential immunity exist yielding a more appropriate balance between, on the one hand, the burdens that subjecting the President to criminal proceedings would impose on his ability to perform constitutional duties, and, on the other, the need to promote the courts' legitimate interests and functions in ensuring effective law enforcement attendant to the proper and fair administration of justice.

The heavy reliance the President places on the DOJ Memos is misplaced for several reasons. First, though they contain an exhaustive and learned consideration of the constitutional questions presented here, the DOJ Memos do not constitute authoritative judicial interpretation of the Constitution concerning those issues. In fact, as the DOJ Memos themselves also concede, the precise presidential immunity questions this litigation raises have never been squarely presented or fully addressed by the Supreme Court. See Moss Memo at 237; Dixon Memo at 21. Nonetheless, as elaborated in Section II.C.3.ii.c infra, insofar as the Supreme Court has examined

some of the relevant presidential privileges and immunities issues as applied in other contexts, the case law does not support the President's and the DOJ Memos' absolute immunity argument to its full extremity and ramifications.

Second, the DOJ Memos address solely the amenability of the President to <u>federal</u> criminal process. Hence, because state law enforcement proceedings were not directly at issue in the matters that prompted the memos, as they are here, the DOJ Memos do not address the unique concerns implicated by a blanket assertion of presidential immunity from state criminal law enforcement and judicial proceedings.[12] That gap and its significant distinction would include due recognition of the principles of federalism and comity, and the proper balance between the legitimate interests of federal and state authorities in the administration of justice, as discussed above in the section addressing <u>Younger</u> abstention. <u>See</u> <u>Clinton v. Jones</u>, 520 U.S. 681, 691 (1997) (noting that in the context of state law enforcement proceedings, invocation of presidential privilege could implicate "federalism and comity concerns").

---

[12] The Moss Memo acknowledged that its analysis, and that of the Dixon Memo, focused solely on federal rather than state prosecution of a President while in office, and therefore did not consider "any additional concerns that may be implicated by state criminal prosecution of a sitting President." Moss Memo at 223 n.2.

State criminal law enforcement proceedings and judicial process, moreover, do not implicate one of the DOJ Memos' rationales justifying broad presidential immunity from federal criminal process: that by virtue of the President's functions as Chief Executive, giving him power over prosecution, invocation of privilege, and pardons in federal criminal proceedings against the President would be inappropriate and ineffective, as such process would turn the President into prosecutor and defendant at the same time.[13] See Dixon Memo at 26.

Third, the Memos' analyses are flawed by ambiguities (if not outright conflicts) on an essential point: the scope of presidential immunity as presented in the DOJ Memos and asserted here by the President's claim. For instance, the Dixon Memo refers to the immunity of a sitting President from "criminal proceedings," without explicitly defining what "proceedings" the rule would encompass. See, e.g., Dixon Memo at 18. The Bork Memo, again without further elaboration, discusses the President's immunity from federal "criminal process" while in office. See Bork Memo at 3. Whether there

---

[13] Of course, as the Watergate scandal and more recent events confirm, there are practical and legal constraints over a president's power to interfere with a federal law enforcement investigation of himself or his Office, without risking serious charges of obstruction of justice.

is a difference between "criminal proceedings" and "criminal process" is a basic open question.

The Moss Memo, rather than addressing this uncertainty, compounds it by introducing a third expression of the principle that, though not further defined, clearly suggests a narrower scope of presidential immunity than that expressed in the Dixon and Bork Memos. In particular, throughout, the Moss Memo's analysis refers to the exemption as not subjecting a President while in office to "indictment and criminal prosecution." See, e.g., Moss Memo at 222. That articulation invites inquiry as to whether the rule it states would not apply to pre-indictment stages of criminal process such as investigations and grand jury proceedings, including responding to subpoenas.

On this crucial point the DOJ Memos may be at odds with one another.  The specific circumstance that impelled the Dixon and Bork Memos was a grand jury investigation of Vice President Agnew, in which he objected to responding to a grand jury subpoena and argued that the Constitution prohibited investigation and indictment of an incumbent Vice President, and consequently that he could not be compelled to answer a subpoena. The Dixon and Bork Memos rejected that contention and concluded that the Vice President was not entitled to claim immunity from criminal process and prosecution. But

both Memos went further and indicated that such a broad
exemption would extend to the sitting President. Implicitly,
therefore, as suggested by the context, the Dixon and Bork
Memos would expand the scope of their reference to "criminal
proceedings" and "criminal process" to cover presidential
immunity from all pre-indictment phases of criminal law
prosecutions, presumably including exemption from
investigations, grand jury proceedings, and subpoenas.

The Moss Memo, however, by framing its analysis of the
scope of the President's immunity from criminal law
enforcement by reference specifically to "indictment or
criminal prosecution," could be read to suggest that the
exemption would not encompass investigations and grand jury
proceedings, including responding to subpoenas. In fact, the
Moss Memo expressly distinguishes the other two memos on this
point.[14] Addressing concern over the potential prejudicial
loss of evidence that could occur during a period of
presidential immunity prior to indictment, the Moss Memo
states that "[a] grand jury could continue to gather evidence
throughout the period of immunity, even passing this task
down to subsequently empaneled grand juries if necessary."
Moss Memo at 257 n.36. Moreover, the Moss Memo disavows an

---

[14] See Moss Memo at 232 n.10 (noting that unlike the Dixon Memo, the Bork
Memo "did not specifically distinguish between indictment and other phases
of the 'criminal process'").

interpretation of the Dixon and Bork Memos' analyses as positing "a broad contention that the President is immune from all judicial process while in office." Moss Memo at 239 n.15. It further notes that the Dixon Memo "specifically cast doubt upon such a contention" and explains that a broader statement by Attorney General Stanbury in 1867 "is presumably limited to the power of the courts to review <u>official</u> action of the President." Id. (emphasis added).

The Moss Memo thus stepped back from the extreme position advanced by Vice President Agnew, and that is repeated here by the President's argument, that immunity extends to all criminal investigations and grand jury proceedings, including responding to subpoenas. In fact, as the Moss Memo acknowledges, such a view has been rejected by longstanding case law. Supporting this observation, the Moss Memo quotes another OLC Memorandum, dating to 1988, which declared that "it has been the rule since the Presidency of Thomas Jefferson that a judicial subpoena in a criminal case may be issued to the President, and any challenge to the subpoena must be based on the nature of the information sought rather than any immunity from process belonging to the President." Id. at 253 n.29 (quoting Memorandum for Arthur B. Culvahouse, Jr., Counsel to the President, from Douglas W. Kmiec, Assistant Attorney General, Office of Legal Counsel, Re: Constitutional

<u>Concerns Implicated by Demand for Presidential Evidence in a Criminal Prosecution</u> at 2 (Oct. 17, 1988)); <u>see also</u> <u>United States v. Burr</u>, 25 Fed. Cas. 30, No. 14,692 (C.C.D. Va. 1807) (Chief Justice Marshall noting that "[t]he guard, furnished to [the President] to protect him from being harassed by vexatious and unnecessary subpoenas, is to be looked for in the conduct of a court after those subpoenas have issued; not in any circumstances which is to [] precede their being issued"); <u>Clinton</u>, 520 U.S. at 704-05 ("It is also settled that the President is subject to judicial process in appropriate circumstances. . . . We unequivocally and emphatically endorsed [Chief Justice] Marshall's position when we held that President Nixon was obligated to comply with a subpoena commanding him to produce certain tape recordings of his conversations with his aides. . . . As we explained, 'neither the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute unqualified Presidential privilege of immunity from judicial process under all circumstances.'" (quoting <u>United States v. Nixon</u>, 418 U.S. 683, 706 (1974) (internal citations omitted)); Memorandum from Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, <u>Re: Presidential Amenability to Judicial Subpoena</u> (June 25, 1973) (noting the

view expressed by Chief Justice Marshall in Burr that while the President's duties may create difficulties complying with a subpoena, this "was a matter to be shown upon the return of the subpoena as a justification for not obeying the process; it did not constitute a reason for not issuing it").

The uncertainties and inconsistencies these various statements manifest about an essential question of constitutional interpretation suggest that the DOJ Memos' position concerning presidential immunity from criminal law enforcement and judicial process cannot serve as compelling authority for the President's claim of absolute immunity, at least insofar as the argument would extend to pre-indictment investigations and grand jury proceedings such as those at issue in this case.

Finally, the DOJ Memos lose persuasive force because their analysis and conclusions derive not from a real case presenting real facts, but instead from an unqualified abstract doctrine conclusorily asserting a generalized principle, specifically the proposition that while in office the President is not subject to criminal process. Because the constitutional text and history on point are scant and inconclusive, the DOJ Memos construct a doctrinal foundation and structure to support a presidential immunity theory that substantially relies on suppositions, practicalities, and

54

public policy, as well as on conjurings of remote prospects and hyperbolic horrors about the consequences to the Presidency and the nation as a whole that would befall under any model of presidential immunity other than the categorical rule on which the DOJ Memos and the President's claim ultimately rest.

The shortcomings of formulating a categorical rule from abstract principles may be highlighted by various concrete examples demonstrating that other plausible alternatives exist that would not produce the dire consequences the DOJ Memos portray absent the absolute presidential exemption they propound. The indictment stage of criminal process presents such an illustration, raising fundamental questions, reasonable doubts, and feasible grounds for making exceptions to an unqualified presidential immunity doctrine. The Dixon Memo itself acknowledges as "arguable" the possibility of an alternative approach that would not implicate the concerns about the burdens and interferences with the President's ability to carry out official duties that are advanced to justify a categorical immunity rule: Permit the indictment of a sitting President but defer further prosecution until he or she leaves office. See Dixon Memo at 31. The Dixon Memo concludes that "[f]rom the standpoint of minimizing direct interruption of official duties . . . this procedure might be

a course to be considered." Id. at 29. Nonetheless, the Dixon Memo rejects that alternative, declaring without further analysis or support that an indictment pending while the President remains in office would harm the Presidency virtually as much as an actual conviction. Id.

Perhaps the most substantial flaw in the DOJ Memos' case in favor of a categorical presidential immunity rule extending to all stages of criminal process is manifested in their expressions of absolutism that upon close parsing and deeper probing does not bear out. On this point, the DOJ Memos engage in rhetorical flair -- also embraced by the President's arguments -- that not only overstates their point, but does not consider the possibility of substantive distinctions which could reasonably address concerns about the burdens and intrusions that criminal proceedings against a sitting President could entail, and thus could support a practical alternative to a regime of absolute presidential immunity.

The thrust of the DOJ Memos' argument is that a doctrine of complete immunity of the President from criminal proceedings while in office can be justified by the consideration that subjecting the President to the jurisdiction of the courts would be unconstitutional because "it would impermissibly interfere with the President's ability to carry out his constitutionally assigned functions

and thus would be inconsistent with the constitutional structure." Moss Memo at 223.

In support of that peremptory claim, the DOJ Memos -- and the President -- describe various physical and non-physical interferences associated with defending criminal proceedings that they contend could impair the ability of a President to govern, even possibly amounting to a complete functional disabling of the President. In particular, the DOJ Memos cite mental distraction, the effect of public stigma, loss of stature and respect, the need to assist in the preparation of a defense, the time commitment demanded by personal appearance at a trial, and the incapacitation effected by an arrest or imprisonment if convicted. See, e.g., Moss Memo at 249-54. Summarizing these potential impediments, the Dixon Memo concludes:

> [T]he President is the symbolic head of the Nation. To wound him by a criminal proceeding is to hamstring the operation of the whole governmental apparatus, both in foreign and domestic affairs. . . . [T]he spectacle of an indicted President still trying to serve as Chief Executive boggles the imagination.

Dixon Memo at 30. To a similar effect, the Moss Memo declares that

> the ordinary workings of the criminal process would impose burdens upon a sitting President that would directly and substantially impede the executive branch from performing its constitutionally assigned functions, and the accusation or adjudication of the criminal culpability of the nation's chief executive by either a

57

> grand jury returning an indictment or a petit jury
> returning a verdict would have a dramatically
> destabilizing effect upon the ability of a coordinate
> branch of government to function.[15]

Moss Memo at 236.

A major problem with constructing a categorical rule

founded upon hypothesizing and extrapolating from an abstract

general proposition disembodied from an actual set of facts,

is that the entire theoretical structure could collapse when

it encounters a real-world application that shakes the

underpinnings of the unqualified doctrine. To propound as a

blanket constitutional principle that a President cannot be

subjected to criminal process presupposes a faulty premise.

Implicit in that pronouncement is the assumption that every

crime -- and every stage of every criminal proceeding, at any

time and forum, whether involving only one or many other

offenders -- is just like every other instance of its kind.

The absolute proposition also presumes uniformity of

consequences: that but for the application of absolute

presidential immunity every one of these circumstances would

give rise to every one of the alarming outcomes conjured by

---

[15] The Court notes that in this statement the Moss Memo essentially implies
that the scope of presidential immunity it urges would extend to grand
jury proceedings, not only to "indictment and criminal prosecution," as
expressed throughout the rest of the memo. The remark apparently
contradicts expressions elsewhere in the memo suggesting that a sitting
President could be the subject of grand jury investigations. See, e.g.,
supra pages 50-51.

the DOJ Memos to justify unqualified presidential protection from any form of criminal process. But on deeper scrutiny of the rationale for the categorical doctrine, and by constructing alternatives that eliminate or substantially mitigate even the most extreme fears conjured, the assumptions underlying the categorical rule may prove both unjustified and wrong.

In fact, not every criminal proceeding to which a President may be subjected would raise the grim specters the DOJ Memos portray as incapacitation of the President, as impeding him from discharging official duties, or as hamstringing "the operation of the whole governmental apparatus." Dixon Memo at 30. To be sure, some crimes and some criminal proceedings may involve very serious offenses that undisputably may demand the President's full personal time, energy, and attention to prepare a defense, and that consequently could justify recognition of broader immunity from criminal process in the particular case.

Nonetheless, not every criminal offense falls into that exceptional category. Some crimes may require months or even years to resolve, while others conceivably could be disposed of in a matter of days, even hours. To be specific, perhaps a charge of murder and imprisonment upon conviction would present extraordinary circumstances raising the burdens and

interferences the DOJ Memos describe and thus justify broad immunity. But a charge of failing to pay state taxes, or of driving while intoxicated, may not necessarily implicate such concerns. Similarly, responding to a subpoena relating to the conduct of a third party, as is the case here, would likely not create the catastrophic intrusions on the President's personal time and energy, or impair his ability to discharge official functions, or threaten the "dramatic destabilization" of the nation's government that the DOJ Memos and the President depict. See Dixon Memo at 29 (acknowledging that "[t]he physical interference consideration . . . would not be quite as serious regarding minor offenses leading to a short trial and a fine," and that "Presidents have submitted to the jurisdiction of the courts in connection with traffic offenses"). See also, Moss Memo at 254 (acknowledging that "[i]t is conceivable that, in a particular set of circumstances, a particular criminal charge will not in fact require so much time and energy of a sitting President so as materially to impede the capacity of the executive branch to perform its constitutionally assigned functions.").

As regards public stigma, vilification, and loss of stature associated with criminal prosecutions, again some criminal offenses undoubtedly could engender such

60

consequences and would warrant significant weight in assessing a claim of immunity from criminal process, but others would not. Indeed, some civil wrongs, such as sexual harassment, could arouse much greater public opprobrium and cause more severe mental anguish and personal distraction than, for example, criminal possession of a marijuana joint. Moreover, as Paula Jones's lawsuit against President Clinton illustrated, civil charges of sexual misconduct filed against a sitting President could entail an extensive call on a President's time and energy, and potentially interfere with performance of official duties,[16] perhaps to a greater degree than some criminal charges that could be more readily resolved. And not every crime and not every conviction necessarily results in a sentence requiring imprisonment.

In a similar vein, a criminal accusation involving the President alone cannot be considered in the same light as one entailing unlawful actions committed by other persons that in some way may also implicate potential criminal conduct by the President. This circumstance presents unique implications that demand recognizing and making finer distinctions. A grand jury investigation of serious unlawful acts committed

---

[16] See Clinton, 520 U.S. at 701-02 ("As a factual matter, [President Clinton] contends that this particular case -- as well as the potential additional litigation that an affirmance . . . might spawn -- may impose an unacceptable burden on the President's time and energy and thereby impair the effective performance of his office.").

by third persons may turn up evidence incriminating the sitting President. It would create significant issues impairing the fair and effective administration of justice if the proceedings had to be suspended or abandoned because the President, invoking absolute immunity from all criminal investigations and grand jury proceedings, refused to provide critical evidence he may possess that could, either during the investigation or at later proceedings, convict or exonerate any of the co-conspirators. In that instance, the President's claim of absolute immunity conceivably could enable the guilty to go free, and deprive the innocent of an opportunity to resolve serious accusations in a court of law.

The running of a statute of limitations in favor of the President or third persons during the period of immunity presents additional complexities and exceptional circumstances in these situations, similarly raising the prospect of frustrating the proper administration of justice.

A hypothetical combining all of these difficulties may illustrate how a real and compelling set of facts could undermine a blanket invocation of presidential immunity from all criminal process. Suppose that during the course of a criminal investigation of numerous third persons engaged in very serious crimes, some of the targets being high-ranking government officials, substantial evidence is uncovered

indicating that the President was closely involved with those other persons in committing the offenses under investigation. The accusations come to light not long before the President's term is about to expire, leaving no time for the House of Representatives to present articles of impeachment, nor for the Senate to conduct a trial. But the applicable statute of limitations is also about to expire before the President leaves office.

On these facts, no persuasive argument could be made that an indictment of the President while in office, along with the co-conspirators -- thereby tolling the statute of limitations -- would present the severe burdens and interferences with the discharge of the President's duties that the DOJ Memos interpose. Balanced against the prospect of a number of powerful individuals going free and escaping punishment for serious crimes by virtue of the President asserting absolute immunity from criminal process, an alternative that would allow the indictment and prosecution to proceed under these circumstances may weigh against recognizing a categorical claim of presidential immunity.

The Dixon Memo acknowledges the special difficulties that criminal proceedings involving co-conspirators and statute of limitations problems present. See Dixon Memo at 29, 32, 41. In response, the Dixon Memo dismisses such

concerns as not sufficient to overcome the argument in favor

of the President's absolute immunity. See id. On that point,

the Dixon Memo remarks: "In this difficult area all courses

of action have costs and we recognize that a situation of the

type just mentioned could cause a complete hiatus in criminal

liability." Id. at 32. But failure to do full and fair justice

in any case should not be shrugged off as mere collateral

damage caused by a claim of presidential privilege or

immunity. If in fact criminal justice falls to an assertion

of immunity, that verdict should be an absolutely last resort.

It should be justified by exacting reasons of momentous public

interest such as national security, and be reviewable by a

court of law. Above all, its effect should not be to shield

the President from all legal process, especially in

circumstances where it may appear that a claim of generalized

immunity is invoked more on personal than on official grounds,

and work to place the President above the law. See Nixon, 418

U.S. at 706 (holding that "[a]bsent a claim of need to protect

military, diplomatic, or sensitive national security

secrets," a generalized interest in protecting the

confidentiality of presidential communications in the

performance of the President's duties must yield to the

adverse effects of such a privilege on the fair administration

of justice). As the Nixon Court declared under pertinent

circumstances, "[t]he impediment that an absolute unqualified privilege would place in the way of the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions would plainly conflict with the function of the courts under Art. III." Id. at 707; see also Clinton, 520 U.S. at 708. Here, this Court is not persuaded that the President has met this rigorous standard.

b. Constitutional Text and History

The Court finds that the structure of the Constitution, the historical record, and the relevant case law support its conclusion that, except in circumstances involving military, diplomatic, or national security issues, a county prosecutor acts within his or her authority -- at the very least -- when issuing a subpoena to a third party even though that subpoena relates to purportedly unlawful conduct or transactions involving third parties that may also implicate the sitting President. No other conclusion squares with the fundamental notion, embodied in those sources, that the President is not above the law.

Turning first to the text of the Constitution and the historical record, the Court concludes that neither the Constitution nor the history surrounding the founding support as broad an interpretation of presidential immunity as the one now espoused by the President. As the Supreme Court did

in Clinton, this Court notes that the historical record does
not conclusively answer the question presented to the Court:

> Just what our forefathers did envision, or would have
> envisioned had they foreseen modern conditions, must be
> divined from materials almost as enigmatic as the dreams
> Joseph was called upon to interpret for Pharaoh. A
> century and a half of partisan debate and scholarly
> speculation yields no net result but only supplies more
> or less apt quotations from respected sources on each
> side . . . . They largely cancel each other.

Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 634-35
(1952).

### c. Supreme Court Guidance

Turning to the opinions issued by the Supreme Court,
the Court finds that they support this Court's conclusions in
this action. The Supreme Court has twice recognized that "[i]t
is settled law that the separation-of-powers doctrine does
not bar every exercise of jurisdiction over the President of
the United States." Clinton, 520 U.S. at 705 (quoting
Fitzgerald, 457 U.S. at 753-54). "[I]t is also settled that
the President is subject to judicial process in appropriate
circumstances." Id. at 703.

The narrower part of the judicial process that is at
issue in this action -- i.e., responding to a subpoena -- has
similarly been addressed by the Supreme Court. That Court
squarely upheld the view first espoused by Chief Justice
Marshall, who presided over the trial for treason of Vice

President Aaron Burr while in office, that "a subpoena duces tecum could be directed to the President." Id. at 703-04; accord Nixon, 418 U.S. at 706 ("[N]either the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances."); see also Nixon v. Sirica, 487 F.2d 700, 709-10 (D.C. Cir. 1973) ("The clear implication is that the President's special interests may warrant a careful judicial screening of subpoenas after the President interposes an objection, but that some subpoenas will nevertheless be properly sustained by judicial orders of compliance.") (en banc) (per curiam).

And at least one President (Richard M. Nixon) has himself conceded that he, as President, was required to produce documents in response to a judicial subpoena: "He concedes that he, like every other citizen, is under a legal duty to produce relevant, non-privileged evidence when called upon to do so." Sirica, 487 F.2d at 713. If a subpoena may be directed to the President, it follows that a subpoena potentially implicating private conduct, records, or transactions of third persons and the President may lawfully be directed to a third-party.

The Court cannot square a vision of presidential immunity that would place the President above the law with the text of the Constitution, the historical record, the relevant case law, or even the DOJ Memos on which the President relies most heavily for support. The Court thus finds that the President has not demonstrated a likelihood of success on the merits and is accordingly not entitled to injunctive relief in this action. Contrary to the President's claims, the Court's conclusion today does not "upend our constitutional design." (Pl.'s Reply at 4.) Rather, the Court's decision upholds it.

   d. Alternatives

The questions and concerns the DOJ Memos present, and that the President here embraces, need not inexorably lead to only one course, that of prescribing an absolute immunity rule. In fact, the Supreme Court has provided guidance to govern invocations of absolute immunity. In Clinton it declared that such claims should be resolved by a "functional" approach. Specifically, the Court counseled that "an official's absolute immunity should extend only to acts in performance of particular functions of his office." Clinton, 520 U.S. at 694. The court further explained that "immunities are grounded in 'the nature of the function to be performed, not the identity of the actor who performed it.'" Id. at 695

(quoting Forrester v. White, 484 U.S. 219, 229-30 (1988)).
Underscoring this point, the Court concluded that "we have
never suggested that the President, or any other official,
has an immunity that extends beyond the scope of any action
taken in an official capacity." Clinton, 520 U.S. at 694.

The DOJ Memos, while espousing a categorical
presidential immunity rule, and perhaps seeming inconsistent
on this point as well,[17] also recognize the applicability of
such a method. The Dixon Memo, for instance, concludes that

> under our constitutional plan it cannot be said either
> that the courts have the same jurisdiction over the
> President as if he were an ordinary citizen or that the
> President is absolutely immune from the jurisdiction of
> the courts in regard to any kind of claim. The proper
> approach is to find the proper balance between the normal
> functions of the courts and the special responsibilities
> and function of the Presidency.

Dixon Memo at 24.

In the few instances in which the Supreme Court has
addressed questions concerning the scope of the President's
assertion of executive privilege and immunity from judicial
process, albeit in varying contexts, several general
principles and a functional framework emerge from the Court's

---

[17] The Dixon Memo, for example, though remarking that an alternative of
permitting an indictment of a President and deferring trial until he is
out of office is a course worthy of consideration, rejects the option in
favor of a categorical rule. The Dixon Memo also admits to "certain
drawbacks" of an absolute immunity doctrine. Similarly, the memo
acknowledges the difficulties that a categorical rule presents because of
issues such as the running of the statute of limitations and the
involvement of co-conspirators, but again discounts those concerns to
support a categorical rule. See Dixon Memo at 17, 32.

pronouncements that should inform and guide adjudications of such claims. A synthesis of Burr, Nixon, Fitzgerald, and Clinton suggests that the Supreme Court would reject an interpretation and application of presidential powers and functions that would "sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances." Nixon, 418 U.S. at 706. Rather than enunciating such a categorical rule, the Supreme Court's guidance suggests that courts take account of various circumstances that may bear upon a court's ultimate determination concerning the appropriateness of a claim of presidential immunity from judicial process relating to a criminal proceeding.

Among the relevant considerations are: whether the events at issue involve conduct taken by the President in an a private or official capacity; whether the conduct at issue involved acts of the President, or of third parties, or both; whether the conduct of the President occurred while the President was in office, or before his tenure; whether the acts in dispute related to functions of the President's office; whether a subpoena for production of records was issued against the President directly or to a third person; whether the judicial process at issue involves federal or state judicial process; whether the proceedings pertain to a

civil or criminal offense; whether the enforcement of the particular criminal process concerned would impose burdens and interferences on the President's ability to execute his constitutional duties and assigned functions; and whether the effect of the President's asserting immunity under the circumstances would be to place the President, or other persons, above the law.

The analytic framework the Supreme Court counsels courts to employ requires a balancing of interests. The assessment would consider the interest of the President in protecting his office from undue burdens and interferences that could impair his ability to perform his official duties, and the interests of law enforcement officers and the judiciary in protecting and promoting the fair, full, and effective administration of justice.

The relevance of these multiple considerations in a determination of the appropriateness of presidential immunity from criminal process under such varying circumstances underscores the incompatibility of an unqualified, absolute doctrine, and, rather than a blanket application; points to a case-by-case approach in which a demonstration of

sufficiently compelling conditions to justify presidential exemption is made by the courts.[18]

Here, the Court's weighing of the competing interests persuades it to reject the President's request for injunctive relief. The interest the President asserts in maintaining the confidentiality of certain personal financial and tax records that largely relate to a time before he assumed office, and that may involve unlawful conduct by third persons and possibly the President, is far outweighed by the interests of state law enforcement officers and the federal courts in ensuring the full, fair, and effective administration of justice.

The Court is not persuaded that the burdens and interferences the President describes in this case would substantially impair the President's ability to perform his constitutional duties. See Clinton, 520 U.S. at 705 ("The burden on the President's time and energy that is a mere byproduct of [judicial] review surely cannot be considered as onerous as the direct burden imposed by judicial review and the occasional invalidation of his official actions."). In

[18] The Moss Memo mentions such a course in passing, reiterating its support for a categorical rule "rather than a doctrinal test that would require the court to assess whether a particular criminal proceeding is likely to impose serious burdens upon the President.") Moss Memo at 254. This point ignores that it was precisely this kind of assessment that the Supreme Court conducted in Nixon and Clinton, and that more generally courts routinely make in the course of performing their constitutional duties.

the Court's view, frustration of the state criminal investigation under the facts presented here presents much greater concerns that overcome the President's grounds for not complying with the grand jury subpoena.

### iii. The Public Interest

Given that the Court finds that the President would not suffer irreparable harm or succeed on the merits, it is unnecessary to consider whether the public interest would favor a preliminary injunction. Nevertheless, the Court notes that the public interest does not favor granting a preliminary injunction. As discussed above, grand juries are an essential component of our legal system and the public has an interest in their unimpeded operation. Manypenny, 451 U.S. at 243; see also United States v. Dionisio, 410 U.S. 1, 17 (1973) (referring to "the public's interest in the fair and expeditious administration of the criminal laws"); Branzburg v. Hayes, 408 U.S. 665, 688-90 (1972) (in a First Amendment case, referring to "the public interest in law enforcement and in ensuring effective grand jury proceedings" and noting that the principle that the public is entitled to every person's evidence "is particularly applicable to grand jury proceedings"); In re Sealed Case, 794 F.2d 749, 751 n.3 (D.C. Cir. 1986) (per curiam) (referring to "the weighty public

interest in the orderly functioning of grand juries and the judicial process").

### III. **ORDER**

For the reasons described above, it is hereby

**ORDERED** that the amended complaint of plaintiff Donald

J. Trump (Dkt. No. 27) is **DISMISSED** pursuant to the decision

of the United States Supreme Court in Younger v. Harris, 401

U.S. 37 (1971).

**SO ORDERED.**

Dated:      New York, New York
            7 October 2019

Victor Marrero
U.S.D.J.