J9P9TRUO

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     DONALD J. TRUMP ,
 3
                   Plaintiff,
 4
             v.                                19 CV 8694 (VM)
 5
     CYRUS R. VANCE, ET AL.,
 6
                   Defendants.
 7   ------------------------------x
                                       New York, N.Y.
 8                                     September 25, 2019
                                       9:30 a.m.
 9   Before:

10                       HON. VICTOR MARRERO

11                                              District Judge

12                            APPEARANCES

13   CONSOVOY MCCARTHY
     BY:  WILLIAM CONSOVOY
14        CAMERON NORRIS
                 -and-
15   MUKASEY FRENCHMAN & SKLAROFF
     BY:  MARC LEE MUKASEY
16               -and-
     LAW OFFICES OF ALAN S. FUTERFAS
17   BY:  ALAN SAMUEL FUTERFAS
          Attorneys for Plaintiff
18
     NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE
19        Attorneys for Defendant Cyrus R. Vance, Jr.
     BY:  CAREY R. DUNNE
20        SOLOMON SHINEROCK
          ALLEN VICKEY
21        JAMES GRAHAM
          CHRISTOPHER CONROY
22
     BLANK ROME
23        Attorneys for Defendant Mazars USA, LLP
     BY:  JERRY D. BERNSTEIN
24        INBAL PAZ GARRITY
          NICHOLAS TAMBONE
25        MICHAEL MULLMAN
```

J9P9TRUO

1          THE COURT:  Good morning.  Thank you.  Be seated.

2          This is a proceeding in the matter of Trump v. Vance,

3     et al.  It's docket no. 19 CV 8694.

4          Counsel please enter your appearances for the record.

5          MR. CONSOVOY:  Good morning, your Honor.  William

6     Consovoy on behalf of the president.  With me this morning from

7     my law firm is Cameron Norris.

8          MR. MUKASEY:  Good morning, your Honor.  Marc Mukasey

9     from Mukasey Frenchman & Sklaroff also for the president.

10          MR. FUTERFAS:  Good morning, your Honor.  Alan

11     Futerfas for the president as well.  Thank you.

12          MR. DUNNE:  Judge, Carey Dunne from the Office of the

13     New York County District Attorney.

14          MR. SHINEROCK:  Good morning, your Honor.  Solomon

15     Shinerock on behalf of the Office of the District Attorney.

16          MR. VICKEY:  Good morning, your Honor.  Alan Vickey on

17     behalf of the district attorney's office.

18          MR. GRAHAM:  Good morning, your honor.  James Graham

19     on behalf of the district attorney's office.

20          MR. CONROY:  Good morning.  Christopher Conroy on

21     behalf of the district attorney's office.

22          MR. BERNSTEIN:  Good morning, your Honor.  Jerry

23     Bernstein from Blank Rome LLP for Mazars USA LLP.

24          MS. GARRITY:  Good morning, your Honor.  Inbal Garrity

25     on behalf of Mazars USA LLP.

J9P9TRUO

1       MR. TAMBONE:  Good morning, your Honor.  Nick Tambone

2   from Blank Rome for defendant.

3       MR. MULLMAN:  Michael Mullman on behalf of Mazars LLP.

4       THE COURT:  Let me note that the Court received a

5   filing in this matter submitted last night on behalf of the

6   United States Attorney for this district and it is labeled

7   Statement of the United States in Support of Temporary

8   Restraining Order to Allow Time for the United States to

9   Consider Whether to Participate in this Proceeding.

10       This proceeding was initiated by submission from the

11   plaintiff seeking a restraining order to enjoin the enforcement

12   of a subpoena that was initiated and served by the district

13   attorney for the County of New York against one of the

14   defendants Mazars USA LLP.

15       Let me first ask whether the district attorney has

16   received a copy of the statement from the U.S. Attorney

17   regarding this matter and whether they may have a view as to

18   the appropriateness of the request from the U.S. Attorney.

19       MR. SHINEROCK:  Thank you, your Honor.

20       May I be heard on that discrete now if that's what you

21   wish?

22       THE COURT:  Yes.

23       MR. SHINEROCK:  We did receive the statement.  We were

24   surprised to receive the statement last night.  The statement

25   in effect requests additional delay of three weeks for

4

J9P9TRUO

1    resolution of this matter.  And while we recognize that the

2    U.S. Attorney's Office may wish to be heard here, we question

3    whether they should be heard to arrive at the eleventh hour and

4    request such a delay when the parties have, by agreement,

5    labored, as the Court has I'm sure, to prepare the emergency

6    relief motion for adjudication today.  That said, the statement

7    does not change our position that compliance should begin under

8    the auspices of grand jury secrecy.  No irreparable harm will

9    be done and for that matter while the U.S. Attorney's Office

10   may seek to be heard on the larger issues presented by the

11   lawsuit we don't feel that it's an appropriate impediment to

12   enforcement of the grand jury subpoena at this time.

13              THE COURT:  Thank you.

14              We will take the observation of the district attorney

15   into account and perhaps return to it later.

16              Let us begin this proceeding by addressing questions

17   of housekeeping or procedural ground rules for the conduct of

18   the hearing.  Thereafter we'll turn to substantive issues

19   presented by the moving papers and the arguments on the record

20   this morning.

21              First, let's go over questions of time limits.  I

22   believe that about 20 minutes for each side in the first

23   instance will be enough.  If you were in the Court of Appeals

24   Second Circuit you would probably be lucky to get fifteen

25   minutes.

J9P9TRUO

| 1 | Before explaining the approach that I plan to take to |
|---|---|

1        Before explaining the approach that I plan to take to

2   follow the management of the allocation of the time that I have

3   allotted, I will exercise the privilege and prerogative of the

4   bench to vent one of my pet peeves with a different practice

5   that is common among appellate judges, the United States

6   Supreme Court perhaps the worst offender in this regard.  I am

7   certain that this is a practice that most litigators deplore.

8   Taking a small measure of judicial license, I will give you a

9   fictional illustration of the problem.

10        Attorneys are scheduled for oral argument on a complex

11   legal question of grave consequences to the client, the lawyers

12   and to the public, and the matter at hand is one that could

13   potentially shape the pillars of the republic.  For this

14   purpose each the lawyers involved spends weeks or even months

15   preparing, refining, and rehearsing the presentation to the

16   court.  When they have the matter down pat, the argument is

17   then compressed to the second precisely within the 20-minute

18   timeframe that the court has given each side.  Then the

19   presentation begins.  Before the speaker finishes the first

20   sentence, a judge interrupts with a question.  Then another

21   judge jumps in now with a question, and then another, any one

22   of which may be entirely on a different issue.  The net effect

23   is to throw off course not only the attorney's timing but the

24   sequence, flow, and stride of their argument which in some

25   cases counsel can never recover because by the time the judge's

J9P9TRUO

1    questioning is over and the speaker can return to where the

2    argument left off the presiding judge reminds the attorney that

3    they have two minutes left to wrap up.

4           Accordingly, to make the amount of time that I have

5    specified for argument meaningful, I will do two things.

6    First, my general practice is to allow the parties to speak

7    without interruption for questions during at least the first

8    seven minutes of their arguments.  Second, coming back to the

9    purpose of this proceeding so as to focus the hearing on the

10   relevant questions and prevent rehashing of matters that you

11   already laid out in your papers as well as to minimize court

12   intrusion into your argument, I will highlight some threshold

13   issues which your presentation should concentrate on because I

14   regard them as potentially dispositive initial matters and

15   because some of them implicate jurisdictional questions.

16          First, this case entails a subpoena issued by a state

17   grand jury and panel in connection with an investigation

18   conducted by a New York County prosecutor.  I note that the tax

19   records and perhaps other financial documents that are the

20   subject of the district attorney's subpoena relate to years

21   going back to 2011.  That, of course, encompasses a period long

22   before this president assumed office.  In this connection,

23   several questions arise.

24          Do the tax returns and records covered by the district

25   attorney's investigation pertain to actions and transactions

J9P9TRUO

1    involving only the president or third persons and businesses

2    related to the president or to a combination of both acting in

3    concert?

4            Do the matters under the district attorney's

5    investigation relate to potential misconduct that arises only

6    under state law or only under federal law or under both state

7    and federal law?

8            To the extent any actions involving the president may

9    be involved, do they relate to his official acts or to private

10   conduct of the president as an ordinary citizen?

11           To what extent are the matters at issue subject to

12   statutory limitations that may soon expire as to the president

13   or as to third parties?

14           What is the constitutional or statutory source for the

15   relief sought and for this court to exercise jurisdiction to

16   hear the underlying dispute.

17           Is 42 U.S.C. Section 1983, as the president now claims

18   in an amended complaint, a proper vehicle for the adjudication

19   of this case in federal court as a declaration of rights,

20   privileges and immunity secured by the Constitution or is there

21   any relief that, if warranted, could not be accorded to the

22   president in a state court?

23           Second, another set of issues implicates principles of

24   federalism and comity.  The president is asking a federal court

25   to enjoin proceedings undertaken under authority of state law

J9P9TRUO

1    enforcement officers before institution of a state's

2    administration of justice.  Would the court granting the

3    injunctive relief requested violate the fundamental document

4    embodied in <u>Younger v. Harris</u> and the Anti Injunction Act

5    counseling against federal interference with ongoing state

6    legal prosecutions, civil enforcement proceedings or judicial

7    functions that involve important state interests.

8            Next, assuming the Court exercises jurisdiction to

9    consider the president's request for injunctive relief

10   restraining the enforcement of a grand jury subpoena, has the

11   plaintiff's application adequately satisfied the requisite

12   showing of irreparable harm and a likelihood of success on the

13   merits?

14           Regarding the first prong, the Court notes that the

15   subpoena issued by the grand jury is directed not at the

16   president but at a third party and that any documents produced

17   in compliance would be part of a confidential investigation

18   protected from public disclosure by the rule of grand jury

19   secrecy as the district attorney argues.  What is the real and

20   immediate threat of actual harm under these circumstances?

21           Regarding the likelihood of success on the merits, the

22   president's request rests on an implication of an absolute

23   immunity from indictment, prosecution, trial, or other

24   application of criminal process that, as claimed, would extend

25   not only to the president but to his private financial affairs

1   as well as those of his businesses and corresponding

2   associates.  Is there basis in the constitutional text, history

3   or judicial interpretation supporting such a proposition?

4        If the president why entitled to immunity from

5   criminal process, would that apply to responding to the request

6   for information during a criminal investigation involving not

7   only himself but third parties?

8        The president argues that the Department of Justice

9   and legal commentators agree that the president cannot be

10  subject to criminal process.  What is the definition of

11  criminal process?  Does it entail investigation, indictment,

12  prosecution, trial, imprisonment, or any one or combination of

13  these?

14       The president relies on a legal memorandum issued by

15  the Office of Legal Counsel in October of 2000.  That memo

16  itself says that a grand jury could continue to gather evidence

17  throughout the period of immunity even passing the task to a

18  subsequent grand juries.

19       Next, there is a question as to whether the president

20  can be subpoenaed and/or directed to respond to a subpoena.  In

21  this regard, there is precedent from the United States Supreme

22  Court and appellate courts.  In United States v. Nixon the

23  Court rejected a claim by the president of absolute privilege

24  based on separation of powers in relation to materials sought

25  related to the president's performance of duties of the

J9P9TRUO

president and involving disclosure of discussions between the

president and his aids.  The district attorney here in turn has

called to our attention conflicted historical evidence.  In

this regard, the historical record I believe is mixed at best

and perhaps you could get into some specifics later on that

point.

Let me conclude with another reference to a memorandum

issued by the Office of Legal Counsel on which the president's

presentation substantially relies.  That memorandum states,

"Thus, it appears that under our Constitution's plan it cannot

be said either that the courts have the same jurisdiction over

the president as if he were an ordinary citizen or that the

president is absolutely immune from the jurisdiction of the

courts in regards to any kind of claim.  The proper approach is

to find the proper balance between the normal functions of the

courts and the special responsibilities and functions of the

presidency."

With that as background let us then turn to the

presentations.  This matter having been initiated by the

president, you have the floor.

MR. CONSOVOY:  Thank you, your Honor.

Good morning, your Honor.  May it please the Court.

Thank you for hearing us this morning on this expedited

schedule.

If I might begin with a few procedural points and then

J9P9TRUO

1    I will turn to the Court's questions and answer them as best I

2    can.

3              From the perspective of the president, we are not here

4    this morning seeking a permanent resolution of this dispute nor

5    are we asking the court to enter a preliminary injunction this

6    morning although that is certainly an option the court, of

7    course, has.  What the president is asking for this morning is

8    what Congress has twice agreed to and what the New York

9    Attorney General has once agreed to in similar cases that are

10   pending now, which is an orderly process that allows the

11   serious constitutional questions to be adjudicated carefully

12   and thoughtfully that preserves the president's right to be

13   heard and allows him a reasonable chance to appeal any adverse

14   decision that might alter the status quo.  That is a quite

15   limited relief that will allow what I believe are concededly

16   serious questions to be adjudicated.  It affords the U.S.

17   Attorney the opportunity to be heard which has now been sought

18   in a week and eliminates the need for emergency appeals as

19   early as this afternoon to the appellate courts in order to

20   preserve the status quo.  If that is what is sought, then I

21   think that limited showing has easily been made by the

22   president's papers.

23             The Court asked a series of questions about the case,

24   the first set dealing with questions that, in all candor, the

25   president can't answer, which is the nature of the

J9P9TRUO

1    investigation, what is being sought, and why it's being sought,

2    and what's being pursued.  The first paragraph of the

3    declaration submitted was redacted.  The president has no

4    access to it.  And so we look forward to the answers by my

5    friend from the district attorney's office that would provide

6    more insight into the nature of the inquiry.

7            What we do know, your Honor, is the subpoena that was

8    sent to Mazars is in all respects a carbon copy of a subpoena

9    that the House Oversight Committee sent to Mazars earlier this

10   year which is now the subject of parallel litigation.

11           The idea that this office's investigation perfectly

12   replicates an Oversight Committee investigation, plus it just

13   so happens to want one additional thing which are the tax

14   returns that the Ways and Means Committee sought can't be a

15   coincidence.  The notion that their investigation or state law

16   perfectly parallels what is claimed to be a federal

17   investigation about federal issues ranging on emoluments to

18   other matters somehow is exactly what this office in good faith

19   needs to pursue a state law investigation is difficult to

20   accept.

21           But the big question, as your Honor pointed out, is

22   whether the president can make a four-factor test for a

23   temporary restraining order or a preliminary injunction.  We

24   think we do.

25           Your Honor asked about the nature of the

J9P9TRUO

1   constitutional claim here.  We believe it's brought under

2   Article II, under the Supremacy Clause, and under the structure

3   of the Constitution itself, no different than many cases that

4   are brought under the Constitution.  The cases -- many cases

5   vindicate separation of powers in this matter.  Appointment of

6   clause cases do.  Cases like Printz do.  Many, many cases.

7   1983 is an available vehicle.  This is a right the president

8   holds and a privilege the president holds under the

9   Constitution, as alleged.  And we're simply at the allegation

10  stage of this case.  He is alleging that his right to temporary

11  immunity, which is what the Office of Legal Counsel has called

12  it, while he is president, meaning he cannot be subject to

13  criminal process.  And I will endeavor to answer your question

14  about what that means as well, your Honor.  He cannot be

15  subject to criminal process while in office.  That doesn't

16  immunize him permanently.  It means that while he is the

17  commander in chief of our nation, 50 states can't decide that

18  they are going to investigate the president while he tries to

19  serve us as a country.  That is a job for Congress with

20  impeachment power, if it so chooses to exercise it.  That is

21  what the framers of our Constitution said.  That is what the

22  text of the Constitution provides.  And with all respect for my

23  friends I do not believe it is a close question.  The idea that

24  any state, New York or any other, could decide that they would

25  indict a sitting president, there is no support for that while

J9P9TRUO

1    he is president.  The framers said during the debates that once

2    the president was impeached and removed, if that were to occur,

3    then he would be subject to ordinary process.  The text of the

4    Constitution says it as well that once removed the courts could

5    have recourse to the president like any other citizen, but not

6    while he is in office.

7           Once that proposition is accepted, I think there are

8    proliferating consequences from it.  And I think the OLC memos

9    from 1973 and including the Bork amicus brief and the Agnew

10   case lay that out exactly.

11          Your Honor, if you look at that brief that we cite.

12   You're right, your Honor.  This is a balancing test.  And the

13   Office of Legal Counsel decided the vice-president was not like

14   the president for many reasons and, therefore, would not be

15   entitled to this type of immunity.  And one of the reasons that

16   brief gave, your Honor, was that the consequences would be

17   somewhat large because it might impede a grand jury

18   investigation.  There would be no point to saying that and

19   saying it differently about the president if that weren't how

20   the Office of Legal Counsel understood the Constitution to

21   function.

22          Even in Clinton v. Jones the Court Supreme Court drew

23   two important distinctions.  One, the Court said do not assume

24   that allowing a challenge of unofficial act in state court

25   would be permitted.  That's an open question.  And two, we are

J9P9TRUO

1  not here deciding today whether the president could be made to

2  appear in any particular place at any particular time or be

3  held in contempt.

4       But, your Honor, if you accept the proposition of the

5  district attorney's office, this is not just about a subpoena

6  for documents.  Those same powers could command the president

7  to appear at a particular place, at a particular time, could

8  hold him in contempt, two propositions that I think no Supreme

9  Court decision supports.

10       Your Honor asked about United States v. Nixon.  United

11  States v. Nixon was about a general confidentiality privilege

12  in regard to a third-party subpoena.  It was not a criminal

13  process directed at the president.  In fact, the Supreme Court,

14  in I believe footnote two or footnote three of that opinion,

15  went out of its way to note that the issues that are more

16  squarely presented here would not be decided there and

17  dismissed the crosspetition as improvidently granted.  So I do

18  not believe U.S. v. Nixon supports the district attorney's

19  position.  I think the Court's decision to avoid that question

20  more squarely supports the president's.

21       And I'm happy to return to the merits issues, your

22  Honor, as we proceed but I think it's important to remember

23  that the only question for the Court is whether this is a

24  serious question, whether the ability of the State of New York

25  to subpoena the president's documents from his custodian

J9P9TRUO

exceeds their power under the Constitution is a serious issue. They had every opportunity to say it wasn't.  The argument that it's been mixed is just another way of saying it's serious. And so then the question becomes who do the equitable factors favor in this action.

Your Honor noted that there is grand jury secrecy. But that's a matter of state law, your Honor.  We do not know how the district attorney will respond to a subpoena from Congress.  Would those secrecy laws trump that subpoena?  Would they supersede it?  Would they not comply with that subpoena? Is the New York legislature committing to not amending its laws to change those rules?  Because the president has experienced from the New York legislature amendment of state law designed specifically to target him.

I do not think the district attorney's office can make either promise.  And so the president, even on confidentiality, is in some jeopardy.

But I think there's a broader point, your Honor, which is any time the subject of an investigation is told to turn over their documents to the government and they are forced to do so the status quo is forever altered.

THE COURT:  Seven minutes of immunity from questions are up.

MR. CONSOVOY:  I appreciate the temporary immunity, your Honor.

J9P9TRUO

1          THE COURT:  So let me ask first.  You made reference

2     to Clinton, the Clinton case and you quoted what you thought

3     was an appropriate reference to by the Court.  In that case the

4     Court looked at the history of the constitutional convention,

5     summarized what it drew to be important points from it and then

6     stated far from being above the laws the president is amenable

7     to them in his private character as a citizen.  The quote

8     further said, "This description is consistent with both the

9     doctrine of president immunity as set forth in Fitzgerald..."

10    that's one of the Nixon cases "...and rejection of that

11    immunity as claimed in this case."  And you may recall that in

12    that case the president also invoked a blanket absolute

13    presidential immunity even from conduct that preceded the

14    presidency.  The Court then concluded, as you know, by stating

15    that the president is otherwise subject to the laws for his

16    purely private acts.

17          Now, I began by asking or noting that the documents

18    that the district attorney is seeking in this case relate back

19    to 2011 and encompasses a number of years in between and

20    encompasses potentially other individuals.  To the extent that

21    those documents going back to 2011 and then up to 2016 relate

22    to purely private acts, private transactions of the president,

23    to what extent is that not covered by the Clinton case?

24          MR. CONSOVOY:  I think it is not covered.  I think,

25    your Honor, because in the Clinton case the Court said it is

J9P9TRUO

1    dealing with a civil action, not a criminal action.

2              THE COURT:  We don't know.  In this case the district

3    attorney has not said that what he is seeking as it relates to

4    the president is a criminal investigation or maybe just

5    documents that may relate to a criminal investigation of third

6    parties.  That's not clear on this record.

7              MR. CONSOVOY:  That is true, your Honor.  Two points.

8    One, if this is not a criminal investigation I'd be interested

9    to hear that.

10             THE COURT:  I said criminal investigation of the

11   president.

12             MR. CONSOVOY:  That was my second point.

13             THE COURT:  As opposed to third parties.

14             MR. CONSOVOY:  The issue here is who the process is

15   directed at.  So -- and we stated in our papers -- let me

16   answer it two ways.  We stated in our papers that we believe

17   the president is a target of this investigation; that he is at

18   least partly the subject of it.  There was nothing in the

19   responsive papers that disclaim that understanding.  If it is

20   going to be fully disclaimed today that the president or his

21   businesses are not targets, if they are true third parties,

22   then that may create different questions.

23             THE COURT:  Let me interrupt.  Sorry.  You mentioned

24   the president or his businesses.  What do the businesses have

25   to do with presidential immunity?

J9P9TRUO

1      MR. CONSOVOY:  The immunity -- well, the point of the

2  immunity is to respect the office of the president.  If you

3  look at the original commentary by the framers, the reason why

4  the process was set up the way it was, was because when you

5  have a single commander in chief who deals with the world on

6  behalf of the nation it is important that, for foreign affairs

7  and domestic, that he be seen as having the full support of the

8  nation.  If there is going to be a problem, Congress through

9  impeachment will address that problem for the nation.  If by

10  attacking the president's businesses, by going after the

11  president through his businesses you implicate all of the same

12  interests that the framers were concerned about when they

13  drafted the Constitution the way they did.

14      THE COURT:  Are you suggesting that the businesses

15  could not as individual entities also engage in misconduct

16  including criminal conduct?

17          Let us suppose for a moment that one of the businesses

18  did not file taxes or falsified documents in the filing of

19  taxes, are you saying that that business, because it's part of

20  the president's financial matters are not subject to

21  prosecution for criminal conduct that occurred before the

22  president was president?

23      MR. CONSOVOY:  No.  As you said earlier, this a

24  balancing question.  And I think both the Supreme Court through

25  the two Nixon cases, in Clinton v. Jones, and in the Office of

J9P9TRUO

1   Legal Counsel memo has made clear -- and in the Bork memo too,

2   brief too, that the Court has to take each of these cases as it

3   finds them and try to balance between these two pillars.  And I

4   think what the Court would have to assure itself of is that

5   those actions by those businesses are not a means to target the

6   president and would not implicate the president in any finding

7   against those corporations.  That is why in the Nixon opinion

8   the Court went out of its way in the footnote to say it was

9   different about the unindicted coconspirator aspect of that

10  case and the truly third-party aspect of the disclosure of the

11  recordings to the grand jury.  The Court saw those as two --

12  even though the president was an unindicted coconspirator, that

13  same question could have been posed there.  Well not indicted,

14  these are just about third parties.  The Court saw that as

15  different.  Didn't decide it.  Completely agree.  But it saw it

16  as distinct.

17          And that raises the case here, which is if in a case

18  if the district attorney could show that it is targeting a

19  business that the president happens to own but in no way

20  seeking to target the president through that action would

21  implicate him in the wrongdoing, that might be a different

22  case.  But there has been no such assertion here, certainly not

23  in the papers that we've seen.  And so we do think the

24  interests are squarely implicated.  It is a -- your Honor, and

25  I would concede.  There is some breadth to that argument.  I

J9P9TRUO

1    readily concede that.

2            THE COURT:  It's a chicken-and-egg situation.  How

3    would the district attorney know that the businesses of the

4    president may have engaged in criminal conduct unless it

5    investigates.  But you're saying that they cannot investigate

6    because it may spillover into the president.

7            MR. CONSOVOY:  It's true.

8            THE COURT:  In the meantime, let's pose the other

9    issue.  What happens if it's a statute of limitations about to

10   expire?  Does that mean that the business in effect gets off

11   scot-free?  Riding on the president's coattails?

12           MR. CONSOVOY:  So if I could take those two

13   separately.

14           On the chicken or egg thing, somebody has to bear the

15   burden.  When you have structural constitutional principles,

16   inevitably there will be close cases where one party has to

17   bear the burden of proof.  In this situation where we're

18   dealing with Article II of the Constitution, which is unique

19   from all branches, when you're dealing with an office that is

20   unique among all offices and you have a supremacy clause, the

21   district attorney would have to bear the burden of convincing

22   the court that this could in no way implicate the president.

23   That was the point that the Bork memo made in the Agnew case.

24   That was why the Office of Legal Counsel drew the circle in pen

25   only around the presidency, not around the vice-presidency, not

J9P9TRUO

1    around the judiciary, and not around other civil officers

2    because the office understood that there could be some broader

3    implications about those -- the ability to go after people

4    either related to the president or involved with the president

5    and that is the cost of having a unitary executive.  That is

6    the choice the framers of our Constitution made.

7         Secondly, on statute of limitations, your Honor, as

8    the Office of Legal Counsel noted, it's an open question.

9    New York legislature can solve the problem itself by extending

10   limitations periods.  It's possible that we could agree to

11   tolling in order to litigate these issues and resolve this.

12        THE COURT:  Would that raise any possible ex-post

13   questions?

14        MR. CONSOVOY:  Well I think how they do it matters of

15   course.  You have to -- they would have to generally extend the

16   limitations period.

17        But my point is that the legislature is not without

18   redress.  What the Office of Legal Counsel said -- and I think

19   the Court would have to reject the opinion to conclude

20   otherwise -- which is even if that's true, even if limitations

21   periods will expire, even if people who are affiliated with the

22   president, it is more difficult to prosecute them, the cost to

23   the nation of allowing this to occur outweigh the rights of the

24   states in this narrow setting.

25        Your Honor, I think if we're going to address this

1    practically, whatever the Court rules, if the Court rules that

2    the district attorney can do this, then all 50 states can do

3    this for any of unofficial action the president took before the

4    presidency, during the presidency.  That is untenable.  The

5    notion that 50 states could decide together we don't like this

6    president or we're going to assert our rights and do that is

7    inappropriate under our Constitution.

8            THE COURT:  In reality our country has been in

9    existence since 1789.  How frequently has it happened that 50

10   states have conspired to somehow undermine the presidency?  How

11   likely is it that that might -- scenario might occur?

12           MR. CONSOVOY:  I actually think -- it not happening I

13   think actually supports us, your Honor, in that I don't think

14   anybody even considered this possibility.  I think it is so

15   well settled the idea that a state could indict and then

16   charge, arrest, detain a sitting president is so beyond the

17   pale constitutionally that before today I'm not sure a state

18   would have considered it.  If your Honor endorses what the

19   district attorney has done here, I do not think it's

20   unrealistic to think that future presidents may experience a

21   far wider range of challenges by states than our country has

22   ever experienced before.

23           THE COURT:  Let's take the case of Vice-President

24   Burr.  Would it have been envisioned in 1789 that a state would

25   indict a vice-president?

J9P9TRUO

1          MR. CONSOVOY:  I think -- actually yes.  When you look

2     at the history of the convention, and the Bork memo actually

3     walks through this, all of the discussions around protection

4     were about the presidency.

5          Now, obviously, Burr shooting Hamilton was unexpected

6     in and of itself.  And the case in Burr -- actually, your

7     Honor, I was looking at this last night -- was actually

8     interesting because I think it has been misdescribed.  There

9     were two state prosecutions with Burr.  And then there was the

10    treason charge brought by Jefferson.  The subpoena issued there

11    was in response, if you look at the Bybee memo that we cite the

12    article -- the subpoena there was issued by Burr for

13    exculpatory evidence.  And what Chief Justice Marshall held was

14    that having initiated the treason charge effectively the

15    presidency had waived the right to object to a subpoena in that

16    case.  That is, of course, far afield from here.

17         So to answer your question directly I think it was --

18    yes, it was contemplated that a vice-president could be

19    prosecuted.  There is no contemplation about the presidency

20    though.  Because the country can persist without a

21    vice-president.  A president subject to proceedings in a state

22    court, the distraction that would create, the multitude of

23    problems that could arise are unique and different in both

24    degree and kind from anything that would attend to a proceeding

25    against the vice-president.

J9P9TRUO

1          Your Honor, on the irreparability issue, again, that

2     argument, that secrecy defeats irreparability would then

3     therefore apply to any citizen who is subject to a subpoena if

4     they wanted to assert their Fourth Amendment rights, their

5     Fifth Amendment rights or any other right.  The idea that they

6     have nothing to worry about because, don't worry, it's only

7     going to be shown to the district attorney and the grand jury

8     so why should you care about whether it's disclosed I think is

9     an unfortunate way to think about constitutional rights

10    vis-a-vis the exercise of government power and an unfair way to

11    think about it.  Again, those laws could be changed.  That

12    secrecy is not guaranteed.  And the status quo would be forever

13    altered.

14          Moreover, the president has a confidentiality right to

15    his accounts.  Once this disclosure is made that

16    confidentiality right is forever lost.  And we've cited pages

17    of cases supporting the proposition that breach of

18    confidentiality can never be repaired later.

19          In contrast, the only issue on exigency that the

20    district attorney raises is the statute of limitations question

21    that we don't know, we can't even test because we haven't seen

22    the aspects of the declaration that talk about what is being

23    investigated, what those limitation periods might be and

24    whether they can be tolled.

25          THE COURT:  Let me give you another minute to wrap up.

1          MR. CONSOVOY:  Yes.  What I didn't touch on was

2     Younger and Anti Injunction Act, so if I could just briefly do

3     that, your Honor.  Anti Injunction Act is quite simple.  One,

4     it's strictly inapplicable to 1983 claims.  We have stated a

5     1983 claim.  We are still at the motion-to-dismiss stage.

6     Mitchum is clear law on that, which is why we do not see the

7     Anti Injunction Act raised very frequently anymore in

8     litigation because so many cases are 1983 cases.  It's also

9     inapplicable because this is a case brought by the national

10    government through the presidency and the act is inapplicable

11    there.  Younger is definitely inapplicable here, your Honor.

12    We've cited four reasons.  I don't think any of them can be

13    refuted.

14          The Third Circuit has persuasively explained why this

15    is not an ongoing state court proceeding.  What the district

16    attorney wants the president to do is initiate a new proceeding

17    and a motion to quash in state court.  The Supreme Court has

18    said there is no duty, especially under 1983, to exhaust by

19    initiating a new action in state court.  Even if that were not

20    true, there is no obvious vehicle for the president to

21    vindicate his rights as a third party in state court.  We found

22    case law suggesting it might not be available.  We have seen no

23    authority from the district attorney suggesting otherwise.

24    And, moreover, this is not the kind of case that belongs in

25    state court.  This is a federal constitutional action brought

J9P9TRUO

1        by the president.

2                The Ninth Circuit has explained, for example, in

3        double jeopardy.  The whole point of double jeopardy is not to

4        have to go through the state system twice.  And so Younger was

5        held inapplicable to that kind of Sixth Amendment argument for

6        the same reasons that temporary immunity -- that's the Office

7        of Legal Counsel's phrase, temporary immunity -- should not be

8        litigated in state court.  This a question for federal court.

9                THE COURT:  Thank you.

10               You've on numerous occasions made reference to the

11       debates and the constitutional convention and the

12       constitutional history about the powers of a president and

13       immunities.  I'm sure that the district attorney will also

14       invoke history and the founders and the framers and

15       commentators.  Let me on that point address a point to both

16       sides that in the Youngstown Steel case Justice Jackson

17       described that when confronted with the issue concerning the

18       dimensions of the president's powers said, "Just what our

19       forefathers did envision, or would have envisioned had they

20       foreseen modern conditions, must be divined from materials

21       almost as enigmatic as the dreams Joseph was called upon to

22       interpret for Pharaoh.  A century-and-a-half of partisan debate

23       and scholarly speculation yields no end results but only

24       supplies more or less apt quotations from respective sources on

25       each side.  They largely cancel each other out."

J9P9TRUO

1        All right.  Thank you.  I will now call upon the

2    district attorney's representative.

3        MR. SHINEROCK:  Thank you, Judge.

4        Again, my name is Solomon Shinerock.  I'm an assistant

5    district attorney representing defendant Cy Vance in this

6    matter.  I'm joined at counsel table by the District Attorney's

7    general counsel, Carey Dunne, who may also seek leave to

8    address the Court this morning.

9        Before I begin I'd like to just take a moment to walk

10   through in a procedural way some of the various requests now

11   pending before the Court.  I earlier addressed the Court

12   regarding last night's request from the DOJ and the U.S.

13   Attorney's Office, and I say something similar with respect to

14   the request for some sort of stay which was made in the

15   plaintiff's filing of last night.  Having agreed to a briefing

16   schedule which would speed this matter up for adjudication

17   today, we find it strange that they now assume the Court needs

18   more time to decide the emergency relief motion.  In our view,

19   that is a tacit recognition that they have failed to satisfy

20   their burden under that standard and are nonetheless seeking to

21   effect an end run around that failure by somehow pulling out at

22   random regardless to the question of this stay.  For that

23   reason we believe a request for a continued stay should be

24   rejected.

25       The reason for our urgency, Judge, rests on really two

J9P9TRUO

1    concerns.  First, there is the sitting grand jury which is

2    impeded in the discharge of its duties by the delay occasioned

3    by this litigation raising questions regarding, as your Honor

4    referenced, statutes of limitation as well as the degradation

5    of available evidence.

6          But perhaps more fundamentally our very presence here

7    in an official capacity, as much as we're glad to be in front

8    of your Honor, our very presence here offends the principles of

9    comity underlining our federalism and Younger abstention

10   doctrine.  For that reason we believe this matter should be

11   adjudicated, if at all, in the state court.  And that leads

12   us -- that leads me now to our motion to dismiss should the

13   Court choose to accept that motion, we believe it should be set

14   for expedited briefing so that this matter can be fully and

15   quickly resolved for the reasons I just gave.

16         Before I get to the substance of our argument on the

17   matter before the Court today I would just like to try to

18   address some of the Court's questions related to the subpoena

19   itself and the investigation to the extent that I can do that

20   without revealing grand jury's materials, which I believe I

21   can.  The subpoena is public and obviously making it public is

22   the right of the recipient, Mazars, and the plaintiff here.  So

23   what I will say in response to your question is that it

24   certainly calls for documents that pertain both to the

25   president but also to a broad range of third party entities and

1   individuals.  Those documents certainly pertain to potential

2   issues under state law.  They may also relate to issues under

3   federal law or federal criminal law.  That's not our focus.

4   Our exclusive focus is on the state criminal law in this

5   investigation.

6          With respect to your question on the statute of

7   limitations, all I will say is that as with all criminal

8   charges there are statute of limitations issues and certainly

9   those are implicated by the type of delay that this litigation

10  threatens.

11         With respect to the contents of the subpoena, I'd like

12  to address counsel's comments regarding similarity to the House

13  Committee's subpoena to Mazars.  And what I can say is that I

14  have had no contact with that committee in the context of this

15  investigation or any other.  I engaged in a search for publicly

16  available information, identified that subpoena.  And unable to

17  very much improve upon it, thought it would be efficient to use

18  it.  But there is another reason that was important.  When

19  Mazars or any party receives a subpoena of this nature it

20  generates quite a bit of workflow in identifying and gathering

21  the documents collected.  The subpoena that had already been

22  served on them hopefully started that process and our view is

23  that we would gain some efficiency in having them work through

24  that process because it also mirrored certainly the scope of

25  what we needed from Mazars.  The contention that somehow that

J9P9TRUO

1   means our investigation is coextensive with the investigation

2   of the House Committee I think is not supported by this issue.

3           So, I'd now like to turn to the substance of our

4   position on the motion for emergency relief.  We have addressed

5   in the brief the questions of the broad presidential immunity

6   that has been claimed by the plaintiff in this case.  As tricky

7   as they are, they need not be addressed by the Court to resolve

8   this matter because this Court's decision can and should rest

9   entirely on the principles underlining Younger abstention which

10  we believe disposes entirely of the case.

11          There is little question that a preindictment grand

12  jury investigation qualifies as an ongoing state criminal

13  prosecution as that term has been used in this Court's

14  abstention analysis.  The Third Circuit case that the

15  plaintiffs have referenced is an outlier and has obviously been

16  disagreed with by subsequent cases in the Fourth Circuit, the

17  Eighth Circuit and the Fifth Circuit as recently as 2004, not

18  to mention by decisions of this Court which we cite in the

19  brief, a Judge Lynch decision in 2007 affirming that a grand

20  jury subpoena constitutes a state criminal proceeding for

21  abstention purposes.  Judge Wood has a similar decision in 2007

22  as well.

23          There is no question that such a proceeding implicates

24  important state interests.  And this Court has held on multiple

25  occasions that New York state courts present an adequate forum

J9P9TRUO

1    for the litigation of any constitutional issues arising from

2    such a state proceeding.

3           There is no credible claim here to either irreparable

4    harm, harassment, bad faith, or other equitable principle that

5    would defeat the strong policy favoring abstention in cases

6    like this one.  We've demonstrated the bona fides of our grand

7    jury investigation which I think is more than we're called on

8    to do.  The burden here rests on the plaintiff and their claims

9    of harassment and bad faith are speculative and unfounded in

10   the record.

11          The subpoena at issue relates to records that are

12   routinely subpoenaed.  And the identity of one of the

13   individuals whose records are implicated by the subpoena,

14   namely the president, should not impact the Court's application

15   of otherwise status-neutral laws.

16          THE COURT:  Mr. Shinerock, in relation to your <u>Younger</u>

17   argument, as you undoubtedly know, <u>Younger</u> was either

18   clarified, modified, and some people say narrowed by the <u>Sprint</u>

19   case.  To what extent do you believe that <u>Sprint</u> in any way

20   addresses or narrows your argument?

21          MR. SHINEROCK:  Your Honor, we cite the <u>Sprint</u> case in

22   our brief and our view is that while it may have narrowed the

23   reach of <u>Younger</u> in other contexts, in fact, it affirmed that

24   <u>Younger</u> is appropriately applied and federal courts ought to

25   abstain in criminal, state criminal proceedings.  And we submit

J9P9TRUO

1    that this is exactly the type of case which is appropriate for

2    <u>Younger</u> abstention consistent with the <u>Sprint</u> decision.  As my

3    colleagues have passed me a passage from the <u>Sprint</u>

4    <u>Communications</u> case, which I think directly addresses your

5    question.  It says, "<u>Younger</u> exemplifies one class of cases in

6    which federal court abstention is required.  When there is a

7    parallel pending state criminal proceeding federal courts must

8    refrain from enjoining the state prosecution."  That's on page

9    72 of the decision.  And as I've said, courts -- judges in this

10   court have found the issuance of a criminal grand jury subpoena

11   to constitute state criminal proceedings for abstention

12   purposes.

13           The plaintiffs fair no better on the merits of their

14   application for a preliminary injunction.  There is no

15   likelihood of success here.  As I think your Honor has pointed

16   out and I won't belabor, they have no authority for the

17   breathtaking grant of immunity that they seek.

18           The <u>Nixon</u> and <u>Sirica</u> cases, as your Honor pointed out,

19   do stand for the proposition that a subpoena may be enforced

20   against a president.  Their position, if accepted, would create

21   a nonjusticiable rule opening federal courts to anyone with a

22   state or federal grand jury subpoena to challenge that subpoena

23   on the basis of some claim, association, or affiliation with

24   the president.  And I don't think that's a workable rule.

25           I would point out too that the legitimacy of their

1   claim to immunity with respect to the Mazars subpoena is belied

2   by their failure to claim the same immunity with respect to the

3   subpoena issued to the Trump Organization itself.  They've

4   complied in part with that subpoena, as they have complied in

5   other criminal investigations to date and at a minimum failed

6   to raise these same broad immunity arguments in the context of

7   those investigations and so I think the Court has to question

8   closely why they are raising these claims now in the context of

9   the Mazars subpoena.

10          The true risk of harm here falls on the state judicial

11  process and on the specific grand jury now impanelled and

12  investigating these matters.

13          THE COURT:  Mr. Shinerock, on that point, the

14  investigation that you've alluded to clearly is very complex,

15  probably has a lot of difficult meanings, involves a lot of

16  parties, extends over many, many years.  To what extent is the

17  grand jury sitting on its hands because they don't have the

18  material from this proceeding or is there nothing else that

19  they could do in the meantime while we resolve this issue?

20          MR. SHINEROCK:  Your Honor, I'd request just a brief

21  moment to confer with our general counsel on that question, if

22  you would allow it.

23          THE COURT:  All right.

24          (Counsel confer)

25          MR. SHINEROCK:  Judge, what we can say is there are

J9P9TRUO

1    other subpoenas outstanding.  There is some work that may be

2    done in the interim.  Certainly the absence of the records that

3    are under consideration here present a substantial impediment

4    to their work but what I think I would say is that issue isn't

5    really what's before the Court.  Their work is impeded to some

6    degree.  The question before the Court really is whether the

7    plaintiff can come, bring a state agency before a federal court

8    and impede in any way an ongoing state criminal proceeding.  I

9    think the answer to that is a resounding no.

10             Now, on the merits of their request for injunctive

11   relief, they fair no better, importantly, because they have

12   failed to establish irreparable harm.  As I had suggested, the

13   true harm here falls on the state judicial process.  The

14   plaintiff's burden today is to show not merely an unusual

15   factual situation which certainly I concede we have here, but

16   they must show an extraordinarily pressing need for immediate

17   federal equitable relief.  And that's directly from a case that

18   we cite in the brief.  They failed to meet that burden.

19             As we have said, our office will keep the documents in

20   confidence.  The plaintiff has no basis to suggest otherwise.

21   The claims regarding changes to hundreds of years of grand jury

22   secrecy rules I think are just the type of speculative and

23   non-immediate harm that do not satisfy the standard for

24   emergency relief.  Any harm resulting to the president's

25   claimed right to immunity, to the extent such a right exists,

J9P9TRUO

1    is entirely speculative and unripe at this point as well given

2    the early stages of the grand jury process.  Indeed, allowing

3    that process to unfold further may generate an actual judicable

4    controversy for the Court but at this point there simply is no

5    controversy.

6            As I said before, the plaintiffs bear the burden here.

7    They have failed to carry it.  Accordingly, Mazars should be

8    left to the orderly and the confidential production of

9    documents while any constitutional claims are litigated fully

10   and fairly in an appropriate forum.

11           Judge, if you have for further questions I'd cede the

12   rest of my time.

13           THE COURT:  Thank you.

14           MR. CONSOVOY:  May I be briefly heard, your Honor?

15           THE COURT:  Yes.  Mr. Consovoy.

16           MR. CONSOVOY:  I'd like to make just six very brief

17   points, your Honor, and then return to the process at the end,

18   if I might.

19           One, the district attorney now concedes the president

20   is a target and his records are implicated.

21           Number two, the district attorney now concedes that

22   the merits are tricky.

23           Three, the district attorney now concedes there is a

24   circuit split on Younger and all of its contrary authority

25   predates Sprint.

J9P9TRUO

1          Four, the district attorney concedes that they copied

2     a congressional subpoena and sent it to Mazars even though they

3     now concede their investigation is not coextensive with the

4     federal investigation but they did it as a matter of

5     convenience.  That is the very definition of bad faith.

6          Five, the district attorney has never said this

7     morning that the president has an avenue for relief through a

8     state process.  We have cited authority that suggests he does

9     not.

10          Six, the district attorney never says that they would

11     reject the congressional subpoena if these documents are turned

12     over.

13          Finally, your Honor, the reason why we have guidance

14     from the Supreme Court in Nixon is because the subpoena was

15     stayed.  The reason why we have guidance from the Supreme Court

16     in Eastland is because the subpoena was stayed.  The reason why

17     we have guidance from the Supreme Court in Clinton v. Jones is

18     because those proceedings were delayed through the Eighth

19     Circuit on a legal point and the Supreme Court had the

20     opportunity to adjudicate the question.

21          The issue this morning is whether this serious

22     constitutional issue will remain ripe in the posture it is so

23     that both this Court, the Second Circuit, and potentially the

24     Supreme Court can issue an important decision, as your Honor

25     noted, on a very significant constitutional issue.  These are

J9P9TRUO

1    serious questions and they should be decided in an appropriate

2    fashion.

3            And as we note in our reply, your Honor, the agreement

4    here runs at 1 p.m. today and the president is in the

5    unfortunate posture of having to decide how to proceed to

6    ensure the status quo is preserved if and when that 1 p.m.

7    deadline expires.  So we respectfully request guidance from the

8    Court as to what next steps might look like in light of those

9    factors.

10           MR. DUNNE:  Your Honor, may I?

11           THE COURT:  Yes.

12           MR. DUNNE:  I just want to punctuate one brief point,

13   your Honor.  And that is Mr. Consovoy started earlier today by

14   saying that they are looking for quite limited relief which is

15   a stay of the obligation to produce these documents.  But what

16   that means, of course, is what they're asking for further today

17   is additional delay.  And that really is not just the quite

18   limited relief they are seeking; it is what they want in the

19   end.  They otherwise characterize it as some temporary immunity

20   for however long.  What that means, if they get further delay

21   basically is that they win and we lose without an adjudication

22   by this court and that's not what should happen today.

23           Thank you.

24           THE COURT:  How do you see the loss there, Mr. Dunne?

25           MR. DUNNE:  I'll just repeat the points we've made

J9P9TRUO

1    about irreparable harm, statute of limitations.  They are all

2    very real.  They are running.  As to third parties as well, as

3    the Court has pointed out.  And I just don't see the

4    irreparable harm in the face of, again, the grand jury secrecy

5    that applies to us.  We just want to do what we do everyday

6    which is to gather documents in confidence and see what they

7    say and whether there should be any action taken as a result.

8    That's the harm to us.  We have our own constitutional rights

9    under <u>Younger</u>, etc. that we're trying to vindicate here.  We

10   just want to go home and do our grand jury work.

11           THE COURT:  Do you believe that grand jury work would

12   be irreparably impeded if the Court were to wait let's say ten

13   days or so or two weeks that the U.S. Attorney has requested,

14   assuming that they do agree to interject themselves?

15           MR. DUNNE:  Your Honor, it's absolutely -- first,

16   again, as to the request from the Department of Justice

17   Southern District last night, again, they're not before the

18   Court.  They have not made any motion before the Court.  They

19   have simply issued a statement, so-called, saying we'd like

20   another week to think about this.  There is no such thing, your

21   Honor, as a motion to have the government cogitate, especially

22   given the emergency timetable that the parties agreed to last

23   Thursday in your chambers.  So I would again suggest it's just

24   inappropriate and unnecessary at this point.

25           But more importantly, I think it's plain from

J9P9TRUO

everything that the plaintiff has said in its papers and today

that the real game plan today, again looking for as much delay

as possible, is to seek stays at every stage.  No doubt

whatever the result of today's proceeding, and whether that

result is decided today or a week from today or whenever, the

plaintiff is going to appeal.  And during that appeal there

will be further requests for a stay.  They will appeal further

if necessary I believe, as they've said, to the Supreme Court

and there too they will be seeking a stay.  They're envisioning

an at least months-long or longer process during which the

entirety of the obligations to produce these documents is

stayed, getting to a point where no doubt statutes of

limitations that we're concerned about will have run and

perhaps getting to a point where the president himself is out

of office at which point I think they concede we can then

proceed but at that point we'll have no charges available.  So

I think that the stays we're talking about again mean they win,

we lose, and I think it's just inappropriate.

MR. CONSOVOY:  Just to clarify two things.  I want to

make sure that the court was aware that, as this court takes it

under advisement, the president is prepared to toll the

limitations period.  So that should take some of the sting out

of it.

And second what I just heard the district attorney say

is we need to hurry because we may not be able to indict the

J9P9TRUO

president while he's still president if we don't.  I don't

think it could be any clearer who the target here is.

MR. DUNNE:  Your Honor, on both points I think that

this has been made clear.  But whatever the grand jury is

looking at, and I'm not going to be specific about that, of

course, it's been made clear there is conduct at issue that has

been engaged in by a wide variety of parties and a wide variety

of businesses.  The offer of tolling for whatever time period

they have in mind is very generous but they will not be tolling

the statute of limitations as to any of those other third

parties, whether they're businesses or individuals, and that

doesn't get us anything I'm afraid.  And, again, I just don't

think that's going to get us what we need and I think that we

ought to go home and do our work.

THE COURT:  Mr. Dunne, what you've said concerning the

likelihood of continuing appeals sounds like a statement of an

inevitability of some delay and the question is to what extent

should some of that inevitable delay at this stage be short or

longer.

Assuming that we were to agree that perhaps a short

stay would be appropriate, let's define short as follows.  The

U.S. Attorney has requested until October 1 to make a

determination and until October 15 to make a submission if they

decide to make a submission.  What if we agree that the U.S.

Attorney should have until let's say Monday to decide and until

J9P9TRUO

1    Wednesday to make whatever submission they're going to make?

2    Would that propose the same concerns or mitigate the concerns

3    that you have?

4           MR. DUNNE:  Again, your Honor, that sounds very

5    reasonable and a very near-term basis but, again, my fear is

6    that this is just going to be extended again and again such

7    that any few days delay will only be followed on inexorably.

8           THE COURT:  I have the ability to say to the plaintiff

9    that whatever judgment I make should be so irrefutable that

10   they should be enjoined from appealing.

11          MR. DUNNE:  Understood, your Honor.

12          I just want to point out that, as we I think make

13   clear in our papers, we envision a scenario where these

14   important issues can, yes, be adjudicated, if they must, in

15   federal court, although we object to that, of course.  But if

16   they are to proceed in federal court on appeal hereinafter,

17   given the need that our grand jury has for these materials and

18   given the fact that they will be maintained confidentially,

19   there is no need to impose a stay of the production during the

20   process in which these issues are adjudicated in federal court

21   if that's what has to happen.  Again, that will solve the

22   problem of us not being able to get materials in the course of

23   our investigation in time.  But, yes, again the issues can be

24   adjudicated as necessary on appeal.  I just don't see that --

25   the risk of harm is such that the simple production of

J9P9TRUO

1   confidential materials to a confidential grand jury to be held

2   in secret is going to cause the harm they expect.

3          With respect to the rather extravagant claim that

4   there is a risk that somehow the New York state legislature

5   will invalidate the principles of grand jury secrecy after two

6   hundred years, I submit that that's not -- that's the kind of

7   fanciful speculation that an irreparable harm argument really

8   shouldn't rely on.  I suppose it's also along those lines

9   possible that the State of New York could be annexed by Ukraine

10  who would invalidate the grand jury secrecy.

11         That's all fanciful, your Honor.  It's not a basis to

12  make a judgment.  And I think that we should be trusted with

13  these documents during the course of any subsequent appeal of

14  these proceedings.

15         THE COURT:  Let me ask you again.  Focusing on the

16  nature of the documents that are involved, is there one single

17  document that is at issue let's say, for example, the

18  president's tax returns or is it a much larger bundle of

19  documents of which the tax returns are one?

20         MR. DUNNE:  It's the latter, your Honor, a much larger

21  bundle is a good way of putting it.  As everyone seems to

22  agree, this is a wide range of request for documents of the

23  sort that we pursue quite commonly in our office.  Yes, the tax

24  returns are a subset of those documents but there's a whole

25  range of other financial records that we're seeking here for,

1   again, reasons which I can't get into but they are all in good

2   faith and so I don't think we can narrow it to a single

3   document or single category.

4         THE COURT:  In that case, Mr. Consovoy, why could not

5   the parties work out some arrangement where some of that other

6   bundle of documents to the extent they don't relate directly to

7   the president could be turned over while we adjudicate the

8   question of the tax returns which seem to be the bone of

9   contention here?

10         MR. CONSOVOY:  In candor, your Honor, it's beyond the

11   tax returns.  That was sort of the impetus for the dispute.  I

12   could walk the Court through it, but it's not really that

13   pertinent anymore.

14         But we object to the subpoena to the third party and

15   to the broad range of documents.

16         I think your Honor had it exactly right, which is we

17   are only asking for a short period of time before this court.

18   As your Honor noted, whatever happens after that will be for

19   the Second Circuit, the Supreme Court to decide.  They may --

20   we hope the Court rules in our favor, of course, as every

21   litigant does.  But if the Court does not, then the Second

22   Circuit may determine that the stay is inappropriate or the

23   Supreme Court may determine that a stay is inappropriate.  All

24   we're asking for is time for the U.S. Attorney to weigh in,

25   time for the Court to issue a decision, and a very short period

45

J9P9TRUO

1    of time after that for us to seek further relief from the Court

2    of Appeals.  We asked for seven days.  It could be three days.

3    I think these requests --

4               THE COURT:  You're not actually answering my question.

5    Whether it's three days or three weeks, assuming that part of

6    the bundle of documents is not really in controversy, why could

7    not you and the district attorney agree upon some program of

8    disclosure that addresses their concerns about the ongoing

9    investigation as to matters that may not necessarily relate to

10   the president's tax returns?

11              MR. CONSOVOY:  Your Honor, I'd have to obviously, as

12   you understand, consult with my client.  We attempted to engage

13   in negotiations before we came to this court.  We've given over

14   reams of information already that were directly sought from the

15   organization, as we noted in our papers.  This is not an issue

16   of noncompliance.  This is about an inappropriate subpoena

17   where they photocopied a congressional subpoena and said here

18   you go.

19              THE COURT:  I am raising a question of

20   continuing compliance in part.

21              MR. CONSOVOY:  So we can -- it's impossible for me to

22   negotiate in open court.  I imagine it would be a range of

23   documents that would be potentially OK.  I've talked to my

24   client.  There is a range of documents that, you know,

25   absolutely not.  And then there's a middle ground, and I

J9P9TRUO

1    suspect negotiations between the parties will break down over

2    the middle ground.  If the Court would like us to meet with

3    them and discuss this, we are happy to.

4              THE COURT:  Mr. Dunne.

5              MR. DUNNE:  Your Honor, my fear is that that middle

6    ground will expand to incorporate virtually everything except

7    routine correspondence among the various parties at issue here.

8    I mean the fact is that we can't be in a position where the

9    plaintiff's lawyers are the ones looking at the documents in

10   question, deciding which will pertain to their client or don't

11   pertain to their client when, in fact, their position is that

12   the client is everything, every business, every subsidiary,

13   every transaction.  They can't be in the position to dictate to

14   us and make the judgments as to what is too close to their

15   client to be produced here.  I don't think this is going to be

16   a fruitful negotiation, your Honor.

17             THE COURT:  Well, perhaps it might be more fruitful if

18   it involved not just the two of you but some facilitation by

19   the court where documents could be submitted, as you

20   undoubtedly know from discovery disputes, to a magistrate judge

21   who decides whether or not a document falls in box A or box B.

22             MR. DUNNE:  Obviously, your Honor, we'll comply with

23   whatever process the court wants to set up.  I just don't know

24   what governing principles would guide the magistrate in

25   deciding what is, quote, too close to the president to produce

J9P9TRUO

or not in the context of a request for a range of documents

about a range of businesses, some of which, not all of which,

are actually owned by or presided over by him while he was --

before he was in office and I just don't -- I can't contemplate

what that process would look like.  And, in fact, we would

instead suggest we just go back to the routine process we

undertake everyday which is getting materials, keeping them

secret, evaluating what they mean, and seeing whether any

action ought to be taken as a result.  At that point, because

this is all very premature, only at that point, if we get to

the stage where we think there needs to be presented to the

grand jury potential charges against one or more parties or

people, perhaps at that point there will be something that

becomes more ripe.  But right now we're just in the very early

stage of wanting to review materials.  And this entire process

I think is really designed by the plaintiff to make sure that

doesn't happen.

THE COURT:  Mr. Consovoy.

MR. CONSOVOY:  I don't have much to add, your Honor.

We offered to meet and negotiate.  We met and negotiated.  The

district attorney does not want to discuss it.  We were --

there's not a document Mazars has that we don't have in our

possession.  Normally you come to the party who has the

document and ask them.  They did.  We complied.  We had a

narrow dispute over the scope of that subpoena and the response

J9P9TRUO

was we're going to photocopy a federal subpoena, send it to
your accountants and see if we can strongarm them to comply
before you can get heard in court.

            MR. DUNNE:  I don't want to get into the backing and
forthing that led to this dispute, but suffice it to say that,
again, the plaintiff's position, through his lawyers, was the
way this ought to work is you should tell us what you're
looking at.  You should tell us what information you think you
need.  We'll then go back and look at the documents and see if
there's anything that we want to give you that might be
responsive or not.  And that's not how this process works, your
Honor.

            THE COURT:  It is the reality that when the parties
are acting unilaterally they take positions like that but when
they are acting under the auspices of a judicial officer there
is a referee who can make determinations.

            I need not remind you, I'm sure, that in your
experience over many, many years you've been on both sides of
these kinds of disputes and there are magistrates, and please
don't underestimate their ability and experience in making
those kinds of judgments.  Recently this Court had occasion, I
believe it was Judge Wood, who was presented with a question of
I believe in the Michael Cohen documents, which should be
disclosed, which should not be; which are privileged and which
are not.  Judge Wood appointed special master in the form of

J9P9TRUO

1    Judge Jones and the matter was resolved.

2            MR. DUNNE:  Your Honor, I'm aware of that case.  And

3    obviously, again, we will comply with whatever process the

4    Court wants to put in place.  And anything that in a

5    constructive way helps us get access to the information we need

6    in a timely fashion we would welcome.

7            THE COURT:  All right.  Would you then undertake to

8    stay the implementation or enforcement of the subpoena for an

9    additional period of time not to exceed let's say Wednesday of

10   next week and by that time the U.S. Attorney may or may not

11   have submitted whatever they may submit.  If they do, I will

12   undertake from that point forward to examine the record and

13   make a judgment on the question of injunctive relief.  But in

14   the meantime the parties can retain the status quo for an

15   additional week and also in the meantime if you can agree upon

16   some form of rolling disclosure that enables the investigation

17   to proceed as to matters that don't implicate the president's

18   privilege to the extent that any exists, I think that that

19   might go a long way towards accommodating both interests.

20           Mr. Dunne.

21           MR. DUNNE:  Your Honor, obviously, we'll comply with

22   whatever the Court orders.  But I don't think --

23           THE COURT:  I'm trying not to order it.  I'm trying to

24   see if you can agree so that I don't have to order it.

25           MR. DUNNE:  Thank you, your Honor.

J9P9TRUO

1          With all due respect, I have to retreat to our more

2     important primary position, which is we don't believe that this

3     dispute belongs in federal court in the first place.  And,

4     therefore, to agree to a process that keeps us here and which

5     at least tacitly acknowledges that this Court has the

6     jurisdiction and should be entertaining these arguments, I

7     appreciate the effort that to try to negotiate a solution that

8     gets us at least some portion of what we're asking for here,

9     but I'm afraid that we cannot in good conscience, given our own

10    Younger constitutional rights, our office, agree to that as a

11    matter of a concession here.  Of course, we'll abide by

12    whatever order the Court directs toward us.

13          THE COURT:  If I made an order, Mr. Dunne, and you

14    disagreed with it, then you're going to be in the position of

15    taking it up on appeal.

16          MR. DUNNE:  That may be -- that may be something we

17    need to consider, your Honor, yes.

18          In other words, I don't want to seem obstinate but our

19    position is that this production should ensue.  And, again, if

20    it needs to ensue while this is still being adjudicated in

21    federal court, we'll abide about that and respond in federal

22    court.  But I think we simply cannot agree that the production

23    should be stayed given our Younger concerns and given our very

24    strong view that there's just no good faith basis for the

25    plaintiff to be objecting to it given the lack of harm.

J9P9TRUO

1         THE COURT:  I am inclined to grant the U.S. Attorney's

2    request for a few days to determine whether or not there is

3    some basis for the U.S. Attorney or the Justice Department to

4    make whatever statement they think may be helpful for the

5    resolution of the dispute here.  I will grant until Monday of

6    next week for the U.S. Attorney to consider the issue and

7    inform the Court as to whether or not the U.S. Attorney and/or

8    the Justice Department will seek to intervene in some form.  If

9    they choose to do so by some submission, I will give a deadline

10   of next Wednesday for that submission to be made.  If the

11   submission is sufficient on paper for the Court to decide, I

12   will close the matter at that point from further filings and

13   endeavor to make a decision very soon thereafter.  And I assure

14   you that it will not be weeks or months.

15        Now, given that schedule, I would suggest that the

16   parties go home, sober up, decompress, perhaps get together

17   again between now and tomorrow and see whether some way may be

18   found to accommodate the concerns that have been expressed from

19   both sides.

20        Now, in the meantime I recognize that there is a

21   deadline of 1 p.m. today by which the subpoena should be

22   enforced.  The district attorney has not indicated an

23   inclination to agree voluntarily to a stay of any length and

24   essentially invited the Court to make an order.  I will then

25   order the stay of a subpoena for one day to enable you to, as I

J9P9TRUO

1    said before, go home and think about this and talk to one

2    another and inform the Court by tomorrow whether a further

3    agreement might be in order.

4              MR. DUNNE:  Thank you, your Honor.

5              MR. CONSOVOY:  The only remaining issue, your Honor,

6    is if the Court ultimately does not stay the subpoena through

7    the period where you've given the U.S. Attorney, I just want to

8    reiterate our request for some period of relief after so we can

9    seek recourse in the Court of Appeals.

10             THE COURT:  That's the agenda for tomorrow.

11             MR. CONSOVOY:  Yes.  Thank you very much.

12             (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25