# United States Court of Appeals
## for the Second Circuit

———————

AUGUST TERM, 2019

(Argued: October 23, 2019    Decided: November 4, 2019)

Docket No. 19-3204

———————

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: Nov 04 2019

DONALD J. TRUMP,

*Plaintiff-Appellant,*

—v.—

CYRUS R. VANCE, JR., in his official capacity as District Attorney of the County of
New York, MAZARS USA, LLP,

*Defendants-Appellees.*[1]

———————

Before: KATZMANN, *Chief Judge*, CHIN and DRONEY, *Circuit Judges*.

———————

President Donald J. Trump filed suit in the United States District Court for
the Southern District of New York seeking declaratory and injunctive relief to
restrain the District Attorney of New York County from enforcing a grand jury
subpoena served on Mazars USA LLP, a third-party custodian of the President's
financial records. The district court (Marrero, *J.*) abstained from exercising

———————

[1] The Clerk of Court is directed to amend the caption to conform to the
above.

CERTIFIED COPY ISSUED ON 11/04/2019

jurisdiction and dismissed the President's complaint pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), but also ruled in the alternative that the President is not entitled to injunctive relief. On appeal, the President argues that abstention is not the course that should be taken here, and he asserts a temporary absolute presidential immunity that would forbid the grand jury from seeking his financial records in service of an investigation into conduct that predated his presidency. We agree that *Younger* abstention does not apply to the circumstances of this case. We hold, however, that any presidential immunity from state criminal process does not extend to investigative steps like the grand jury subpoena at issue here. We accordingly **AFFIRM** the district court's decision on the immunity question, which we construe as an order denying a preliminary injunction, **VACATE** the judgment of the district court dismissing the complaint on the ground of *Younger* abstention, and **REMAND** for further proceedings consistent with this opinion.

––––––––––––––––

WILLIAM S. CONSOVOY, Consovoy McCarthy PLLC, Arlington, VA (Cameron T. Norris, Consovoy McCarthy PLLC, Arlington, VA; Patrick Strawbridge, Consovoy McCarthy PLLC, Boston, MA; Marc L. Mukasey, Mukasey Frenchman & Sklaroff, New York, NY; Alan S. Futerfas, Law Offices of Alan S. Futerfas, New York, NY, *on the brief*), *for Plaintiff-Appellant*.

CAREY R. DUNNE, General Counsel (Christopher Conroy, Solomon Shinerock, James H. Graham, Sarah Walsh, Allen J. Vickey, Assistant District Attorneys, *on the brief*), *for Defendant-Appellee*.

JOSEPH H. HUNT, Assistant Attorney General (Hashim M. Mooppan, Deputy Assistant Attorney General; Mark R. Freeman, Scott R. McIntosh, Gerard Sinzdak, Attorneys, *on the brief*), United States Department of Justice, Washington, DC, *for Amicus Curiae* United States of America, *in support of Plaintiff-Appellant*.

––––––––––––––––

KATZMANN, *Chief Judge*:

This case presents the question of when, if ever, a county prosecutor can subpoena a third-party custodian for the financial and tax records of a sitting President, over which the President has no claim of executive privilege.[2] The District Attorney of New York County has issued a grand jury subpoena to an accounting firm that possesses a variety of such records because it performed accounting services for President Donald J. Trump and his organization. When the President sought injunctive relief in federal court to restrain enforcement of that subpoena, the district court (Marrero, *J.*) declined to exercise jurisdiction and dismissed the case under the doctrine of *Younger v. Harris*, 401 U.S. 37 (1971). The district court also explained in an alternative holding why, in its view, there was no constitutional basis to temporarily restrain or preliminarily enjoin the subpoena at issue. On appeal, we conclude that *Younger* abstention does not extend to the circumstances of this case, but we hold that the President has not shown a likelihood of success on the merits of his claims sufficient to warrant injunctive relief. Construing the district court's discussion of the immunity

---

[2] Any references in this opinion to the President's privilege or lack thereof concerns only a President's executive privilege.

question as an order denying a preliminary injunction, we **AFFIRM** that order,
**VACATE** the judgment dismissing the complaint on the ground of *Younger*
abstention, and **REMAND** for further proceedings consistent with this opinion.

## BACKGROUND

The relevant facts are straightforward. The District Attorney of the County
of New York has initiated a grand jury investigation that "targets New York
conduct and has yet to conclude as to specific charges or defendants."[3] Joint
App'x 46. The parties agree for purposes of this case that the grand jury is
investigating whether several individuals and entities have committed criminal
violations of New York law.

On August 1, 2019, the District Attorney served a subpoena *duces tecum* on
behalf of the grand jury on the Trump Organization.[4] The subpoena sought

---

[3] The President's complaint is silent as to the nature of the grand jury
investigation, but the District Attorney has described the investigation in further
detail in a declaration filed in opposition to the President's motion for
preliminary injunctive relief. The relevant portion of that declaration remains
redacted from the public record; in any event, we need not rely on those further
details here. It is enough for purposes of our analysis that the Mazars subpoena
seeks evidence in service of an investigation into potential criminal conduct
within the District Attorney's jurisdiction, a fact about the investigation which
the district court treated as "uncontested." Joint App'x 76.

[4] According to the President's complaint, the Trump Organization is

4

"documents and communications" from the period between June 1, 2015 and September 20, 2018 relating to suspected "hush money" payments made to two women. Joint App'x 39, 48. At first, the Trump Organization cooperated with the subpoena and produced responsive documents. However, when "the President's attorneys"—private counsel retained by the President and apparently then acting on behalf of the Trump Organization—learned that the District Attorney interpreted the subpoena to require production of the President's personal tax returns, they "resisted" that interpretation. Joint App'x 21. Although the Trump Organization has apparently continued to produce limited tranches of documents in response to the August 1, 2019 subpoena, it has not produced any tax records.

On August 29, 2019, the District Attorney served another subpoena *duces tecum* on behalf of the grand jury on Defendant-Appellee Mazars USA LLP (the "Mazars subpoena"). Mazars is an accounting firm that possesses various financial records relating to the President's personal and business dealings, and the Mazars subpoena seeks a wide variety of financial records dating from

---

wholly owned by the Donald J. Trump Revocable Trust, of which the President is the grantor and beneficiary.

January 1, 2011 to the present and relating to the President, the Trump

Organization, and several related entities. Among the records sought in the

August 29, 2019 subpoena are any "[t]ax returns and related schedules, in draft,

as-filed, and amended form" within Mazars's possession.[5] Joint App'x 34. The

---

[5] The full document request is as follows:

1. For the period of January 1, 2011 to the present, with respect to Donald J. Trump, the Donald J. Trump Revocable Trust, the Trump Organization Inc., the Trump Organization LLC, the Trump Corporation, DJT Holdings LLC, DJT Holdings Managing Member LLC, Trump Acquisition LLC, Trump Acquisition, Corp., the Trump Old Post Office LLC, the Trump Foundation, and any related parents, subsidiaries, affiliates, joint ventures, predecessors, or successors (collectively, the "Trump Entities"):

   a. Tax returns and related schedules, in draft, as-filed, and amended form;

   b. Any and all statements of financial condition, annual statements, periodic financial reports, and independent auditors' reports prepared, compiled, reviewed, or audited by Mazars USA LLP or its predecessor, WeiserMazars LLP;

   c. Regardless of time period, any and all engagement agreements or contracts related to the preparation, compilation, review, or auditing of the documents described in items (a) and (b);

   d. All underlying, supporting, or source documents and records used in the preparation, compilation, review, or auditing of documents described in items (a) and (b), and any summaries of such documents and records; and

   e. All work papers, memoranda, notes, and communications related to the preparation, compilation, review, or auditing of the documents described in items (a) and (b), including,

subpoena set a return date of September 19, 2019. Only the Mazars subpoena is the subject of this action and appeal.[6]

On September 19, 2019, the President filed this action in the United States District Court for the Southern District of New York. The President's complaint asserted a broad presidential immunity from state criminal process and sought "[a] declaratory judgment that the [Mazars] subpoena is invalid and unenforceable while the President is in office;" "[a] permanent injunction staying the subpoena while the President is in office;" "[a] permanent injunction prohibiting the District Attorney's office from taking any action to enforce the subpoena, from imposing sanctions for noncompliance with the subpoena, and from inspecting, using, maintaining, or disclosing any information obtained as a result of the subpoena, until the President is no longer in office;" "[a] permanent

but not limited to,

i.   All communications between Donald Bender and any employee or representative of the Trump Entities as defined above; and

ii.  All communications, whether internal or external, related to concerns about the completeness, accuracy, or authenticity of any records, documents, valuations, explanations, or other information provided by any employee or representative of the Trump Entities.

[6] Mazars itself takes no position on the legal issues raised in this appeal.

injunction prohibiting Mazars from disclosing, revealing, delivering, or producing the requested information, or otherwise complying with the subpoena, until the President is no longer in office;" and temporary restraining orders and preliminary injunctions to the same effect during the pendency of the federal litigation. Joint App'x 26.

After a compressed briefing schedule, the able district court issued a thorough and thoughtful decision and order on October 7, 2019. *See Trump v. Vance*, 395 F. Supp. 3d 283 (S.D.N.Y. 2019). The court held that it was required to abstain from exercising jurisdiction under the Supreme Court's decision in *Younger v. Harris*, 401 U.S. 37 (1971), and it dismissed the President's complaint on that ground. *Trump*, 395 F. Supp. 3d at 316. The court also articulated an alternative holding—to govern "in the event on appeal abstention were found unwarranted under the circumstances presented here"—in which it denied the President's motion for injunctive relief. *Id.* at 290. This appeal followed immediately on an expedited briefing schedule.

8

Case 19-3204, Document 151, 11/04/2019, 2697341, Page9 of 34

## DISCUSSION

### I.    Standard of Review

"We review *de novo* the essentially legal determination of whether the requirements for abstention have been met." *Disability Rights N.Y. v. New York*, 916 F.3d 129, 133 (2d Cir. 2019).[7] Likewise, although the denial of a preliminary injunction is generally reviewable only for abuse of discretion, "[q]uestions of law decided in connection with requests for preliminary injunctions . . . receive the same *de novo* review that is appropriate for issues of law generally." *Am. Express Fin. Advisors Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir. 1998).

### II.    *Younger* Abstention

The district court dismissed the President's complaint on the basis that abstention was required under *Younger v. Harris*, 401 U.S. 37 (1971). On appeal, the President and the United States argue that *Younger* abstention is unwarranted in the circumstances of this case. We agree.

"In the main, federal courts are obliged to decide cases within the scope of federal jurisdiction." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013). "[O]nly

---

[7] Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 368 (1989) ("*NOPSI*"). Under *Younger* and its progeny, however, federal courts must decline to exercise jurisdiction in three such exceptional categories of cases: "First, *Younger* preclude[s] federal intrusion into ongoing state criminal prosecutions. Second, certain civil enforcement proceedings warrant[] abstention. Finally, federal courts [must] refrain[] from interfering with pending civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint Commc'ns*, 571 U.S. at 78. *Younger* abstention is thus an "exception to th[e] general rule" that "a federal court's obligation to hear and decide a case is virtually unflagging," *id.* at 77, and the doctrine is also subject to exceptions of its own in cases of bad faith, harassment, or other "extraordinary circumstances," *Kugler v. Helfant*, 421 U.S. 117, 124 (1975).

As the district court recognized, *Younger* abstention is grounded "partly on traditional principles of equity, but . . . primarily on the 'even more vital consideration' of comity," which "includes 'a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate

state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.'" *NOPSI*, 491 U.S. at 364 (quoting *Younger*, 401 U.S. at 43–44). And as the Supreme Court has emphasized, "[w]hen a federal court is asked to interfere with a pending state prosecution," those "established doctrines of equity and comity are reinforced by the demands of federalism, which require that federal rights be protected in a manner that does not unduly interfere with the legitimate functioning of the judicial systems of the States." *Kugler*, 421 U.S. at 123.

The demands of federalism are diminished, however, and the importance of preventing friction is reduced, when state and federal actors are already engaged in litigation. Recognition of this reality underlies legislative enactments like the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which is grounded in a congressional decision that "federal officers, and indeed the Federal Government itself, require the protection of a federal forum." *See Willingham v. Morgan*, 395 U.S. 402, 407 (1969). It is also reflected in the Supreme Court's observation that allowing federal actors to access federal courts is "preferable in the context of healthy federal-state relations." *Leiter Minerals, Inc. v. United States*,

352 U.S. 220, 226 (1957). We think this is strikingly so when the federal actor is the President of the United States, who under Article II of the Constitution serves as the nation's chief executive, the head of a branch of the federal government.

The Court's decision in *Leiter* is illuminating in this respect. There the Court held that the Anti-Injunction Act[8] does not bar the United States from seeking a stay of state court proceedings. Consistent with the discussion above, the Court recognized that the Act was "designed to prevent conflict between federal and state courts." *Id.* at 225. The Court nevertheless reasoned that "[t]his policy is much more compelling when it is the litigation of private parties which threatens to draw the two judicial systems into conflict than when it is the United States which seeks a stay to prevent threatened irreparable injury to a national interest." *Id.* at 225–26. Indeed, the Court concluded that Congress would not have intended for the Act to preclude stay applications by the United States given "[t]he frustration of superior federal interests that would ensue from

---

[8] 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.").

precluding the Federal Government from obtaining a stay of state court

proceedings." *Id.* at 226.

Neither the Supreme Court nor this Court has had occasion to apply

*Leiter*'s reasoning in the *Younger* context or to decide "when, if at all, abstention

would be appropriate where the Federal Government seeks to invoke federal

jurisdiction." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 816

n.23 (1976) (citing *Leiter*, 352 U.S. 220). However, nearly every circuit to address

the issue has either held or suggested that abstention is unwarranted in such

circumstances.[9] We find these decisions persuasive, at least insofar as they

counsel against abstention in this case. Specifically, we do not believe that

*Younger*'s policy of comity can be vindicated where a county prosecutor,

---

[9] *See United States v. Morros*, 268 F.3d 695, 707–09 (9th Cir. 2001); *United States v. Composite State Bd. of Med. Exam'rs*, 656 F.2d 131, 135–38 (5th Cir. Unit B 1981); *cf. United States v. Pa., Dep't of Envtl. Res.*, 923 F.2d 1071, 1078–79 (3d Cir. 1991) (endorsing *Composite State Board* in the context of Declaratory Judgment Act); *First Fed. Sav. & Loan Ass'n of Bos. v. Greenwald*, 591 F.2d 417, 423–25 (1st Cir. 1979) (holding that abstention from adjudication of declaratory judgment action was unwarranted where federal agency was joined as defendant). *But see United States v. Ohio*, 614 F.2d 101, 105 (6th Cir. 1979) (holding that, even in "cases brought by the United States . . . , exercise of . . . jurisdiction must be tempered by the judicial doctrine of abstention whenever the interest of states in administering their own laws, as well as in deciding constitutional questions, would be unnecessarily hampered by federal judicial proceedings").

however competent, has opened a criminal investigation that involves the sitting

President, and the President has invoked federal jurisdiction "to vindicate the

'superior federal interests' embodied in Article II and the Supremacy Clause."

Appellant Br. 13. "Comity is a two-way street, requiring a delicate balancing of

sometimes-competing state and federal concerns," *Yeatts v. Angelone*, 166 F.3d

255, 261 (4th Cir. 1999), and on the facts before us, this balance tips in favor of

exercising jurisdiction.[10]

In reaching the opposite conclusion, the district court cited our decision in

*United States v. Certified Industries, Inc.* for the proposition that "a stay [should not

be] automatically granted simply on the application of the United States"

because it is "necessary to inquire 'whether the granting of an injunction [i]s

proper in the circumstances of this case.'" 361 F.2d 857, 859 (2d Cir. 1966)

(quoting *Leiter*, 352 U.S. at 226). This proposition, while true, does not weigh in

favor of abstention. Instead, *Certified Industries* merely reiterated *Leiter*'s holding

that the Anti-Injunction Act neither precludes nor compels a stay of state court

---

[10] Our conclusion is unaltered by the fact that the President is represented
by private counsel. The same was true in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982),
and *Clinton v. Jones*, 520 U.S. 681 (1997), and those cases nevertheless raised
fundamental questions involving immunity and the separation of powers.

proceedings on the application of the United States. The same is true here: *Younger* neither precludes nor compels the issuance of an injunction in the circumstances of this case. Indeed, as discussed below, we ultimately conclude that an injunction is not warranted.

Our conclusion that *Younger* abstention is not applicable here is not intended, in any way, to denigrate the competence of New York's courts to adjudicate federal claims. To the contrary, we are confident that New York's courts approach federal constitutional claims with the same care and thoughtfulness as their federal counterparts.

The district court astutely noted that this case highlights "the complexities and uncharted ground that the *Younger* doctrine presents." *Trump*, 395 F. Supp. 3d at 301. Legitimate arguments can be made both in favor of and against abstention here. Because *Younger*'s policy of comity cannot be vindicated in light of the state-federal clash before us, and because the President raises novel and serious claims that are more appropriately adjudicated in federal court, we conclude that abstention does not extend to the circumstances of this case. We

therefore respectfully vacate the district court's judgment dismissing the President's complaint.[11]

## III.    Injunctive Relief

Having concluded that abstention is not the route to be taken here, we proceed to consider the district court's alternative holding that the President failed to demonstrate his entitlement to injunctive relief. Because the district court clearly intended its discussion of the President's request for injunctive relief to "obviate a remand" in the event we disagreed with its decision to abstain, we will construe that discussion as an order denying the President's motion for a preliminary injunction. For the reasons that follow, we affirm that decision.

A party seeking such relief must "show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35

---

[11] As we hold that abstention is not called for because of the reasons above, we need not address the other arguments against abstention raised by the President and the United States.

(2d Cir. 2010). The district court reasoned that the President failed to show that (1) he was likely to succeed on the merits, (2) he would suffer irreparable harm in the absence of the injunction, or (3) an injunction would be in the public interest. *Trump*, 395 F. Supp. 3d at 304, 315–16. Because we conclude that the President is unlikely to succeed on the merits of his immunity claim, we agree with the district court that he is not entitled to injunctive relief.

The President relies on what he described at oral argument as "temporary absolute presidential immunity"—he argues that he is absolutely immune from all stages of state criminal process while in office, including pre-indictment investigation, and that the Mazars subpoena cannot be enforced in furtherance of any investigation into his activities. We have no occasion to decide today the precise contours and limitations of presidential immunity from prosecution, and we express no opinion on the applicability of any such immunity under circumstances not presented here. Instead, after reviewing historical and legal precedent, we conclude only that presidential immunity does not bar the enforcement of a state grand jury subpoena directing a third party to produce non-privileged material, even when the subject matter under investigation pertains to the President.

17

We begin with the long-settled proposition that "the President is subject to judicial process in appropriate circumstances." *Clinton v. Jones*, 520 U.S. 681, 703 (1997). Over 200 years ago, Chief Justice Marshall, sitting as the trial judge in the prosecution of Aaron Burr, upheld the issuance of a subpoena *duces tecum* to President Jefferson. *United States v. Burr*, 25 F. Cas. 30, 34–35 (C.C.D. Va. 1807) (No. 14,692D) (Marshall, *C.J.*); *see also United States v. Burr*, 25 F. Cas. 187, 191 (C.C.D. Va. 1807) (No. 14,694) (Marshall, *C.J.*) (explaining that it was "not controverted" that "the president of the United States may be subpoenaed, and examined as a witness, and required to produce any paper in his possession"); *Clinton*, 520 U.S. at 703–04 & 704 n.38 (endorsing Marshall's position). Consistent with that historical understanding, presidents have been ordered to give deposition testimony or provide materials in response to subpoenas. *See Clinton*, 520 U.S. at 704–05 (collecting examples). In particular, "the exercise of jurisdiction [over the President] has been held warranted" when necessary "to vindicate the public interest in an ongoing criminal prosecution." *Nixon v. Fitzgerald*, 457 U.S. 731, 754 (1982).

The most relevant precedent for present purposes is *United States v. Nixon*, 418 U.S. 683 (1974). There, a subpoena directed President Nixon to "produce

certain tape recordings and documents relating to his conversations with aides and advisers" for use in a criminal trial against high-level advisers to the President. *Id.* at 686. Nixon objected on two grounds: first, that the communications memorialized in the requested materials were privileged; second, that the separation of powers "insulates a President from a judicial subpoena in an ongoing criminal prosecution." *Id.* at 705–06. The Supreme Court unanimously disagreed, noting that "neither the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances." *Id.* at 706. The Court explained that "a generalized claim of the public interest in confidentiality of nonmilitary and nondiplomatic discussions" was insufficient to justify non-compliance with a subpoena "requiring the production of materials for use in a criminal prosecution." *Id.* at 707, 710. The Court noted that privileges "are not lightly created nor expansively construed, for they are in derogation of the search for truth." *Id.* at 710. And this was true even of executive privilege, a doctrine "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Id.* at 708.

The President has not persuasively explained why, if executive privilege did not preclude enforcement of the subpoena issued in *Nixon*, the Mazars subpoena must be enjoined despite seeking no privileged information and bearing no relation to the President's performance of his official functions. The *Nixon* Court explained that even the President's weighty interest in candid and confidential conversations with his advisers could not justify a blanket privilege that would "cut deeply into the guarantee of due process of law and gravely impair the basic function of the courts." *Id.* at 712.

Here, none of the materials sought by the Mazars subpoena implicates executive privilege. *Cf. Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 384 (2004) ("In light of the fundamental and comprehensive need for every man's evidence in the criminal justice system . . . the Executive Branch [must] first assert privilege to resist disclosure. . . ."). Nor does the subpoena seek information regarding the President's "action[s] taken in an official capacity." *Clinton*, 520 U.S. at 694. The subpoena seeks only the President's private tax returns and financial information relating to the businesses he owns in his capacity as a private citizen. These documents do not implicate, in any way, the performance

of his official duties.[12] We find no support in the *Nixon* Court's conclusion—that

even documents exposing the President's confidential, official conversations may

properly be obtained by subpoena—for the proposition that a President's *private*

and *non-privileged* documents may be absolutely shielded from judicial scrutiny.

*Cf. id.* at 693–94 (noting that the President's immunity from damages for acts

taken in his official capacity "provides no support for an immunity for *unofficial*

conduct").[13]

Tellingly, although Nixon asserted both a claim of executive privilege *and*

of presidential immunity from judicial process, the Court's analysis focused

---

[12] We note that the past six presidents, dating back to President Carter, all
voluntarily released their tax returns to the public. While we do not place
dispositive weight on this fact, it reinforces our conclusion that the disclosure of
personal financial information, standing alone, is unlikely to impair the President
in performing the duties of his office.

[13] Chief Justice Marshall recognized "a privilege . . . to withhold private
letters of a certain description," but only because "[l]etters to the president in his
private character, are often written to him in consequence of his public character,
and may relate to public concerns. Such a letter, though it be a private one, seems
to partake of the character of an official paper, and to be such as ought not on
light ground to be forced into public view." *Burr*, 25 F. Cas. at 192. Here, there is
no contention that any of the documents sought by the Mazars subpoena relate
in any way to the President's "public character" and so there is no reason to give
them the heightened protection afforded to "official paper[s]."

almost entirely on privilege. That the Court felt it unnecessary to devote

extended discussion to the latter argument strongly suggests that the President

may not resist compliance with an otherwise valid subpoena for private and non-

privileged materials simply because he is the President. *Cf. Nixon v. Sirica*, 487

F.2d 700, 713 (D.C. Cir. 1973) (per curiam) ("[The President] concedes that he,

like every other citizen, is under a legal duty to produce relevant, non-privileged

evidence when called upon to do so.").[14]

It is true that the President "occupies a unique position in the

constitutional scheme," *Fitzgerald*, 457 U.S. at 749, and we are mindful of the

Supreme Court's admonition that a court should not "proceed against the

president as against an ordinary individual," *Nixon*, 418 U.S. at 708 (quoting

*Burr*, 25 F. Cas. at 192). For example, historical practice suggests that a court may

not compel the President to personally attend trial or give live testimony in open

---

[14] At oral argument, the President suggested that Nixon either did not
think to, or deliberately chose not to, raise an argument of presidential privilege.
That is not accurate. *See Nixon*, 418 U.S. at 706 (noting that "[t]he second ground
asserted by the President's counsel in support of the claim of absolute privilege"
is "that the independence of the Executive Branch . . . insulates a President from
a judicial subpoena in an ongoing criminal prosecution"); *see also Sirica*, 487 F.2d
at 708 ("Counsel argue, first, that, so long as he remains in office, the President is
absolutely immune from the compulsory process of a court . . . .").

court. *See Clinton*, 520 U.S. at 692 n.14. In the context of a subpoena, the "timing and scope" of any production from the President must be informed by "[t]he high respect that is owed to the office of the Chief Executive." *Id.* at 707. And in holding that a former president was entitled to "absolute immunity from damages liability predicated on his official acts," the Supreme Court quoted with approval Justice Story's conclusion that the President is not "liable to arrest, imprisonment, or detention, while he is in the discharge of the duties of his office." *Fitzgerald*, 457 U.S. at 749 (quoting 3 J. Story, Commentaries on the Constitution of the United States § 1563, pp. 418–19 (1st ed. 1833)).

But we are not faced, in this case, with the President's arrest or imprisonment, or with an order compelling him to attend court at a particular time or place, or, indeed, with an order that compels the President *himself* to do anything. The subpoena at issue is directed not to the President, but to his accountants; compliance does not require the President to do anything at all.[15]

_____

[15] The President resists this distinction, arguing that "courts treat a subpoena to a third-party custodian as if it was issued directly to the aggrieved party." Reply Br. 18 n.7. We do not think that is quite right. When the objection to a subpoena pertains to the information sought, there is little difference between the custodian and the true party in interest, and either may resist enforcement. *See* 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2459 (3d ed. 2008) (noting that a party may object to

The President argues that this case is distinguishable from *Nixon* and
related cases because this subpoena comes from a state rather than a federal
court. While the Supreme Court has not had occasion to address this question, it
has noted in passing that "any direct control by a state court over the President"
may "implicate concerns" under the Supremacy Clause. *Clinton*, 520 U.S. at 691
n.13. But, as already discussed, this subpoena does not involve "direct control by
a state court over the President." Although the subpoena is directed to the
President's custodian, no court has ordered the President to do or produce
anything. Nor has the President explained why any burden or distraction the
third-party subpoena causes would rise to the level of interfering with his duty
to "faithfully execute[]" the laws, U.S. CONST. art. II, § 3, or otherwise
subordinate federal law in favor of a state process. *Cf. Clinton*, 520 U.S. at 705 n.40
(noting that although the President "may become distracted or preoccupied by
pending litigation," such distractions "do not ordinarily implicate constitutional

---

a subpoena directed to another person if "the objecting party claims some
personal right or privilege with regard to the documents sought"). That is why
the President has standing to challenge the Mazars subpoena: because he argues
that his personal records are absolutely privileged from criminal discovery, no
matter who has custody of them. Nonetheless, in assessing the impact of the
subpoena on the office of the President, we cannot ignore the fact that
compliance would not require him to do anything.

separation-of-powers concerns"). So while the President may be correct that state courts lack the authority to issue him orders—a question we have no need to address today—that provides no basis to enjoin the enforcement of a subpoena issued to a third party simply because the President is implicated in the subject matter of the investigation.

The President also argues that this case is unlike *Nixon* because he is a "target" of the investigation, which carries a "distinctive and serious stigma" that is not present when the President is merely a witness in another person's trial. Appellant Br. 29–30. We are not persuaded by this distinction. The President has not been charged with a crime. The grand jury investigation may not result in an indictment against any person, and even if it does, it is unclear whether the President will be indicted. The District Attorney represents, and the President does not contest, that the grand jury is investigating not only the President, but also other persons and entities. Even assuming, without deciding, that a formal criminal charge against the President carries a stigma too great for the Constitution to tolerate, we cannot conclude that mere investigation is so debilitating. Indeed, that contention is hard to square with *Nixon*. Although that case concerned a trial subpoena, rather than one issued by a grand jury, the

grand jury had previously named President Nixon an unindicted coconspirator. *See Nixon*, 418 U.S. at 687. Surely that designation carries far greater stigma than the mere revelation that matters involving the President are under investigation. It is true that the Supreme Court did not decide whether it was appropriate for the grand jury to so name President Nixon, an issue on which it originally granted certiorari. *See id.* at 687 n.2. But the fact that Nixon was ordered to comply with a subpoena seeking documents for a trial proceeding on an indictment that named him as a conspirator strongly suggests that the mere specter of "stigma" or "opprobrium" from association with a criminal case is not a sufficient reason to enjoin a subpoena—at least when, as here, no formal charges have been lodged.

Nor can we accept the President's suggestion that a grand jury investigation is less pressing or important than a criminal trial. It is true, as the President points out, that the grand jury process does not involve the *same* "constitutional dimensions" as a criminal trial. *Id.* at 711 (citing the Sixth Amendment's guarantees of confrontation and compulsory process and the Fifth Amendment's guarantee of due process). But the grand jury has a central role in our system of federalism nonetheless. In the federal context, "[g]rand jury

proceedings are constitutionally mandated" for the "prosecutions for capital or other serious crimes, and its constitutional prerogatives are rooted in long centuries of Anglo-American history." *Branzburg v. Hayes*, 408 U.S. 665, 687 (1972). "[T]he grand jury is similarly guaranteed by many state constitutions," *id.*, including New York's, N.Y. CONST. art. I, § 6. Indeed, "the longstanding principle that the public has a right to every man's evidence . . . is *particularly* applicable to grand jury proceedings." *Branzburg*, 408 U.S. at 688 (emphasis added). Accordingly, the grand jury's "investigative powers are necessarily broad." *Id.*; *see also Cheney*, 542 U.S. at 384 (interpreting *Nixon* to require that "privilege claims that shield information from *a grand jury proceeding* or a criminal trial are not to be expansively construed" (emphasis added)).

We are thus hesitant to interfere with the "ancient role of the grand jury." *Branzburg*, 408 U.S. at 686. Our concern is heightened by the fact that the grand jury in this case is investigating not only the President, but also other persons and entities. Assuming, again without deciding, that the President cannot be prosecuted while he remains in office, it would nonetheless exact a heavy toll on our criminal justice system to prohibit a state from even *investigating* potential crimes committed by him for potential later prosecution, or by other persons, not

27

protected by any immunity, simply because the proof of those alleged crimes

involves the President. Our "twofold aim" that "guilt shall not escape or

innocence suffer," *Nixon*, 418 U.S. at 709, would be substantially frustrated if the

President's temporary immunity were interpreted to shield the conduct of third

parties from investigation.

We do not hold, contrary to the President's characterization, that "a State

can criminally prosecute the President so long as it *also* prosecutes other people."

Appellant Br. 37. We have no reason to address that subject, since at this point

any prosecution of any person—as opposed to investigation—is purely

hypothetical. Rather, we hold only that presidential immunity does not bar a

state grand jury from issuing a subpoena in aid of its investigation of potential

crimes committed by persons within its jurisdiction, even if that investigation

may in some way implicate the President.

Moreover, the President concedes that his immunity lasts only so long as

he holds office and that he could therefore be prosecuted after leaving office.

There is no obvious reason why a state could not begin to investigate a President

during his term and, with the information secured during that search, ultimately

determine to prosecute him after he leaves office. The President claims to find

support for his position in two memoranda from the Justice Department's Office

of Legal Counsel ("OLC"), which concluded that the President may not be

prosecuted. *See* Memorandum from Robert G. Dixon, Jr., Asst. Att'y Gen., O.L.C.,

*Re: Amenability of the President, Vice President and other Civil Officers to Federal*

*Criminal Prosecution while in Office* (Sept. 24, 1973) ("Dixon Memo"); *A Sitting*

*President's Amenability to Indictment and Criminal Prosecution*, 24 O.L.C. Op. 222

(Oct. 16, 2000) ("Moss Memo").[16] Both memoranda, however, are directed almost

exclusively to the question of whether the President may be *indicted*—an issue,

again, that is not presented by this appeal. Neither concludes that a sitting

President may not be *investigated*; to the contrary, the Moss Memo explicitly

approves of a grand jury "continu[ing] to gather evidence throughout the period

of immunity, even passing this task down to subsequently empaneled grand

juries if necessary." Moss Memo, 24 O.L.C. Op. at 257 n.36. We therefore find it

unnecessary to consider whether OLC's reasoning is persuasive, for even if it is

correct, a grand jury that simply "gather[s] evidence" during the President's term

---

[16] The President appropriately does not argue that we owe any deference to the OLC memoranda, for "[t]he federal Judiciary does not . . . owe deference to the Executive Branch's interpretation of the Constitution." *Pub. Citizen v. Burke*, 843 F.2d 1473, 1478 (D.C. Cir. 1988).

commits no constitutional violation. That is all that the Mazars subpoena seeks to do.[17]

The President argues that the District Attorney has gone beyond the mere "gathering" of evidence because a subpoena is "a form of coercive process backed up by the State's contempt power." Appellant Br. 35. We find this distinction unpersuasive. A subpoena is a perfectly ordinary way of gathering evidence; it strains credulity to suggest that a grand jury is permitted only to request the voluntary cooperation of witnesses but not to compel their

---

[17] The President also claims to draw support for his broad view of presidential immunity from a memorandum filed by the Solicitor General in litigation concerning a grand jury that was investigating Vice President Spiro Agnew. *See* Memorandum for the U.S. Concerning the Vice President's Claim of Constitutional Immunity, *In re Proceedings of the Grand Jury Impaneled Dec. 5, 1972*, No. 73-cv-965 (D. Md.) ("Bork Memo"). The Bork Memo was submitted in opposition to the Vice President's motion to enjoin the grand jury investigation and so could be broadly read to suggest presidential immunity from such investigation. Bork Memo at 3. Elsewhere, however, the Bork Memo refers more specifically to the President's immunity "from indictment and trial." *Id.* at 20. And because the Bork Memo was chiefly concerned with refuting the Vice President's claim of immunity, and brought up the President's immunity only for the sake of contrast, we are reluctant to read into it an unspoken assumption that the President cannot be the subject of a criminal subpoena—particularly since that conclusion would be in great tension with, if not a direct contradiction of, *Nixon* and *Burr*. In any event, even if the Bork Memo could be read to suggest that the President is immune from any stage of criminal investigation, that is plainly not the position of the Department of Justice, as reflected in the Moss Memo and the government's amicus brief here.

attendance or the production of documents. *See Branzburg*, 408 U.S. at 688 ("[T]he grand jury's authority to subpoena witnesses is not only historic, but essential to its task."). More importantly, the subpoena is not directed to the President and so it cannot "coerc[e]" him at all. It is Mazars, not the President, that would be cited for contempt in the event of non-compliance. *Cf. Sirica*, 487 F.2d at 711 (concluding that an order compelling President Nixon to produce documents requested by a subpoena for *in camera* examination "is not a form of criminal process"). This case therefore presents no concerns about the constitutionality of holding a sitting President in contempt.

The United States, as amicus curiae, argues that while the President may not be absolutely immune from a state grand jury's subpoena power, any prosecutor seeking to exercise that power must make a heightened showing of need for the documents sought. But the government draws this test from cases concerning when a subpoena can demand the production of documents protected by executive privilege. *See In re Sealed Case*, 121 F.3d 729, 753 (D.C. Cir. 1997) (considering "what type of showing of need the [prosecutor] must make . . . *in order to overcome the privilege*") (emphasis added); *id.* at 754 ("A party *seeking to overcome a claim of presidential privilege*" must make a showing of

"demonstrated, specific need") (emphasis added); *see also Nixon*, 418 U.S. at 713
("The generalized assertion of privilege must yield to the demonstrated, specific
need for evidence in a pending criminal trial."). Even assuming that *Nixon*
imposes a heightened standard in such cases, *but see Cheney*, 542 U.S. at 386
(interpreting *Nixon* to require subpoenas seeking to overcome executive privilege
to satisfy only the same "exacting standards" applicable to all criminal
subpoenas), that has little bearing on a subpoena that, as here, does not seek any
information subject to executive privilege.

The United States suggests, without elaboration, that "[t]he heightened
standards set forth in *Nixon* . . . are no less appropriate" and "indeed may be
even more necessary" when applied to the President's personal records. U.S. Br.
23. We do not see how this is so. Surely the exposure of potentially sensitive
communications related to the functioning of the government is of greater
constitutional concern than information relating solely to the President in his
private capacity and disconnected from the discharge of his constitutional
obligations. *Cf. Clinton*, 520 U.S. at 696 ("With respect to acts taken in his 'public
character'—that is, official acts—the President may be disciplined principally by

impeachment, not by private lawsuits for damages. But he is otherwise subject to the laws for his purely private acts.").

We emphasize again the narrowness of the issue before us. This appeal does not require us to consider whether the President is immune from indictment and prosecution while in office, nor to consider whether the President may lawfully be ordered to produce documents for use in a state criminal proceeding. We accordingly do not address those issues. The only question before us is whether a state may lawfully demand production by a third party of the President's personal financial records for use in a grand jury investigation while the President is in office. With the benefit of the district court's well-articulated opinion, we hold that any presidential immunity from state criminal process does not bar the enforcement of such a subpoena.

Considering the foregoing, the President has neither demonstrated that he is likely to prevail on, nor raised sufficiently serious questions going to the merits of, his immunity claim, and so he is not entitled to preliminary injunctive relief.[18]

---

[18] Because the President has not shown that he is likely to succeed on the merits, we need not consider whether he has met the remaining requirements for the issuance of injunctive relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23–24 (2008).

## CONCLUSION

For the reasons above, we **AFFIRM** the district court's order denying the President's request for a preliminary injunction, **VACATE** the judgment of the district court dismissing the complaint on the ground of *Younger* abstention, and **REMAND** for further proceedings consistent with this opinion.[19]

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

---

[19] Because the President's complaint seeks only declaratory and injunctive relief, on remand the district court may wish to consider, and the parties may wish to address, whether further proceedings are necessary in light of our disposition.