UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONALD J. TRUMP,<br>　　　　　　　　　　　Plaintiff,<br><br>- against -<br><br>CYRUS R. VANCE, JR., in his official capacity as District Attorney of the County of New York;<br><br>and<br><br>MAZARS USA, LLP,<br>　　　　　　　　　　　Defendants. | Case No. 1:19-cv-8694-VM<br><br>**SECOND AMENDED COMPLAINT** |

　　　　Plaintiff Donald J. Trump brings this complaint against Defendants pursuant to 28 U.S.C. §1983 and alleges as follows:

### INTRODUCTION

　　　　1.　　In 2018, a New York County grand jury began investigating whether certain business transactions from 2016 violated New York law. The Trump Organization initially cooperated with the investigation, including by producing hundreds of documents in response to the grand-jury subpoena. A disagreement arose, however, when the District Attorney requested tax returns even though the subpoena did not cover them. Instead of trying to resolve the dispute, the District Attorney issued a grand-jury subpoena to the President's accounting firm that duplicated two congressional subpoenas that had been issued for purportedly legislative purposes.

　　　　2.　　The President filed suit under §1983 to protect his legal rights, including those held under Article II of the Constitution. Although the subpoena "was directed to the President's accounting firm, ... it is functionally a subpoena issued to the President." *Trump v. Vance*, --- S. Ct. ---, Slip. Op. 10 n.5 (2020). Thus, "the President has standing to challenge the Mazars subpoena," *Trump v. Vance*, 941 F.3d 631, 642 (2d. Cir. 2019), *inter alia*, as "overly broad" or having been issued "in bad faith," *Vance*, Slip Op. at 20.

1

3. In challenging "such harassment," the President is "entitled to the protection of federal courts." *Id.* at 16.

4. *First*, the Mazars subpoena is wildly overbroad and is not remotely confined to the grand jury investigation that began in 2018. Moreover, the subpoena demands voluminous documents that relate to topics and entities far beyond the District Attorney's limited jurisdiction under New York law. This is not a properly tailored subpoena for the President's records.

5. *Second*, the Mazars subpoena was issued in bad faith. The District Attorney knew when he issued it—and he has since admitted—that the subpoena was not designed to meet the needs of the grand jury. It was drafted by a congressional committee purportedly to investigate issues of national concern. In other words, the District Attorney issued a grand-jury subpoena he knew was overbroad and sought irrelevant records. That the District Attorney dubiously claims he did this for "efficiency" reasons does not save the subpoena from invalidation. It confirms that he lacked a good-faith basis and that the subpoena amounts to harassment of the President.

## PARTIES

6. Plaintiff Donald J. Trump is the 45th President of the United States. He is the grantor and beneficiary of The Donald J. Trump Revocable Trust ("the Trust"). The Trust is the sole ultimate owner of The Trump Organization, Inc.; Trump Organization LLC; The Trump Corporation; DJT Holdings LLC; DJT Holdings Managing Member LLC; Trump Acquisition, LLC; and Trump Acquisition Corp. The Trust is the majority ultimate owner of the Trump Old Post Office LLC.

7. Defendant Cyrus R. Vance, Jr., is the District Attorney for the County of New York. The subpoena to Mazars was issued by his office and under his authority. Vance is sued in his official capacity.

8. Defendant Mazars USA LLP is a New York accounting firm and the recipient of the subpoena. It is sued in its capacity as custodian of the President's records and is a defendant to ensure that the President can obtain effective relief.

## JURISDICTION & VENUE

9. This Court has subject matter jurisdiction under 28 U.S.C. §1331, 28 U.S.C. §1343, 28 U.S.C. §1367, and 28 U.S.C. §2201.

10. Venue is proper because Defendants reside in this district and because a substantial part of the events or omissions giving rise to the President's claim occurred in this district. 28 U.S.C. §1391(b).

## BACKGROUND

### I. The Grand Jury Investigation

11. "In the summer of 2018, the New York County District Attorney's Office opened an investigation into what it opaquely describes as 'business transactions involving multiple individuals whose conduct may have violated state law.'" *Vance*, Slip. Op. at 2.

12. According to published reports, the focus of the District Attorney's investigation is payments made by Michael Cohen in 2016 to certain individuals. Citing anonymous sources, The New York Times reported that "Mr. Vance's office is exploring whether the reimbursements violated any New York state laws .... In particular, the state prosecutors are examining whether the company falsely accounted for the reimbursements as a legal expense. In New York, filing a false business record can be a crime."

13. On August 1, 2019, the District Attorney issued a grand jury subpoena to The Trump Organization. That subpoena sought the following documents and communications:

> 1. For the period of June 1, 2015, through September 20, 2018, any and all documents and communications that relate to, reference, concern, or reflect:
>
>    a. payments made for the benefit of or agreements concerning Karen McDougal,
>
>    b. payments made for the benefit of or agreements concerning Stephanie Clifford aka Stormy Daniels aka Peggy Peterson,
>
>    c. payments made to or agreements with Michael Cohen or American Media, Inc. that concern Karen McDougal or Stephanie Clifford aka Stormy Daniels aka Peggy Peterson, including but not limited to documents and communications involving:

3

- Resolution Consultants LLC
- Essential Consultants LLC aka EC LLC
- Entities owned or controlled by Michael Cohen
- Michael Cohen
- David Dennison
- Keith Davidson
- Keith M. Davidson & Associates
- American Media, Inc.
- National Enquirer
- David Pecker
- Dylan Howard
- Hope Hicks
- Jill Martin
- Jeffrey McConney
- Deborah Tarasoff
- Donald Trump, Jr.
- Allen Weisselberg.

The items sought by this demand include without limitation: emails, memoranda, and other communications; invoices; agreements, including without limitation retainer agreements; accounting and other book entries or backup documents; general ledger records; wire transfer requests and related records, check images, bank statements, and any other evidence of payments or installments; and organizational documents and agreements, including without limitation articles of incorporations, limited liability agreements, and minutes of director or member meetings.

2. For the period of June 1, 2015, through September 20, 2018, any and all documents and communications that relate to, reference, concern, or reflect Michael Cohen's employment by or work on behalf of Donald Trump or the Trump Organization at any time, including without limitation:

invoices, payment records, human resource records, W2s, 1099s, emails, memoranda, and other communications.

14. The subpoena did not call for tax returns.

15. The President's attorneys immediately opened a dialogue with the District Attorney's Office, collecting, and ultimately, producing hundreds of documents encompassed by this grand-jury subpoena.

16. But the District Attorney soon revealed that what he really wanted was The Trump Organization's tax returns. When the President's attorneys pointed out that the subpoena could not

4

plausibly be read to demand returns, the District Attorney declined to defend his implausible reading. He instead retaliated by issuing a new subpoena to Mazars, a neutral third-party custodian, in an effort to circumvent the President.

**II.   The Subpoena to Mazars**

17. On August 29, 2019, the District Attorney issued a grand-jury subpoena to Mazars.

18. The subpoena orders Mazars to produce a list of records concerning the President:

   1. For the period of January 1, 2011 to the present, with respect to Donald J. Trump, the Donald J. Trump Revocable Trust, the Trump Organization Inc., the Trump Organization LLC, the Trump Corporation, DJT Holdings LLC, DJT Holdings Managing Member LLC, Trump Acquisition LLC, Trump Acquisition, Corp., the Trump Old Post Office LLC, the Trump Foundation, and any related parents, subsidiaries, affiliates, joint ventures, predecessors, or successors (collectively, the "Trump Entities"):

      a. Tax returns and related schedules, in draft, as-filed, and amended form;

      b. Any and all statements of financial condition, annual statements, periodic financial reports, and independent auditors' reports prepared, compiled, reviewed, or audited by Mazars USA LLP or its predecessor, WeiserMazars LLP;

      c. Regardless of time period, any and all engagement agreements or contracts related to the preparation, compilation, review, or auditing of the documents described in items (a) and (b);

      d. All underlying, supporting, or source documents and records used in the preparation, compilation, review, or auditing of documents described in items (a) and (b), and any summaries of such documents and records; and

      e. All work papers, memoranda, notes, and communications related to the preparation, compilation, review, or auditing of the documents described in items (a) and (b), including, but not limited to,

         i. All communications between Donald Bender and any employee or representative of the Trump Entities as defined above; and

         ii. All communications, whether internal or external, related to concerns about the completeness, accuracy, or authenticity of any records, documents, valuations, explanations, or other information provided by any employee or representative of the Trump Entities.

5

19. The District Attorney's subpoena to Mazars is identical to the House Oversight Committee's subpoena to Mazars (except for a few stylistic edits). The only exception is paragraph 1.a. The House Oversight Committee did not ask Mazars for the President's tax returns, but the District Attorney (following the lead of the House Ways and Means Committee) did. Essentially, then, the District Attorney cut-and-pasted the House Oversight and House Ways and Means subpoenas into a document and sent them to Mazars.

20. The following table illustrates how each provision of the District Attorney's subpoena (other than paragraph 1.a) precisely tracks the House Oversight Committee's subpoena.

| House Oversight Committee | District Attorney |
|---|---|
| Unless otherwise noted, the time period covered by this subpoena includes calendar years 2011 through 2018.<br><br>With respect to Donald J. Trump, Donald J. Trump Revocable Trust, the Trump Organization Inc., the Trump Organization LLC, the Trump Corporation, DJT Holdings LLC, the Trump Old Post Office LLC, the Trump Foundation, and any parent, subsidiary, affiliate, joint venture, predecessor, or successor of the foregoing: | 1. For the period of January 1, 2011 to the present,<br><br>with respect to Donald J. Trump, the Donald J. Trump Revocable Trust, the Trump Organization Inc., the Trump Organization LLC, the Trump Corporation, DJT Holdings LLC, DJT Holdings Managing Member LLC, Trump Acquisition LLC, Trump Acquisition, Corp., the Trump Old Post Office LLC, the Trump Foundation, and any related parents, subsidiaries, affiliates, joint ventures, predecessors, or successors (collectively, the "Trump Entities"):<br><br>**a. Tax returns and related schedules, in draft, as-filed, and amended form**; |
| 1. All statements of financial condition, annual statements, periodic financial reports, and independent auditors' reports prepared, compiled, reviewed, or audited by Mazars USA LLP or its predecessor, WeiserMazars LLP; | b. Any and all statements of financial condition, annual statements, periodic financial reports, and independent auditors' reports prepared, compiled, reviewed, or audited by Mazars USA LLP or its predecessor, WeiserMazars LLP; |
| 2. Without regard to time, all engagement agreements or contracts related to the preparation, compilation, review, or auditing of the documents described in Item Number 1; | c. Regardless of time period, any and all engagement agreements or contracts related to the preparation, compilation, review, or auditing of the documents described in items (a) and (b); |

6

| | |
|---|---|
| 3. All underlying, supporting, or source documents and records used in the preparation, compilation, review, or auditing of documents described in Item Number 1, or any summaries of such documents and records relied upon, or any requests for such documents and records; and | d. All underlying, supporting, or source documents and records used in the preparation, compilation, review, or auditing of documents described in items (a) and (b), and any summaries of such documents and records; and |
| 4. All memoranda, notes, and communications related to the preparation, compilation, review, or auditing of the documents described in Item Number 1, including, but not limited to: | e. All work papers, memoranda, notes, and communications related to the preparation, compilation, review, or auditing of the documents described in items (a) and (b), including, but not limited to, |
| a. all communications between Donald Bender and Donald J. Trump or any employee or representative of the Trump Organization; and | i. All communications between Donald Bender and any employee or representative of the Trump Entities as defined above; and |
| b. all communications related to potential concerns that records, documents, explanations, or other information, including significant judgments, provided by Donald J. Trump or other individuals from the Trump Organization, were incomplete, inaccurate, or otherwise unsatisfactory. | ii. All communications, whether internal or external, related to concerns about the completeness, accuracy, or authenticity of any records, documents, valuations, explanations, or other information provided by any employee or representative of the Trump Entities. |

21. As with the first subpoena, the attorneys for the President—the true party-in-interest—contacted the District Attorney's office to engage in good-faith negotiations concerning the Mazars subpoena in effort to cooperate with the investigation. Yet the District Attorney refused to engage in any meaningful discussion about the investigation, justify the subpoena's scope and breadth, or narrow the subpoena in any way.

**III.   The scope of the Mazars subpoena.**

22. The District Attorney has defended his decision to copy the congressional subpoenas on "efficiency" grounds. Specifically, the District Attorney has explained that "the decision to mirror the earlier subpoena was about efficiency, meaning it was intended to facilitate the easy production by Mazars of a set of documents already collected, and to minimize any claim that the Office's request imposed new and different burdens." According to the District Attorney, the point was to facilitate "expeditious production of responsive documents."

7

23. There is nothing efficient—let alone proper—about demanding voluminous records that are irrelevant to the grand jury's work. After all, a subpoena's legitimacy is not defined by what is most efficient for the records custodian. And issuing a patently overbroad subpoena is obviously not efficient for the owner whose records are being demanded.

24. Notably, the District Attorney's decision to photocopy congressional subpoenas came at a time when, as U.S. News reported, Democrats had become increasingly dismayed over their ongoing failure "to get their hands on the long-sought after documents." As the New York Times put it: there was hope that "it may be more difficult to fend off a subpoena in a criminal investigation with sitting grand jury." The timing and nature of this demand for ten years of tax returns is powerful evidence of bad faith.

25. Regardless, the District Attorney has never taken the position that the grand jury's investigation has the same scope as the one being conducted by the House Oversight Committee—the legislative body from which the District Attorney lifted nearly all of the language in the Mazars subpoena—or any other congressional committee.

26. The District Attorney also has not taken the position that the timeframe of the grand jury's investigation is fortuitously the same as those being conducted by the congressional committees. To the contrary, the District Attorney concedes that the grand jury's investigation is not "coextensive with the investigation of the House Committee" and that "the Mazars Subpoena does not define the scope of the grand jury investigation."

27. The District Attorney's inability to reconcile the Mazars subpoena with the grand jury's investigation is unsurprising. The District Attorney has limited criminal jurisdiction. The State of New York's criminal jurisdiction is limited to: (1) crimes the conduct of which occurred within the State (meaning an element of the offense or an attempt or conspiracy to complete the offense occurred in the State); (2) "result" crimes, where the result occurred within the State, crimes that occurred outside the State but constituted an attempt or conspiracy to commit a crime within the State, or crimes that

8

were otherwise intended to have a particular prohibited effect within the State; and (3) crimes of omission to perform within the State a duty imposed by the law of the State. *See* N.Y. CPL §20.20.

28. New York County's jurisdiction is even more limited. The District Attorney has the authority to enforce the criminal laws of the State of New York—but that authority is restricted by the geographical borders of New York County. *See* N.Y. CPL §20.40.

29. The District Attorney's authority is also limited by criminal statutes of limitation. The statutes of limitation for most New York crimes (aside from the most heinous like murder and rape) typically range from one to five years after the commission of the offense. *See* N.Y. CPL §30.10. Prosecution must commence within that time.

30. The Mazars subpoena seeks records that far exceed the District Attorney's jurisdiction generally and the scope of this investigation specifically.

31. The subpoena demands voluminous documents related to every facet of the business and financial affairs of the President and numerous associated entities—from the banal to the complex, from drafts and memoranda to formal records, from source documents to summaries.

32. Many of those entities operate wholly outside of New York County. Numerous documents subpoenaed concern entities located, for example, in California, Florida, Hawaii, Illinois, New Jersey, North Carolina, Pennsylvania, Virginia, and the District of Columbia. Other entities whose documents are covered by the subpoena are not even in the United States. They are located, for example, in Canada, the Dominican Republic, Dubai, India, Indonesia, Ireland, the Philippines, Scotland, and Turkey.

33. Taken together, the subpoena demands an accounting and analysis of every single asset and liability of the President, including each one of the listed entities. Indeed, the kinds of documents requested typically include all assets and liabilities likely broken down by type, description, and value (e.g., cash, securities, instruments, receivables, payables, property, equipment, loans, etc.). And the subpoena demands production of every such document prepared (perhaps on a quarterly basis for

some) over a ten-year period. That is hundreds—if not thousands—of comprehensive reports, each one containing a trove of information about the health, trajectory, and operations of the business. In addition, the subpoena demands "[a]ll underlying, supporting, or source documents and records" used in the preparation of "any and all" financial documents—that is, the original record of every transaction made by every listed entity in the last ten years. Simply put, it asks for everything.

34. The subpoena is not confined to financial records. It even asks for the engagement agreements or contracts related to the preparation or review of any of the aforementioned financial documents "[r]egardless of time period." It also demands "[a]ll work papers, memoranda, notes, and communications" related to the preparation of those documents. This is ten years of internal, and in some cases "external," communications about the accounts for each entity: reminders, tallies, analysis, discussion, questions, answers, research, etc. And it asks for any communications—personal or professional, relating to the preparation or review of financial documents or not—between a named Mazars partner and any employee or representative of a listed entity.

35. Even on its face and without any context, the Mazars subpoena is so sweeping that it amounts to an unguided and unlawful "fishing expedition[]" into the President's personal financial and business dealings. *Vance*, Slip Op. at 16. But especially in the context of a New York grand jury investigation, the subpoena plainly reaches far beyond the District Attorney's jurisdiction—to say nothing of this particular investigation into whether certain payments made in 2016 may have violated New York law. This is not a straightforward request to review specific business transitions; it is an overreaching demand designed to pick apart the President and each related entity from the inside out, without regard to the geographic limits of the District Attorney's jurisdiction or the scope of the grand jury's investigation.

36. Of course, the incongruity between this subpoena and any investigation into particular state-law crimes makes sense. The original author of the subpoena (aside from the request for tax returns)—the House Oversight Committee—had no intention of it being used to facilitate a state-law

10

criminal investigation. Instead, the Oversight Committee has claimed that the subpoena is aimed at issues that are "of national importance" and fall within the Committee's own jurisdiction. Indeed, the Oversight Committee has offered several, sometimes overlapping, reasons for seeking the documents covered by the Mazars subpoena, none of which fall within the District Attorney's jurisdiction, let alone within the scope of the grand jury's investigation.

37. First, the Committee has claimed that its investigation is in "pursuit of … [federal] legislative prerogatives." In other words, the Committee claims that the Mazars subpoena is designed to help it "determine the adequacy of existing [federal] laws and perform related agency oversight." This subject is not within the jurisdiction of the County of New York.

38. Second, the Committee has claimed that it needs the subpoenaed documents to investigate compliance with the Ethics in Government Act of 1978 and to refine "proposals to strengthen the investigative and enforcement authority of the Office of Government Ethics." Specifically, the Committee has claimed to be concerned with ensuring that the President is able to operate in the best interest of the nation, free from conflicting interests. This subject is not within the jurisdiction of the County of New York.

39. Third, and relatedly, the Committee has claimed to be investigating the need for potential reforms to Presidential and Vice-Presidential financial disclosure and reporting requirements. This subject is not within the jurisdiction of the County of New York.

40. Fourth, the Committee has claimed to be investigating compliance with the Foreign and Domestic Emoluments Clauses of the U.S. Constitution. According to the Committee, the information from the subpoena might help it to define what it thinks "is or is not [an] [] emolument" or whether it thinks the President has violated either Clause. This subject is not within the jurisdiction of the County of New York.

41. Fifth, and relatedly, the Committee has claimed to be investigating any ties or dealings between the President's businesses and any foreign—e.g., South Korean or German—entities, to

11

ensure that no such entity could exercise outside influence on the Office of the President. Specifically, the Committee claims to be pursuing whether "the President of the United States [is] beholden to foreign interests who can hold certain things over his head." This subject is not within the jurisdiction of the County of New York.

42. Sixth, the Committee has claimed to be investigating whether it should enact legislation that would ban the President and Vice President from conducting business directly with the federal government. This subject is not within the jurisdiction of the County of New York.

43. Seventh, and relatedly, the Committee has claimed to be investigating "federal-lease management." The Committee has identified "significant concerns with [the General Services Administration's] ongoing management of the lease of the federal Old Post Office Building for the Trump International Hotel in Washington, D.C." GSA issued a request for proposals on the property in 2011 and thereafter granted the contract to Trump Old Post Office LLC to restore and redevelop the building into a luxury hotel. The Committee claims to be interested in any ongoing relationship between a federal agency and one of the President's businesses. Indeed, the Committee claims it purposefully drafted the Mazars subpoena to seek "documents from 2011—the year GSA sought proposals for the Old Post Office Building." This subject is not within the jurisdiction of the County of New York.

44. In sum, the District Attorney has no authority to determine the adequacy of existing federal law, assess compliance with or the sufficiency of the Ethics in Government Act, reform disclosure requirements for the Executive Branch, evaluate or define the Emoluments Clauses of the U.S. Constitution, manage international relations, or regulate federal-government lease management. Nor does the District Attorney have any reason to seek documents dating back to 2011. Indeed, the events that would have triggered the conduct that the grand jury claims to be investigating did not occur until five years later.

45. It is inconceivable to think that a subpoena designed for the purpose of achieving the Committee's explicitly national and international goals and structured around a particular action by the federal government that took place in Washington D.C. is properly tailored to the New York grand jury's state-law investigation. Slapping on a demand for tax returns for the same time period from the same (in some cases extra-jurisdictional) entities serves only to further undermine the tailoring of the Mazars subpoena.

**IV.   Litigation over the validity of the Mazars subpoena.**

46. The subpoena "COMMANDED" Mazars "to appear before the GRAND JURY of the County of New York, at the Grand Jury Room 907, of the Criminal Courts Building at One Hogan Place, between Centre and Baxter streets, in the Borough of Manhattan of the City, County and State of New York, on September 19, 2019 at 2:00 p.m. of the same day, as a witness in a criminal proceeding."

47. On September 19, 2019, the President filed this §1983 suit arguing that the disputed subpoena is invalid. The President also sought a preliminary injunction to enjoin enforcement of the subpoena. Shortly thereafter, the District Attorney sought dismissal on jurisdictional grounds and opposed the President's request for an injunction. This Court granted dismissal under *Younger v. Harris*, 401 U.S. 37 (1971), and, alternatively, denied the President's preliminary-injunction motion. *See Trump v. Vance*, 395 F. Supp. 3d 283 (S.D.N.Y. 2019). The President appealed.

48. On November 4, 2019, the Second Circuit rejected this Court's holding that *Younger* abstention applied, but agreed that the President wasn't entitled to a preliminary injunction. As a result, the Second Circuit vacated the judgment dismissing the lawsuit, affirmed the denial of the preliminary injunction, and remanded the matter for further proceedings consistent with its opinion. *See Trump v. Vance*, 941 F.3d 631 (2d Cir. 2019). The President filed a petition for writ of certiorari.

49. The Supreme Court granted review and, on July 9, 2020, issued an opinion affirming the Second Circuit's judgment. The Court also remanded the case for further proceedings consistent with its opinion. *See Vance*, Slip. Op. at 1-22.

## V. Governing Law

50. The Supreme Court held that on remand the President could allege, *inter alia*, that this is not a "properly tailored" grand-jury subpoena. *Id.* at 13. As the Court explained, "grand juries are prohibited from engaging in arbitrary fishing expeditions." *Id.* at 16. This tailoring command requires the reviewing courts to evaluate the "breadth" of the subpoena. *Id.* at 20. Federal and New York criminal law afford similar protections to all citizens. *See generally United States v. R. Enterprises, Inc.*, 498 U.S. 292 (1991); *In re Grand Jury Proceedings*, 616 F.3d 1186 (3d Cir. 2010); *Virag v. Hynes*, 54 N.Y. 2d 437, 430 N.E. 2d 1249 (1981).

51. The Court held that the President also may assert on remand that this subpoena "'is motivated by a desire to harass'" or has been issued "'in bad faith.'" *Vance*, Slip. Op. at 16. Federal and New York criminal law afford similar protections to all citizens. *See generally United States v. R. Enterprises, Inc.*, 498 U. S. 292 (1991); *Huffman v. Pursue, Ltd.*, 420 U. S. 592 (1975); *Virag v. Hynes*, 54 N.Y. 2d 437, 430 N.E. 2d 1249 (1981).

52. But the President is no ordinary litigant. "The high respect that is owed to the office of the Chief Executive should inform the conduct of the entire proceeding, including the ... scope of discovery." *Vance*, Slip. Op. at 20. "These protections" against overbroad and bad-faith grand-jury subpoenas thus "'apply with special force to a President, in light of the office's unique position as the head of the Executive Branch.'" *Id.* at 16. In accordance with Article II of the Constitution, the court's examination of a grand-jury subpoena for the President's records "should be particularly meticulous." *Id.* at 20.

## CLAIMS FOR RELIEF
## COUNT I: OVERBREADTH

53. The President incorporates all prior allegations.

54. The subpoena seeks voluminous documents that have no relation to the grand jury's investigation and instead relate to topics and entities that far exceed the District Attorney's jurisdiction under New York law.

55. The subpoena covers a timeframe far exceeding that of the grand jury's investigation.

56. The subpoena is overbroad, improperly tailored, and otherwise amounts to an arbitrary fishing expedition.

57. Accordingly, the subpoena amounts to harassment of the President in violation of his legal rights, including those held under Article II of the Constitution.

## COUNT II: BAD FAITH

58. The President incorporates all prior allegations.

59. In response to a dispute over whether the President's tax returns were encompassed by a grand-jury subpoena, the District Attorney photocopied a sweeping congressional demand and issued it to the President's records custodian.

60. The District Attorney lacked a good-faith basis to believe that the subpoena is tailored to the grand jury's investigation. Rather, the District Attorney has admitted that the subpoena is not based on or tied to any potential violations of New York law.

61. Whether the District Attorney photocopied a congressional subpoena for political reasons, for efficiency reasons, or for both, he knowingly and intentionally issued a wildly overbroad subpoena for the President's records.

62. The subpoena was issued in bad faith.

63. Accordingly, the subpoena amounts to harassment of the President in violation of his legal rights, including those held under Article II of the Constitution.

**WHEREFORE**, The President asks this Court to enter judgment in his favor and provide the following relief:

    a.    A declaratory judgment that the subpoena is invalid and unenforceable.

    b.    A permanent injunction quashing or modifying the subpoena as necessary to protect the President's legal rights.

    c.    A permanent injunction prohibiting the District Attorney from taking any action to enforce the subpoena, from imposing sanctions for noncompliance with the subpoena, and from inspecting, using, maintaining, or disclosing any information obtained as a result of the subpoena.

    d.    A permanent injunction prohibiting Mazars from disclosing, revealing, delivering, or producing the requested information, or otherwise complying with the subpoena.

    e.    The President's reasonable costs and expenses, including attorney's fees; and

    f.    All other preliminary and permanent relief to which the President is entitled.

Dated: July 27, 2020

Respectfully submitted,

   *s/ William S. Consovoy*
William S. Consovoy
Cameron T. Norris
Alexa R. Baltes
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com
cam@consovoymccarthy.com

Marc L. Mukasey
MUKASEY FRENCHMAN & SKLAROFF LLP
Two Grand Central Tower
140 East 45th Street, 17th Floor
New York, NY 10177
(212) 466-6400
marc.mukasey@mukaseylaw.com

Alan S. Futerfas
LAW OFFICES OF ALAN S. FUTERFAS
565 Fifth Ave., 7th Floor
New York, NY 10017
(212) 684-8400
asfuterfas@futerfaslaw.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
patrick@consovoymccarthy.com

*Counsel for President Donald J. Trump*