USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: August 20, 2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
DONALD J. TRUMP,                        :
                                        :
                        Plaintiff,      :
                                        :      19 Civ. 8694 (VM)
        - against -                     :
                                        :      **DECISION AND ORDER**
CYRUS R. VANCE, JR., in his official    :
capacity as District Attorney of the    :
County of New York, and                 :
MAZARS USA, LLP,                        :
                                        :
                        Defendants.     :
--------------------------------------X

**VICTOR MARRERO, United States District Judge.**

Plaintiff Donald J. Trump (the "President") filed this action seeking to enjoin enforcement of a grand jury subpoena (the "Mazars Subpoena") issued by Cyrus R. Vance, Jr., in his official capacity as the District Attorney of the County of New York (the "District Attorney"), to the accounting firm Mazars USA, LLP ("Mazars"). (See "Complaint," Dkt. No. 1; "Amended Complaint," Dkt. No. 27.) The President initially based his claim for injunctive relief on an allegedly absolute immunity from criminal process while in office, which this Court rejected by Decision and Order dated October 7, 2019. See Trump v. Vance, 395 F. Supp. 3d 283 (S.D.N.Y. 2019). On appeal, both the United States Court of Appeals for the Second Circuit and the United States Supreme Court agreed that the President was not entitled to an injunction based on his

assertions of a temporary absolute immunity from criminal process. <u>See</u> <u>Trump v. Vance</u>, 941 F.3d 631 (2d Cir. 2019); <u>Trump v. Vance</u>, 140 S. Ct. 2412 (2020).

The case now returns to this Court on remand, pursuant to the Supreme Court's guidance that the President may challenge the validity of the Mazars Subpoena on specific grounds apart from the categorical immunity considered initially and on appeal. (<u>See</u> Dkt. Nos. 47, 54.) In accordance with the Supreme Court's Opinion, the President has filed a Second Amended Complaint claiming that the Mazars Subpoena is overbroad and issued in bad faith. (<u>See</u> Second Amended Complaint ("SAC"), Dkt. No. 57.) Now before the Court is the District Attorney's motion to dismiss the SAC for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). (<u>See</u> "Motion," Dkt. No. 62.) For the reasons set forth below, the Court GRANTS the Motion and dismisses the SAC with prejudice.

<strong><u>INTRODUCTION</u></strong>

<strong>"NOTHING COULD BE DONE"</strong>

At the oral arguments held before the Court of Appeals for the Second Circuit late last year, the lawyers representing the President, in both his official and personal capacities, advocated the novel theory of absolute

2

presidential immunity detailed below.[1] To summarize, the President brought the action in federal district court challenging the grand jury subpoena issued by the District Attorney, who was investigating potential violations of state law arising from private conduct involving individuals and entities associated with the President and covering a period of time predating his election. In that connection, the District Attorney sought certain financial records, including eight years of President Trump's tax returns. To this end, the District Attorney served a grand jury subpoena on the President's accounting firm demanding production of the documents.

The President's counsel claimed that a sitting President is absolutely immune from any form of judicial process in any criminal case, and that the President could thus refuse to comply with the subpoena by withholding the materials requested, as well as by directing the private accountant who

---

[1] In its previous ruling on immunity issues raised in this litigation, the Court offered some general observations about claims of absolute presidential immunity from judicial process. That discussion was meant to provide backdrop considerations that guided the Court's inquiry and reasoning regarding the factual and constitutional questions at issue. Admittedly, those remarks were broad; they touched upon issues beyond the specific grand jury subpoena in dispute, including whether an incumbent President is or should be absolutely immune from any indictment accusing him or her of criminal charges. To that extent, those comments may be regarded as somewhat tangential. It is characteristic of a tangent, however, that at some locus along an arc where the line touches the curve, there the tangent makes a point.

had custody of the records not to produce them to the prosecutor. To stake out the limitless boundaries of the exemption they asserted, the President's attorneys gave the appellate judges an example aggressive in its breadth and telling by its extremity. They declared that under their theory of temporary absolute immunity, even if the President (presumably any president) while in office were to shoot a person in the middle of New York's Fifth Avenue, he or she would be shielded from law enforcement investigations and judicial proceedings of any kind, federal or state, until the expiration of the President's term. Short of that time lapse, they argued, "nothing could be done" by the authorities to prosecute the crime.[2] As this Court suggested in its earlier ruling in this litigation, that notion, applied as so robustly proclaimed by the President's advocates, is as unprecedented and far-reaching as it is perilous to the rule of law and other bedrock constitutional principles on which this country was founded and by which it continues to be governed.

## TO BE SO BOLD

Various categorical "nothing-could-be-done" features of the temporary absolute immunity theory the President's

---

[2] Oral Argument at 47:45, Trump v. Vance, 941 F.3d 631 (No. 19-3204), https://www.c-span.org/video/?465172-1/circuit-hears-oral-argument-president-trumps-tax-returns (Judge Chin: "I'm talking about while in office. That's the hypo. Nothing could be done? That is your position?" Counsel: "That is correct.").

counsel proclaimed in the previous proceedings in this litigation illustrate just how far the notion could stretch and work in practice, why it raises such ominous implications, and why the courts at the three levels of the federal judiciary that reviewed it unequivocally rejected the argument. Though not directly at issue here in relation to an assessment of the SAC, for contextual purposes a review of these contentions may be helpful. As depicted, temporary absolute immunity would encompass every phase of judicial process, whether conducted by federal or state prosecutors, effectively precluding any investigation, indictment, trial, and punishment of an incumbent President. Moreover, the bar would apply to actions arising from the President's discharge of official duties as well as to conduct relating to his or her private affairs. And the President could claim such immunity even if the underlying events entailed private behavior that occurred before he or she assumed office. Perhaps the most remarkable aspect of the purported immunity is that in essence it could be transmittable: If the President's potentially unlawful actions integrally entangled misdeeds by other persons, absolute immunity protection could be passed on to them so as to effectively forestall grand jury inquiry, at the President's will and behest, not only into the President's own behavior, but also potentially into

offenses that may have been committed by third persons, such as presidential staff, relatives, or business associates, insofar as the suspected wrongdoing also touched upon the President or his or her property or effects. The concept of temporary absolute immunity would bear adverse consequences for the fair and effective administration of justice. Theoretically, if reelected, a President could be in office for eight years, perhaps longer in the case of a President who assumes office to fill a vacancy in the presidency. For a prosecutor to wait until then to obtain vital records necessary for an investigation of potential criminal conduct would risk that key witnesses would no longer be available and that their memories of the events would have significantly dimmed. In that event not only the President but also any private individual accomplices implicated in serious crimes could escape being brought to justice, while potentially innocent persons snared in the scandal may be unable to gain official exculpation.

At the core, the argument declares that a sitting President, as well as, derivatively, his or her staff, relatives, and business associates, current and former, stand above the law and beyond the reach of any judicial process in law enforcement proceedings pertaining to potentially criminal conduct and transactions involving an incumbent

President. Such unlimited protection from judicial process presumably would apply no matter how egregious the presidential wrongdoing charged -- even a murder on Fifth Avenue, according to what the President's attorney told the appellate court in this case. Moreover, under such a categorical enlargement of presidential immunity, any inquiry concerning how substantially or minimally judicial process would actually bear on a President's discharge of his or her official duties, the running of statutes of limitations, or the involvement of accomplices and effects on them, would all be irrelevant as well.

Rulings by this Court and the Second Circuit Court of Appeals repudiated the President's temporary absolute immunity theory.[3] On further appeal, the United States Supreme Court similarly rejected the President's arguments, holding that "the President is neither absolutely immune from state criminal subpoenas seeking his private papers nor entitled to a heightened standard of need."[4]

The Supreme Court's opinion in Trump v. Vance did not definitively settle the controversy over the constitutional scope and practical application of presidential immunity from judicial process. Historically, the case represents the

---

[3] Trump v. Vance, 941 F.3d at 646; Trump v. Vance, 395 F. Supp. 3d at 301-16.
[4] Trump v. Vance, 140 S. Ct. at 2431.

latest of a long line of disputes implicating the underpinnings and dimensions of that doctrine. Moreover, the litigation entailed only one component of judicial proceedings, a state grand jury investigation that possibly could implicate various individuals and business entities, potentially including the President, in charges of criminal behavior. To that extent, the Supreme Court's decision serves as but a prologue to possible future rounds of litigation and constitutional confrontation over the full scope of presidential immunity encompassing other stages of judicial process. Here, the Court elaborates on its earlier reflections on these issues for several reasons.

Although the Supreme Court's opinion roundly denied the President's invocation of generalized categorical immunity to justify his refusal to comply with the state grand jury subpoena, in the SAC the President has asserted claims the tenor and practical effect of which could be to engender a form of presidential immunity by default. In particular, as detailed further below, the President challenges the validity and enforceability of the grand jury subpoena at issue, claiming that it is overly broad and was issued in bad faith.[5] To bolster these arguments, the President, quoting Supreme

---

[5] See SAC ¶¶ 53-63.

Court guidance, stresses a point central to his legal theory: the uniqueness of the executive branch and special position the President occupies in the nation's constitutional structure. Fundamentally, he declares that the President is constitutionally different from the other branches of the government, and thus entitled to corresponding special treatment in the application of judicial process. For the reasons stated below, the Court finds no merit in these claims as they relate to the facts relevant to this action. In the prior proceedings, the President raised substantially the same or similar arguments, which the Court rejected.

To that extent, the SAC in substantial part merely reiterates factual allegations made in the President's prior complaint. The revised pleadings thus prompted a motion to dismiss the action, hence calling upon the Court to devote considerable judicial resources to consider again a fact pattern it believes the parties had thoroughly argued and the Court had substantially addressed.

Certainly, as the Court acknowledges below, the President holds a unique position in the country's constitutional system, and hence merits utmost respect to check unjustified encroachment on presidential powers and duties, and so prevent impairing the President's ability to discharge executive branch functions. But special standing

within the governmental scheme at times could come into conflict with other basic principles; it cannot equate under all circumstances to special privilege and special treatment of the President much greater than legally or practically justifiable, and far beyond the official standards applied to govern the affairs of ordinary citizens. The Supreme Court suggested as much in Trump v. Vance when it rejected the Justice Department's theory that the President's claim of immunity from complying with a grand jury subpoena should be evaluated by a heightened need standard, and counseled instead that to challenge a subpoena allegedly issued for unwarranted purposes, a President could raise "the same protections available to every other citizen."[6] Conveying a similar point, in United States v. Burr[7] Chief Justice Marshall declared that a President served with a subpoena to produce unofficial records "must stand, as respects that paper, in nearly the same situation with any other individual."[8] The message these pronouncements express is clear: absent evidence that compliance with a grand jury subpoena would improperly influence or impede the executive branch's performance of constitutional duties, the President

---

[6] Trump v. Vance, 140 S. Ct. at 2430.
[7] 25 F. Cas. 187 (No. 14,694) (C.C.D. Va. 1807).
[8] Id. at 191.

is entitled to claim no greater shield from judicial process than any other person.

Though mindful of the vital need for balance in the expectations of permissible conduct and attendant liabilities of the President in relation to ordinary citizens, this Court cannot mechanically credit allegations that a particular application of judicial process to the President is necessarily unduly burdensome and motivated by bad faith if, upon thorough and independent review, it fairly and compellingly appears that the claimed imposition on the President lacks plausible basis. Established judicial process commonplace to all persons, accompanied by the inevitable inconveniences, annoyances, and embarrassments that litigants routinely suffer in court proceedings, should not transform automatically into an incidence of incapacitating harassment and ill-will merely because the proceedings potentially may implicate the President.

Given force, the relief the President seeks, directly or indirectly, by design or effect, would essentially  extend the application of presidential immunity simply by virtue of a mere invocation that it is, after all, the President whose petition to be shielded from judicial process the Court is evaluating. In essence, the filing of the SAC to assert claims and reargue issues substantially addressed in earlier

proceedings would prolong the President's noncompliance with the grand jury's demand for the documents in dispute. That strategy potentially would enable the clock to run on applicable statutes of limitations, risk the loss of witnesses and evidence and thus possibly foreclose law enforcement concerning any crimes under grand jury investigation. In this respect, the President's response embodies a novel application of presidential immunity to protect the executive branch from judicial process. At its core, it amounts to absolute immunity through a back door, an entry point through which not only a President but also potentially other persons and entities, public and private, could effectively gain cover from judicial process. The evolution of presidential immunity to encompass its prevailing expansive bounds would attest, however, that even by way of the roundabout route advanced here, the immunity concept as so applied would pose significant doctrinal and practical implications that merit rigorous judicial inquiry.

This Court would be remiss in performing its judicial duties if it failed to call out by name, and point to the far-reaching effects on the fair and effective administration of justice and the separation of powers, that the President's litigation strategy would bear. That course of action embodies national consequences that could impact the

12

constitutional order and justice system all the more adversely precisely because the expedient emanates from the President than it would when an ordinary citizen pursues similar practices.[9]

Upon meticulous application of the relevant legal standards to the facts presented in the record before the Court, and against a background underlying these considerations, the Court determined that the claims the President asserted in the SAC do not allege sufficient facts to warrant a different judgment. That conclusion holds with special force insofar as granting the relief the President requests would effectively constitute an undue expansion of presidential immunity doctrine potentially implicating adverse public concerns.

---

[9] Indeed, the earlier round of litigation involved many concerns that, while not directly before the Court at this stage, are still implicated by the President's arguments. As the Court sought to do in its prior ruling in this case, the question of the contours of presidential immunity from judicial process should be considered holistically, taking into account the historical, textual, and empirical developments that have animated previous applications of presidential immunity. A vital step in this regard would call for a review of the consequences to the presidency, the government, the nation's constitutional order, and the larger society that have accompanied that doctrinal evolution. As this Court envisioned such an inquiry, in its totality, the analysis would reduce to a bold letter warning: Over time, the executive branch's invocations of absolute immunity in various forms and guises to justify exempting the presidency from judicial process, including withholding information demanded by Congress, the courts, or the public, have yielded disquieting constitutional effects eroding the rule of law and the doctrines of separation and balance of powers. Those impacts counsel hesitation against enabling any attempt to expand the application of presidential immunity and executive privilege doctrines except in demonstrably extraordinary circumstances, and only following vigorous public scrutiny.

## I.   <u>BACKGROUND</u>

A.   <u>FACTUAL BACKGROUND</u>[10]

Many of the relevant facts throughout this litigation have been uncontested. The District Attorney is conducting a grand jury investigation that has yet to conclude as to specific charges or specific defendants. The District Attorney has described the investigation as one focused on "business transactions involving multiple individuals whose conduct may have violated state law." (SAC ¶ 11 (quoting <u>Trump v. Vance</u>, 140 S. Ct. at 2420).) On August 1, 2019, as part of its investigation, the District Attorney served a grand jury subpoena on the Trump Organization seeking various documents and records covering the period from June 1, 2015 through September 20, 2018 (the "Trump Organization Subpoena"). Certain of the documents sought by the District Attorney pertained to payments made for the benefit of, or agreements concerning, Stephanie Clifford (also known as Stormy Daniels or Peggy Peterson) and Karen McDougal, including payments or agreements concerning the individuals mentioned above that also involved Michael Cohen or American Media, Inc. The

---

[10] Except as otherwise noted, the factual background below derives from the SAC and the facts pleaded therein, which the Court accepts as true for the purposes of ruling on a motion to dismiss. <u>See</u> <u>infra</u> Section II.A. Except where specifically quoted, no further citation will be made to the SAC.

subpoena also sought documents and records related to the President's and the Trump Organization's employment of Michael Cohen.[11] (See id. ¶ 13.) The Trump Organization responded in part to that subpoena by producing hundreds of responsive documents. However, the President's attorneys objected to producing the President's tax returns because they did not believe the Trump Organization Subpoena could reasonably be read to request such documents.

On August 29, 2019, the District Attorney issued the Mazars Subpoena. This subpoena called for documents dating back to 2011, including tax returns and related schedules with respect to the President and several entities affiliated with the President, in draft, as-filed, and amended form. Apart from the tax records, the Mazars Subpoena sought the same financial records requested by the Committee on Oversight and Reform of the United States House of Representatives in a separate legislative subpoena. These financial records include statements of financial condition and annual statements, engagement agreements and contracts

---

[11] The New York Times, citing anonymous sources, has reported that the District Attorney "is exploring whether the reimbursements violated any New York state laws," in particular "whether the company falsely accounted for the reimbursements as a legal expense. In New York, filing a false business record can be a crime." (SAC ¶ 12; William K. Rashbaum & Ben Protess, 8 Years of Trump Tax Returns Are Subpoenaed by Manhattan D.A., New York Times (Sept. 16, 2019), https://www.nytimes.com/2019/09/16/nyregion/trump-tax-returns-cy-vance.html.)

related to preparing the tax returns and financial records, the underlying documents used to prepare the tax returns and financial records, and related work product including communications between the Trump entities and Donald Bender (a Mazars partner) and communications regarding any concerns about the accuracy of any information provided by the Trump entities. (See id. ¶ 18.)

Because much of the present litigation pertains to the similarity of the Mazars Subpoena and the subpoena issued by the House Committee on Oversight and Reform, a brief overview of the House's investigation will help guide the Court's discussion. As noted above, the House Committee's subpoena mirrors the District Attorney's subpoena to Mazars, except that it does not specifically request tax returns.[12] The Committee has "offered several, sometimes overlapping, reasons" why it is seeking these documents. (Id. ¶ 36.) The President describes seven of these reasons, from federal legislative prerogatives to federal lease management. (Id. ¶¶ 37-43.)

---

[12] The House Ways and Means Committee, however, requested the President's tax returns from the Treasury Department and the IRS, in May 2019. The House Committee on Financial Services also issued subpoenas (covering different time periods) to Deutsche Bank and Capital One for financial information related to the President and affiliated entities in an investigation into corruption, terrorism, and money laundering. The House Permanent Select Committee on Intelligence issued an identical subpoena to Deutsche Bank in its investigation into foreign efforts to undermine the U.S. political process. See generally Trump v. Mazars USA, LLP, 140 S. Ct. 2019, 2027 (2020).

B.   PROCEDURAL BACKGROUND

1.   Initial Proceedings Before This Court

The President filed the Complaint in this action on September 19, 2019. This prompted a round of briefing and a hearing on the President's initial claims, as set forth more fully in the Court's October 7, 2019 Decision and Order. See Trump v. Vance, 395 F. Supp. 3d at 291–92. During these preliminary injunction proceedings, the Court considered both the President's claim of temporary absolute immunity from criminal process and the District Attorney's argument that the Court should abstain from exercising jurisdiction over the suit pursuant to Younger v. Harris, 401 U.S. 37 (1971). On October 7, 2019, the Court issued a Decision and Order abstaining pursuant to Younger and alternatively denying the President's claim for injunctive relief on its merits. See 395 F. Supp. 3d at 301–02.

2.   Appeals Arising from This Court's Decision

The President subsequently appealed both of this Court's holdings. By Opinion dated November 4, 2019, the Second Circuit affirmed in part and vacated in part this Court's October 7, 2019 Order. Though the Second Circuit noted that "[l]egitimate arguments [could] be made both in favor of and against abstention," it ultimately decided that abstention was inappropriate under the circumstances of this case

17

because the conflict between federal and state actors and the President's "novel and serious claims [were] more appropriately adjudicated in federal court." Trump v. Vance, 941 F.3d at 639. The Second Circuit affirmed this Court's alternative holding, though, observing that "any presidential immunity from state criminal process does not bar the enforcement of" a state grand jury subpoena for the President's personal financial records. Id. at 646.

The Supreme Court affirmed the Second Circuit's Opinion on July 9, 2020. Canvassing over two centuries' worth of judicial guidance and presidential practice, the Supreme Court concluded that neither Article II nor the Supremacy Clause of the United States Constitution categorically precluded the issuance of a state criminal subpoena to the President. 140 S. Ct. at 2429. The Supreme Court then proceeded to reject the United States Department of Justice's arguments that state criminal subpoenas for the President's private papers must meet a heightened standard of need. The Court stated that a heightened standard would be inappropriate in these circumstances because the President stands in "nearly the same situation with any other individual" with respect to his private papers. Id. (quoting Burr, 25 F. Cas. at 191). The Court added that there was no showing that a heightened standard for state subpoenas was

necessary for the President to fulfill his Article II functions, and moreover that the "public interest in fair and effective law enforcement cuts in favor of comprehensive access to evidence." Id. at 2430.

However, the Court noted that its rejection of the two foregoing legal standards did not preclude challenges to the Mazars Subpoena on state law grounds including bad faith, undue burden, and overbreadth, or constitutional grounds including influencing or impeding the President's official duties. Id. at 2430-31. The Supreme Court unanimously agreed that the case should be remanded to this Court for the President to raise challenges along these lines as he deemed appropriate.

### 3.   Proceedings on Remand Before This Court

Following the Supreme Court's decision, this Court held a teleconference to discuss the scheduling of further proceedings on remand in this matter. (See Dkt. Minute Entry dated July 16, 2020.) The Court heard the parties' preview of potential arguments on remand and endorsed their jointly proposed schedule for the filing of the SAC, as well as an answer or briefing on a motion to dismiss. (See Dkt. No. 53.)

In accordance with the briefing schedule endorsed by the Court, the President filed the SAC on July 27, 2020. (See SAC.) The SAC alleges that because the Mazars Subpoena was

mostly copied from congressional subpoenas designed to achieve national and international goals, it is not properly tailored to the grand jury investigation and should be quashed. More specifically, the SAC asserts two claims. First, it alleges that the subpoena is overly broad because it seeks documents that have no relation to the grand jury's investigation, covers a timeframe far exceeding that of the investigation, and otherwise amounts to an arbitrary fishing expedition. (See id. ¶¶ 54–56.) Second, the SAC alleges that the District Attorney knowingly and intentionally issued the Mazars Subpoena in bad faith as retaliation for the President's refusal to produce tax returns under the Trump Organization Subpoena, and that the District Attorney lacked a good faith basis to believe the Mazars Subpoena was properly tailored in light of his copying. (See id. ¶¶ 59–62.)  The SAC contends that by issuing an overly broad subpoena, and by doing so in bad faith, the District Attorney violated the President's legal rights, including those arising under Article II.[13] (Id. ¶¶ 57, 63.) The SAC seeks a declaratory

---

[13] Though the President alleges that the overbreadth and bad faith of the Mazars Subpoena violate his legal rights held under Article II, the Court does not understand the SAC to allege separate and discrete constitutional claims of the sort suggested by the Supreme Court. See Trump v. Vance, 140 S. Ct. at 2430–31. The SAC does not specify any presidential duties or policies that the District Attorney allegedly sought to manipulate, and it does not clearly allege that Mazars' compliance with the subpoena would impede any specific Article II duty.

judgment that the Mazars Subpoena is invalid and unenforceable and an injunction quashing the subpoena. (See id. ¶ 60(a–b).)   The SAC also requests that the Court permanently enjoin the District Attorney from taking any action to enforce the subpoena and permanently enjoin Mazars from disclosing the requested information. (See id. ¶ 60(c–d).)

On August 3, 2020, the District Attorney filed a motion to dismiss the SAC for failure to state a claim. (See Motion.) In the accompanying Memorandum of Law, the District Attorney argues that the President did not allege any burden to (or violation of) his Article II rights or duties. (See "Memo," Dkt. No. 63, at 9–11.) The District Attorney further states that the President's allegations do not rebut the subpoena's presumptive validity because they are speculative and lack sufficient factual support to render the claims of overbreadth and bad faith plausible. (See id. at 11–21.)

The President opposed the District Attorney's proffered grounds for dismissal on August 10, 2020. (See "Opposition," Dkt. No. 66.) The President argues that he has plausibly alleged that the grand jury investigation focuses on payments made in 2016 by Michael Cohen (the "2016 Michael Cohen Payments"), and that the Mazars Subpoena is overbroad in relation to that conduct. (See id. at 5–6, 11–18.) The

President further claims that the District Attorney does not challenge the legal plausibility of the SAC's allegations, but instead merely attempts to rebut the SAC's assertions regarding the scope of the investigation through the sworn declaration of Assistant District Attorney Solomon Shinerock (the "Shinerock Declaration"), other evidence adduced at the preliminary injunction hearing before this Court, and public news articles. (See id. at 6-11.) The President argues that these sources cannot be considered at the pleading stage, and that at best they raise contested issues of fact. The President then casts the District Attorney's motion as entirely reliant on cases involving motions to quash subpoenas rather than motions to dismiss, and presses that, at the pleading stage, the President need not make the strong showing required to overturn the presumption of validity accorded to grand jury subpoenas on motions to quash. (Id. at 18.) The President argues that even if the grand jury investigation is not limited to the 2016 Michael Cohen Payments, the Mazars Subpoena is nevertheless overbroad. (Id. at 19-21.) The President next argues that the Mazars Subpoena was issued in bad faith because it was copied from congressional subpoenas and issued as retaliation for the President's refusal to produce tax returns in response to the Trump Organization Subpoena. (Id. at 21.) The President

concludes by further asserting that the District Attorney's justifications for the Mazars Subpoena do not amount to good faith, and in fact demonstrate bad faith insofar as they are allegedly inconsistent with each other. (Id. at 22-25.)

On the same day, the President separately filed a letter requesting a pre-motion conference regarding the President's anticipated motion for discovery pursuant to Federal Rule of Civil Procedure 56(d). (See "Letter," Dkt. No. 67.) In the Letter, the President asserts that the District Attorney's reliance on allegedly extrinsic evidence such as the Shinerock Declaration and public news articles requires the Court to either exclude such evidence or convert the Motion into a motion for summary judgment and allow the President to seek discovery into the redacted portion of the Shinerock Declaration. (See id. at 1.) The President explains that such discovery would be germane, that he has not been dilatory, and that broader discovery should be allowed in light of his status as President. (See id. at 2-3.)

By letter dated August 11, 2020, the District Attorney opposed the requests in the Letter as speculative and premature. (See "August 11 Letter," Dkt. No. 70.) The District Attorney previewed that a future submission from his office, due on August 14, 2020, would explain why there would be no need or basis to convert the Motion into a motion for summary

judgment pursuant to Federal Rule of Civil Procedure 56. (See id.)

The District Attorney subsequently reiterated his arguments for dismissal of the SAC in a reply brief dated August 14, 2020. (See "Reply," Dkt. No. 68.) First, the District Attorney argues that the President's attempt to invoke a heightened standard of need is unavailing, and that the Supreme Court's decision confirms that the President does not benefit from greater procedural rights or more favorable substantive law in regard to a state grand jury subpoena. (Id. at 1-3.) Second, the District Attorney contends that the SAC is facially deficient. In particular, he points out that the SAC does not allege facts that support a reasonable inference that the grand jury is investigating only the 2016 Michael Cohen Payments. (Id. at 3-5.) He also points out that the President's assertion of retaliation is based on the timing of the issuance of the subpoena, and is entirely speculative. (Id. at 5-7.) Third, and finally, the District Attorney notes that the Court may take judicial notice of other materials beyond the SAC, and that these materials confirm that dismissal of the SAC is appropriate. (Id. at 7-9.) The District Attorney requests that the Court dismiss the SAC with prejudice. (Id. at 10.)

24

By letter dated August 14, 2020, the District Attorney also responded to the President's Letter. (See "August 14 Letter," Dkt. No. 69.) The District Attorney writes that because "there is neither a need nor a basis to convert the pending motion to dismiss to a motion for summary judgment," the President's request for discovery is speculative and premature. (Id. at 1.) In any event, the District Attorney continues, the request for discovery runs counter to long-established law and process with respect to grand juries, the proceedings of which are not public. (Id. at 1–2.) Even if the President had made a sufficient initial showing of overbreadth and bad faith, the proper procedure, according to the District Attorney, would not be for the Court to permit discovery but rather to rely upon its previous in camera review of grand jury information, including the Shinerock Declaration. (Id. at 2 n.1.) In short, the District Attorney submits that the President may not circumvent the robust case law governing motions to quash, which require a strong showing to overcome the presumption of regularity in grand jury proceedings.

## II.   LEGAL STANDARDS

### A.   MOTIONS TO DISMISS

Rule 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted."

Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A complaint should be dismissed if the plaintiff has not offered factual allegations sufficient to render the claims facially plausible. See id. However, a court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. The requirement that a court accept the factual allegations in the complaint as true does not extend to legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." See Iqbal, 556 U.S. at 678; see also Lynch v. City of N.Y., 952 F.3d 67, 75–76 (2d Cir. 2020) (noting that courts "are not to give effect to a complaint's assertions of law or legal conclusions couched as factual allegations").

"Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense.**"** Iqbal, 556 U.S. at 679. "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 430 (2d Cir. 2011); see also Renfro v. Unisys Corp., 671 F.3d 314, 321 (3d Cir. 2011) ("[W]e must examine the context of a claim, including the underlying substantive law, in order to assess its plausibility.") (citing In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 320 n.18 (3d Cir. 2010) ("[W]hat suffices to withstand a motion to dismiss necessarily depends on substantive law and the elements of the specific claim asserted.")). For example, the plausibility of a claim may depend on whether a pleading sufficiently addresses a presumption applicable to the underlying cause of action. See, e.g., Hadid v. City of N.Y., 730 F. App'x 68, 71-72 (2d Cir. 2018) (affirming dismissal of malicious prosecution claims where complaint's allegations of bad faith failed to rebut presumption of probable cause that arises from grand jury indictment); Lewis v. City of N.Y., 591 F. App'x 21, 22 (2d Cir. 2015) (same); Buday v. N.Y. Yankees P'ship, 486 F.

27

App'x 894, 898-99 (2d Cir. 2012) (stating that plaintiff did not plead facts sufficient to overcome work-for-hire presumption applicable in copyright cases). "[C]ourts may draw a reasonable inference of liability when the facts alleged are suggestive of, rather than merely consistent with, a finding of misconduct. Moreover, the existence of other, competing inferences does not prevent the plaintiff's desired inference from qualifying as reasonable unless at least one of those competing inferences rises to the level of an 'obvious alternative explanation.'" N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC, 709 F.3d 109, 121 (2d Cir. 2013) (quoting Twombly, 550 U.S. at 567).

While Rule 12(b)(6) does not impose a probability requirement at the pleading stage, it does call for enough facts "to raise a reasonable expectation that discovery will reveal evidence of illegal" conduct. Twombly, 550 U.S. at 556; Lynch, 952 F.3d at 75. Numerous decisions indicate that if this standard is not met, denying a motion to dismiss under Rule 12(b)(6) would unjustifiably subject defendants to a variety of costs associated with the discovery process. For example, the Supreme Court in Twombly cautioned courts not "to forget that proceeding to antitrust discovery can be expensive" and that "a district court must retain the power to insist upon some specificity in pleading before allowing

a potentially massive factual controversy to proceed." 550 U.S. at 558 (internal quotation marks omitted); see also Mayor and City Council of Baltimore, Md. v. Citigroup, Inc., 709 F.3d 129, 137 (2d Cir. 2013) ("If we permit antitrust plaintiffs to overcome a motion to dismiss simply by alleging parallel conduct, we risk propelling defendants into expensive antitrust discovery on the basis of acts that could just as easily turn out to have been rational business behavior as they could a proscribed antitrust conspiracy.").

Not all costs are monetary, either; in Iqbal, the Supreme Court cautioned that allowing discrimination claims against government officials to proceed without a reasonable expectation that discovery would reveal illegal conduct "exacts heavy costs in terms of efficiency and expenditure of valuable time and resources that might otherwise be directed to the proper execution of the work of the Government." 556 U.S. at 685-86. Courts should also bear in mind that the discovery contemplated by the Federal Rules of Civil Procedure may often be a probing and intrusive process. See, e.g., Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 719 (2d Cir. 2013) (noting that courts should apply the Rule 12(b)(6) standard with "particular care" in ERISA cases because "the prospect of discovery in a suit claiming breach of fiduciary duty is ominous,

potentially exposing the ERISA fiduciary to probing and costly inquiries and document requests about its methods and knowledge at the relevant times").

In adjudicating a Rule 12(b)(6) motion, a court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." Leonard F. v. Israel Discount Bank of N.Y., 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted). "[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents," when assessing matters such as inquiry notice. Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008) (emphasis omitted). Courts may similarly refer to public matters (such as the state of financial markets) to illustrate why bare assertions of fact are insufficient, as long as the court does not rely on those matters to establish their truth. See id.; Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991) (noting that court could permissibly refer to matters of public record as "merely an example of why a naked allegation" was legally insufficient). "When ruling on a motion to dismiss, the Court may take judicial

notice of . . . items in the record of the case, matters of
general public record, and copies of documents attached to
the complaint." Smart v. Goord, 441 F. Supp. 2d 631, 637
(S.D.N.Y. 2006); Reisner v. Stoller, 51 F. Supp. 2d 430, 440
(S.D.N.Y. 1999) ("The court may also take judicial notice of
matters of public record, such as pleadings and court orders
from prior litigation between the parties."); Eaves v.
Designs for Fin., Inc., 785 F. Supp. 2d 229, 244-45 (S.D.N.Y.
2011) (taking notice of prior filings in the same action).

B.   OVERBREADTH AND BAD FAITH

As discussed above, the President claims that the Mazars
Subpoena is both overbroad and issued in bad faith.[14] Much as
the President's two claims share significant similarities,
the legal standards for overbreadth and bad faith are not
necessarily entirely distinct. The President correctly notes
that "[f]ederal and New York criminal law afford similar
protections" against grand jury subpoenas that are overbroad
and issued in bad faith. (SAC ¶¶ 50-51; see also Opposition
at 11-13, 21 (citing federal and state cases in parallel).)
The District Attorney agrees. (See Memo at 11-12 & n.5; 18-

---

[14] As noted above, the Court does not understand the SAC to allege any
other discrete constitutional claims. See supra Section I.B.3. Given the
paucity of allegations suggesting any claim other than those of bad faith
and overbreadth, the Court concludes that any such claim would not be
plausible. The Court does not disregard the President's arguments that an
overbroad or bad faith subpoena would violate his Article II rights, and
considers those arguments further below.

19 & n.10.) Accordingly, the standards for overbreadth and bad faith set forth below take note of both federal and state decisions. Though each standard is set forth separately, their application will require addressing many of the same factual considerations.

Before delving into the standards for overbreadth and bad faith, one final point merits discussion. A party who wishes to object to a subpoena typically files a motion to quash. When a party moves to quash a subpoena, it bears the burden of "demonstrating" or making a "strong showing" of impropriety with "concrete evidence." Although the President is asking the Court to quash the Mazars Subpoena, he has filed a complaint seeking relief pursuant to 42 U.S.C. Section 1983, rather than a motion to quash, to which the District Attorney has responded with a Rule 12(b)(6) motion to dismiss. As the President argues, a plaintiff need not provide evidence demonstrating his claims to survive a Rule 12(b)(6) motion. The District Attorney agrees that the Court can resolve this motion by applying the traditional Rule 12(b)(6) analysis. In short, the parties are litigating the validity of the subpoena through a procedural device not typically used for that purpose.

The sections below describing the standards for overbreadth and bad faith quote from cases deciding motions

to quash and thus incorporate language reflecting the evidentiary burden applicable in that context. But in the discussion section that follows, the Court does not require the President to provide concrete evidence or otherwise make a strong showing of his ultimate entitlement to relief. Consistent with the preceding discussion of the standard applicable to Rule 12(b)(6) motions, the Court will instead assess whether the President has, as he puts it, "allege[d] facts sufficient to support an inference that he could prove his case" in light of the standards for overbreadth and bad faith set forth below "after appropriate discovery and litigation." (Opposition at 18.)

    1.   <u>The Presumptive Legitimacy of Grand Jury Subpoenas</u>

"[T]he grand jury has a central role in our system of federalism," and courts should consequently hesitate to interfere with it. <u>Trump v. Vance</u>, 941 F.3d at 643–44. Specifically, the grand jury is responsible for determining, based on the evidence and the law, whether criminal charges should be brought against any person. <u>See</u> N.Y. Crim. Proc. Law Ann. §§ 190.05, 190.55, 190.60 (McKinney 2019). As the Supreme Court has explained:

> Historically, [the grand jury] has been regarded as a
> primary security to the innocent against hasty,
> malicious and oppressive persecution; it serves the
> invaluable function in our society of standing between
> the accuser and the accused, whether the latter be an

33

> individual, minority group, or other, to determine
> whether a charge is founded upon reason or was dictated
> by an intimidating power or by malice and personal ill
> will.

Wood v. Georgia, 370 U.S. 375, 390 (1962). Furthermore,
"Grand Juries exist by virtue of the New York State
Constitution and the Superior Court that impanels them; they
are not arms or instruments of the District Attorney." United
States v. Reed, 756 F.3d 184, 188 (2d Cir. 2014); see also
People v. Thompson, 8 N.E.3d 803, 810 (N.Y. 2014) ("[G]rand
jurors are empowered to carry out numerous vital functions
independently of the prosecutor, for they 'ha[ve] long been
heralded as the shield of innocence . . . and as the guard of
the liberties of the people against the encroachments of
unfounded accusations from any source.'") (quoting People v.
Sayavong, 635 N.E.2d 1213, 1215 (N.Y. 1994) (internal
quotation marks omitted)).

The role of the grand jury "is to inquire into the
possible existence of criminal conduct." Virag v. Hynes, 430
N.E.2d 1249, 1253 (N.Y. 1981). Thus, "its investigatory
powers are necessarily broad." Id. A grand jury "must often
conduct investigations to determine whether a crime has been
committed, before it is possible for the District Attorney to
formulate a charge or to point to any particular
person." Id. at 1251-52 (quoting Spector v. Allen, 22 N.E.2d

360, 363 (N.Y. 1939)). The grand jury can "hardly be expected to be able to designate or call for what its exact [evidentiary] needs may ultimately turn out to be" and must be allowed to collect not only material that bears directly on whether a crime was committed but also material that may shed "possible light on seemingly related aspects whose significance [the grand jury] is seeking to uncover." Id. at 1252 (quoting Schwimmer v. United States, 232 F.2d 855, 862 (8th Cir.), cert. denied, 352 U.S. 833 (1956)). Indeed, the Supreme Court has stated that "[a] grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed." United States v. R. Enterprises, Inc., 498 U.S. 292, 297 (1991) (quoting Branzburg v. Hayes, 408 U.S. 665, 701 (1972)). To this end, a grand jury can "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." Id. at 297 (quoting United States v. Morton Salt Co., 338 U.S. 632, 642–43 (1950)); see also People v. Doe, 445 N.Y.S.2d 768, 777 (App. Div. 2d Dep't 1981). By conducting a "thorough and extensive investigation," the grand jury advances society's interest in the fair enforcement of criminal laws. Virag, 430 N.E.2d at 1252 (quoting Wood, 370 U.S. at 392).

Accordingly, the opponent of a grand jury subpoena "is not entitled to set limits to the investigation that the grand jury may conduct." Blair v. United States, 250 U.S. 273, 282 (1919). Indeed, New York courts require the party moving to quash a grand jury subpoena to satisfy a demanding burden of proof for several reasons. First, the grand jury's "broad exploratory powers" should not "be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime." Virag, 430 N.E.2d at 1252 (quoting Blair, 250 U.S. at 282). Second, the successful prosecution of crimes "would be intolerably impeded if a District Attorney could be compelled to divulge, before he is ready, the nature of an investigation by the grand jury or the name of the person or persons suspected." Id. (quoting Spector, 22 N.E.2d at 363). Third, a less demanding standard may induce parties to "continually litigate the threshold validity of [grand jury] subpoenas" and thereby delay the grand jury's proceedings. Id. at 1253. Such delay could, in turn, "impede [the grand jury's] investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." Id. at 1252 (quoting United States v. Dionisio, 410 U.S. 1, 17 (1973)).

In light of all these considerations, courts have held that a grand jury's subpoena "enjoys a presumption of validity." Id. at 1253; see id. at 1252 ("[A]bsent some indication of abuse, '[a]ny holding that would saddle a grand jury with minitrials and preliminary showings would" impede investigations and frustrate the public interest) (quoting Dionisio, 410 U.S. at 17). Accordingly, as discussed below, the party challenging a grand jury subpoena as overbroad or issued in bad faith must come forward with more than mere "speculat[ion]" and "bare assertions" of impropriety. Id. at 1253.

### 2.   Overbreadth

To assess whether a subpoena is overbroad, the court considers whether "the materials demanded by the subpoena are relevant to the subject matter of the grand jury's investigation." United States v. Vilar, No. 05 CR 621, 2007 WL 1075041, at *44 (S.D.N.Y. Apr. 4, 2007). "[R]elevancy and adequacy or excess in the breadth of the subpoena are matters variable in relation to the nature, purposes and scope of the inquiry." Okla. Press Publ'g Co. v. Walling, 327 U.S. 186, 209 (1946). Furthermore, because a grand jury cannot be expected to identify its "exact [evidentiary] needs" in advance and is entitled to material that may shed "possible light" on conduct under investigation, relevance in this

context is "necessarily a term of broader import than when
applied to evidence at trial." Virag, 430 N.E.2d at 1252-53;
see also Trump v. Vance, 140 S. Ct. at 2430 (recognizing the
grand jury's "ability to acquire 'all information that might
possibly bear on its investigation.'" (quoting R.
Enterprises, 498 U.S. at 297)). "Any circumstance permitting
intelligent estimate of relevancy is sufficient to support a
direction that the subpoena's mandate be obeyed." Manning v.
Valente, 72 N.Y.S.2d 88, 93 (App. Div. 1st Dep't 1947)
(internal quotation marks omitted).

Thus, to overcome the presumption that a grand jury
subpoena is valid, a party moving to quash a grand jury
subpoena on overbreadth grounds must "demonstrate, by
concrete evidence, . . . 'that a particular category of
documents can have no conceivable relevance to any legitimate
object of investigation by the grand jury.'" Virag, 430
N.E.2d at 1253 (quoting In re Horowitz, 482 F.2d 72, 80 (2d
Cir. 1973); accord Trump v. Vance, 140 S. Ct. at 2450 (Alito,
J., dissenting) (quoting In re Grand Jury Subpoenas for
Locals 17, 135, and 608, 528 N.E.2d 1195, 1201 (1988)). Put
differently, he "must show that 'the documents are so
unrelated to the subject of inquiry as to make it obvious
that their production would be futile as an aid to the' Grand
Jury's investigation." Virag, 430 N.E.2d at 1253

38

(quoting Manning, 72 N.Y.S.2d at 92); see also In re Nassau County Grand Jury Subpoena, 830 N.E.2d 1118, 1126 (N.Y. 2005). Conclusory assertions of irrelevance do not suffice. Virag, 430 N.E.2d at 1253.

### 3.  Bad Faith

A grand jury may not "select targets of investigation out of malice or an intent to harass." R. Enterprises, 498 U.S. at 299. However, because a New York state grand jury subpoena is presumptively valid, it "can only be quashed by proving an affirmative act of impropriety or bad faith." See Grand Jury Subpoenas, 528 N.E.2d at 1201; Virag, 430 N.E.2d at 1252 (presumption may be rebutted only "by concrete evidence that the subpoena was issued in bad faith or that it is for some other reason invalid" (internal quotation marks omitted)); see also R. Enterprises, 498 U.S. at 300 ("We begin by reiterating that the law presumes, absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority."); In re Grand Jury Proceeding, 2020 WL 4744687, at *8 (2d Cir. Aug. 14, 2020) (noting that a party "must present particularized proof of an improper purpose to overcome the presumption of propriety of the grand jury subpoena" (internal quotation marks omitted)).

As noted above, where a petitioner bringing a motion to quash alleges that a subpoena's breadth reflects bad faith or

impropriety, the petitioner must consequently demonstrate "that a particular category of documents can have no conceivable relevance to any legitimate object of investigation" by the grand jury. Id. at 1253 (quoting Horowitz, 482 F.2d at 80; see also Grand Jury Subpoenas, 528 N.E.2d at 1201. "Bare assertions of the lack of relevancy will not suffice," and mere speculation as to the grand jury's purpose does not allege the type of abuse that would overcome a subpoena's presumptive validity. Id. at 1253; United States v. Leung, 40 F.3d 577, 582 (2d Cir. 1994) (observing that "speculations about possible irregularities in the grand jury investigation [are] insufficient to overcome the presumption that [an] investigation was for a proper purpose").

In determining whether a subpoena's demands are relevant to a legitimate purpose, courts should not attempt to predict the probable results of the investigation; "[i]nstead, the inquiry should [center] on whether the material sought by the subpoena was related to a legitimate objective of the Grand Jury investigation." In re Vanderbilt, 448 N.Y.S.2d 3, 5-6 (App. Div. 1st Dep't 1982). As noted above, the Grand Jury may legitimately "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." R. Enterprises, 498 U.S. at 297; Branzburg, 408 U.S. at 701 (grand jury's work "may be triggered by tips,

rumors, evidence proffered by the prosecutor, or the personal knowledge of the grand jurors"); see also People v. Doe, 445 N.Y.S.2d at 777; In re Bick, 372 N.Y.S.2d 447, 450 (Sup. Ct. N.Y. Cty. 1975) ("In other words, absent abuse of power a grand jury has a broad scope of inquiry.").

Despite the broad standard above, courts have provided guidance on improper purposes for the use of grand jury subpoenas. For example, it is "improper for the government to use a grand jury subpoena for the sole or dominant purpose of preparing for trial." United States v. Salameh, 152 F.3d 88, 109-10 (2d Cir. 1998) (internal quotation marks omitted). Similarly, grand jury subpoenas may not be used primarily for the purposes of gathering evidence for civil proceedings. See Harlem Teams for Self-Help, Inc. v. Dep't of Investigation of City of N.Y., 472 N.Y.S.2d 967, 971 (Sup. Ct. N.Y. Cty. 1984); In re Morgan, 377 F. Supp. 281, 285-86 (S.D.N.Y. 1974). The timing of a grand jury subpoena may also shed light on an improper purpose, particularly if the subpoena is issued after a related indictment. See In re Grand Jury Subpoena (Simels), 767 F.2d 26, 29-30 (2d Cir. 1985). The grand jury's investigative powers likewise may not be used to violate a valid privilege. See Stern v. Morgenthau, 465 N.E.2d 349, 351 (N.Y. 1984).

C.   HIGH RESPECT FOR THE OFFICE OF THE PRESIDENT

41

The standards set forth above apply broadly to all parties that challenge a grand jury subpoena. However, the President is not an ordinary individual; "[t]he President is the only person who alone composes a branch of government." Trump v. Mazars USA, LLP, 140 S. Ct. at 2034. The Court is thus mindful that "[t]he high respect that is owed to the office of the Chief Executive . . . should inform the conduct of the entire proceeding, including the timing and scope of discovery." Trump v. Vance, 140 S. Ct. at 2430 (quoting Clinton v. Jones, 520 U.S. 681, 707 (1997)). The District Attorney presses that the Court should not equate this high respect with a heightened standard of need or scrutiny when assessing the validity of the Mazars Subpoena. Because the nature of the respect due to the office of the President is not altogether self-evident, the Court briefly sets forth below its understanding of what such respect entails in the context of the particular challenges raised here.

High respect for the office of the President does not require state grand juries to satisfy a heightened standard of need when issuing subpoenas for the records of the President or related businesses and individuals. See Trump v. Vance, 140 S. Ct. at 2430 ("Requiring a state grand jury to meet a heightened standard of need would hobble the grand jury's ability to acquire 'all information that might

possibly bear on its investigation.'" (quoting R. Enterprises, 498 U.S. at 297)). As the Court interprets the Supreme Court's Opinion, high respect for the President's office primarily requires sensitivity to the demands imposed by the President's Article II duties and the executive privileges attendant to discharge of those duties. See, e.g., id. at 2430 (noting that courts presiding over suits involving the President must "schedule proceedings so as to avoid significant interference with the President's ongoing discharge of his official responsibilities" (quoting Clinton, 520 U.S. at 724 (Breyer, J., concurring in judgment))); id. at 2431 (adding that courts should quash or modify subpoenas if necessary where the President "sets forth and explains a conflict between judicial proceeding and public duties," or shows that a court order or subpoena would "significantly interfere with his efforts" to carry out those duties (quoting Clinton, 520 U.S. at 710, 714 (Breyer, J., concurring in judgment))).

High respect for the President's office, however, is not strictly limited to the considerations of timing, burden, and privilege highlighted above. The Supreme Court also observed that the protections against subpoenas that are overbroad or issued in bad faith "apply with special force to a President, in light of the office's unique position as the head of the

43

Executive Branch," and that judicial review must accordingly be "particularly meticulous." Id. at 2428, 2430. The Court does not understand "particularly meticulous" review to require any heightened showing from the District Attorney. Indeed, the Nixon Court noted that "where a subpoena is directed to a President of the United States," appellate review "should be particularly meticulous to ensure that the [relevant standards] have been correctly applied." United States v. Nixon, 418 U.S. 683, 702 (1974). Accordingly, the Court must take particular care to correctly apply the existing legal standards governing grand jury subpoenas and motions to dismiss, rather than substantively alter those standards. The guard furnished to the President ultimately lies in a court's application of "established legal and constitutional principles to individual subpoenas in a manner that preserves both the independence of the Executive and the integrity of the criminal justice system." Trump v. Vance, 140 S. Ct. at 2431.

In this respect, the Supreme Court's Opinion above suggests that high respect for the President's office does not absolve the President of the need to affirmatively plead or show impropriety, and it does not categorically narrow the scope of materials that may be relevant to a grand jury. See Trump v. Vance, 140 S. Ct. at 2428 (citing Virag for

44

proposition that the President can challenge grand jury subpoenas "by an affirmative showing of impropriety, including bad faith" (internal quotation marks omitted)); id. at 2430 (citing R. Enterprises for proposition that judicial scrutiny of subpoenas directed to a President should not "hobble the grand jury's ability to acquire all information that might possibly bear on its investigation" (internal quotation marks omitted)).[15] As the Supreme Court noted, where a subpoena requests only a President's private papers, "he must stand, as respects that paper, in nearly the same situation with any other individual . . . . And it is only nearly -- and not entirely -- because the President retains the right to assert privilege over documents that, while ostensibly private, partake of the character of an official paper." Id. at 2429 (internal quotation marks and citation omitted).

    Accordingly, while the Court will "be particularly meticulous to ensure" that the relevant legal standards are

---

[15] In fact, categorically lessening the pleading standard for the President in this context might have the additional impermissible consequence of undermining the distinction between subpoenas issued by grand juries, which are arms of the court, and non-judicial "office" subpoenas issued by New York state agencies. Whereas grand jury subpoenas are presumptively valid, state issuers of an office subpoena must affirmatively justify their requests when challenged. See Virag, 430 N.E.2d at 1251; Sussman v. N.Y.S. Organized Crime Task Force, 347 N.E.2d 638, 640-41 (N.Y. 1976) ("Nor is this historical distinction between office and Grand Jury investigations accidental."). The Court declines to adopt a categorical standard that risks blurring this important distinction.

correctly applied in this case, it will abide by those standards in full rather than alter them. Nixon, 418 U.S. at 702. High respect for the President does not imply diminished respect for the ancient functions of the grand jury or the long-established standards governing challenges to its subpoenas.

### III. **DISCUSSION**

As noted above, the overbreadth and bad faith inquiries in this case address many of the same facts. Accordingly, the Court structures the following discussion around the factual allegations in the SAC and notes whether these allegations suggest either overbreadth or bad faith as appropriate. The Court begins by discussing the timing and preparation of the Mazars Subpoena, and whether such circumstances plausibly reflect the extent of the grand jury's investigation. The Court then turns to the subpoena's particular requests, focusing on the requests' timeframe, geographic scope, and the nature of the documents requested.[16] The Court concludes by considering whether discovery or leave to amend the SAC might be appropriate in light of its failure to state a claim.

---

[16] Although the Court divides its discussion into separate sections addressing different factual allegations, it does not treat these allegations in isolation. On the contrary, the Court considers the allegations as a whole and construes all reasonable inferences drawn from the well-pled allegations in the light most favorable to the non-movant, as required by the standards set forth above in Section II.A.

A.    <u>TIMING AND PREPARATION OF THE MAZARS SUBPOENA</u>

The claims in the SAC focus largely on the District Attorney's choice to copy two congressional subpoenas when preparing the Mazars Subpoena. The Court is familiar with this fact pattern, having already concluded that such copying did not demonstrate bad faith for the purposes of _Younger_ abstention. _See_ _Trump v. Vance_, 395 F. Supp. 3d at 298-300.[17] However, as the President observed, the bad faith analysis under _Younger_ does not necessarily track the bad faith analysis otherwise required by the Federal and New York State cases cited by the Supreme Court in its Opinion above. (_See_ Opposition at 24-25.) The same could be said of the overbreadth analysis. Accordingly, the Court will consider the SAC's allegations regarding the copying of the two congressional subpoenas under the legal standards set forth above in Section II, rather than the standards that governed its analysis in the _Younger_ context.

Though the governing legal standards and the submissions now before the Court are different, the Court's conclusion is

---

[17] Because the Second Circuit vacated this Court's decision to abstain in light of the federal-state conflict presented here, the Second Circuit did not address this Court's findings regarding bad faith in the _Younger_ context. _See_ _Trump v. Vance_, 941 F.3d at 639 n.11. Although the Court now assesses bad faith under different legal standards and in reliance on a different set of submissions, the Court will occasionally refer to its previous findings regarding bad faith where relevant to note continuities between its earlier findings and the observations made in the instant Decision and Order.

not.[18] As explained in greater detail below, the President's allegations regarding the timing and preparation of the Mazars Subpoena do not adequately rebut the subpoena's presumptive validity. The alleged circumstances of the Mazars Subpoena's preparation and issuance do not raise a reasonable inference of retaliation or harassment, and the President's allegations that the subpoena's resulting requests are outside the scope of the grand jury's investigation fail to account for obvious alternative explanations that accord with the presumptive validity of the subpoena.

      1.   <u>Timing of the Mazars Subpoena's Issuance</u>

The President first orients his allegations regarding the Mazars Subpoena by noting two details about the timing of its issuance: (1) that it was issued at some point after the President claimed the Trump Organization Subpoena could not legitimately be read to request tax returns; and (2) that it was issued during a time when news reports suggested Democrats

---

[18] The Court notes that the Supreme Court and President cited <u>Huffman v. Pursue, Ltd.</u>, 420 U.S. 592 (1975) as relevant precedent for the bad faith inquiry. <u>See</u> <u>Trump v. Vance</u>, 140 S. Ct. at 2428; SAC ¶ 51. The Court would conclude that the President has failed to allege bad faith if <u>Huffman</u>, the "civil counterpart" of <u>Younger</u>, controls the analysis. <u>See</u> <u>Huffman</u>, 420 U.S. at 611. Under this line of case law, "[a] state proceeding that is legitimate in its purposes, but unconstitutional in its execution -- even when the violations of constitutional rights are egregious -- will not warrant the application of the bad faith exception." <u>Diamond "D" Constr. Corp. v. McGowan</u>, 282 F.3d 191, 198 (2d Cir. 2002). As explained elsewhere in this Decision, the SAC's allegations do not adequately reflect that the grand jury investigation and Mazars Subpoena are "anything other than a straightforward enforcement of the laws of New York." <u>Schlagler v. Phillips</u>, 166 F.3d 439, 443 (2d Cir. 1999).

desired access to the President's tax returns. (See SAC ¶¶
13-17, 24.) It is true that the timing of a subpoena may
suggest an improper purpose animated its issuance. See
Simels, 767 F.2d at 29-30; see also Hynes v. Lerner, 376
N.E.2d 1294, 1296 (N.Y. 1978) ("[O]nce an indictment is
issued, a Grand Jury subpoena duces tecum may not be used for
the sole or dominant purpose of preparing the pending
indictment for trial."). However, the allegations regarding
timing here lack sufficient factual support to render them
plausible.

The Court begins by noting several issues with the
allegation that the District Attorney issued the Mazars
Subpoena to retaliate against the President's refusal to
produce tax returns under the Trump Organization Subpoena.
The SAC alleges that the District Attorney issued the Trump
Organization Subpoena on August 1, 2019, and requested tax
returns pursuant to that subpoena at some unspecified point
thereafter. (SAC ¶¶ 13, 16.) "When the President's attorneys
pointed out that the subpoena could not plausibly be read to
demand returns, the District Attorney declined to defend his
implausible reading" and instead issued the Mazars Subpoena,
which explicitly called for tax returns. (Id. ¶¶ 16-18.)[19]

─────────────
[19] The Court notes that the SAC does not specify the date on which the
President objected to producing tax returns, and it will not rely on
extrinsic evidence such as the Shinerock Declaration to identify that

While the President conclusorily describes the issuance of the Mazars Subpoena as retaliation for the President's refusal to produce tax returns under the Trump Organization Subpoena, the alleged fact pattern described above does not render such an inference reasonable. The SAC lacks detailed factual allegations; it neither includes quotations from nor attaches correspondence in which the District Attorney's communications indicated anything but good faith. Without additional factual allegations supporting the claim that the District Attorney prepared and issued the Mazars Subpoena "in a fit of pique" prompted by the refusal to produce tax returns (see Opposition at 2), this sequence of events could obviously be explained in ways that do not impugn the presumptive validity of the Mazars Subpoena. First, the District Attorney's decision not to argue that the Trump Organization Subpoena calls for tax returns obviously need not reflect bad faith; normally, acquiescence in the face of another party's opposition is a sign of good faith negotiations. Similarly, the District Attorney's choice to issue a new subpoena that

---

date. The Court will instead assume for the purposes of this Decision that the President raised his specific objection regarding tax returns before the District Attorney issued the Mazars Subpoena, because it would not be reasonable to infer that the Mazars Subpoena was issued in retaliation for objections that the President had not yet made. (See Opposition at 6 ("Only after a disagreement arose over whether [the Trump Organization Subpoena] required the production of tax returns was the sweeping subpoena issued to Mazars.").)

explicitly called for tax returns could just as readily reflect either a good faith agreement that the President's interpretation of the Trump Organization Subpoena was valid or a conclusion that issuing a clearer subpoena would simply be preferable to prolonged arguments.

While the alternatives suggested above might not in fact be the case, they are "obvious alternative explanations" consistent with general experience and common sense that undermine the reasonableness of the factual inferences that the President asks the Court to draw. The fundamental cases that set forth the standards for motions under Rule 12(b)(6) require this Court to consider such possibilities when determining the plausibility of a complaint's allegations. For example, the Twombly court declined to infer the existence of an anticompetitive agreement based only on conduct that was "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy"; given an equally compelling factual inference based on legitimate conduct, the court saw "no reason to infer that the companies had agreed among themselves to do what was only natural anyway." 550 U.S. at 554, 566. The Iqbal Court similarly held that while the plaintiff's allegations regarding certain arrests and detentions were consistent with illegal discrimination, "given more likely explanations, they

[did] not plausibly establish this purpose . . . As between that 'obvious alternative explanation' for the arrests and the purposeful, invidious discrimination" that the plaintiff asked the Court to infer, "discrimination [was] not a plausible conclusion." 556 U.S. at 681-82 (quoting <u>Twombly</u>, 550 U.S. at 567).

The Supreme Court has since reiterated that courts should remain mindful of alternative explanations for alleged misconduct when those explanations would seem fairly obvious in their proper context. <u>See</u>, <u>e.g.</u>, <u>Fifth Third Bancorp v. Dudenhoeffer</u>, 573 U.S. 409, 429-30 (2014). Considering that grand jury subpoenas are presumptively valid, the inference that the Mazars Subpoena is retaliatory simply because it asks for tax returns and was issued approximately one month after the Trump Organization Subpoena is speculative in light of the obvious alternatives here.

Nor does the issuance of the subpoena to Mazars plausibly show "an effort to circumvent the President." (SAC ¶ 16.) As a matter of common sense, it is entirely unsurprising that a grand jury would issue multiple subpoenas to multiple different recipients, and it is not uncommon for a grand jury subpoena to request a subject's documents from third-party custodians. <u>See</u>, <u>e.g.</u>, <u>Hirschfield v. City of New York</u>, 686 N.Y.S.2d 367, 370 (App. Div. 1st Dep't 1999). The simple fact

that the Mazars Subpoena was issued shortly after the Trump Organization subpoena and requested tax returns does not raise a reasonable inference that it served the same purposes as the Trump Organization Subpoena, that the grand jury should have requested tax returns directly from the Trump Organization, or that the grand jury had no independent reason to request any other documents from Mazars. While the allegations above may be consistent with a bad faith effort to circumvent the President, they are certainly not suggestive of it. The Court cannot lightly assume bad faith on the part of the District Attorney, and the President's allegations simply do not contain sufficient factual support to render the numerous inferences required above non-speculative.

For example, in Hirschfield, the District Attorney issued a grand jury subpoena to Citibank for the financial records of a prominent New York real estate developer and political figure and affiliated entities in connection with an investigation into whether individual and corporate transactions over a five-year period may have violated state tax laws. See id. at 368. Hirschfield alleged that "the investigation was politically motivated" and undertaken in bad faith. Id. at 369. The Appellate Division upheld the subpoenas because there was an objective, good faith

justification to issue them, and it did not consider the particular details of the subpoenas' issuance or terms sufficient to reflect either bad faith or a violation of Hirschfield's rights. See id. at 370. While Hirschfield involved a claim for damages on summary judgment, the Appellate Division's reasoning clearly counsels against concluding that the issuance of a grand jury subpoena to a third-party custodian raises a reasonable inference of bad faith, either on its own or in conjunction with the allegations regarding timing and copying here.

The Court is also not persuaded that contemporaneous articles indicating "Democrats had become increasingly dismayed over their ongoing failure to get their hands on the [President's tax returns]," or that it might "be more difficult to fend off a subpoena in a criminal investigation with a sitting grand jury," support a plausible claim that the Mazars Subpoena was issued in bad faith. (SAC ¶ 24 (internal quotation marks omitted).) Taking these allegations as true, the SAC still provides no detail on why any similarity in timing suggests that the District Attorney issued the Mazars Subpoena primarily to assuage those particular politicians' dismay. While the Mazars Subpoena may well have been issued for that particular purpose, the lack of specific facts tying the Mazars Subpoena to those

politicians prevents the Court from reasonably inferring that
the Mazars Subpoena reflects an effort to advance the
Democrats' goals rather than legitimate ones.[20]

Certainly, the Court is aware, based on reports of public
record, that Democrats in the House of Representatives have
subpoenaed the President's tax returns too. Taking the SAC's
allegations as a whole, the President may have intended to
suggest that the Mazars Subpoena was primarily aimed at
effectuating Congressional Democrats' substantially
identical subpoenas in this regard. However, unless the
documents are leaked, Congressional Democrats would not have
access to them. N.Y. Crim. Proc. Law § 190.25(4) (McKinney
2019); N.Y. Penal Law § 215.70 (McKinney 2019). The Court
cannot lightly infer that the District Attorney will leak
documents subject to the rules of grand jury secrecy. Because
unlawful grand jury disclosure is a felony under New York
state law, "those who make unauthorized disclosures regarding
a grand jury subpoena do so at their peril." See Trump v.
Vance, 140 S. Ct. at 2427; see also Trump v. Vance, 395 F.
Supp. 3d at 304 (noting that "a grand jury is under a legal

---

[20] See Matter of Archuleta, 432 F. Supp. 583, 594 (S.D.N.Y. 1977)
(declining to impute bad faith to federal grand jury in New York on the
basis of alleged harassment by New Mexico officials where petitioner did
"not specify a causal connection between those [political] activities [in
New Mexico] and whatever local ire they may have provoked and the issuance
of a subpoena by a federal grand jury in the Southern District of New
York").

obligation to keep the confidentiality of its records"). The SAC does not provide an adequate basis to assume unauthorized disclosures to congressional Democrats will happen regardless of the rules applicable to grand juries. Attributing the speculative malice of apparently unaffiliated Democrats to the District Attorney on such bare allegations would not accord with the respect due to state grand jury proceedings. See Trump v. Vance, 395 F. Supp. 3d at 299 ("To . . . impute bad faith to the District Attorney on the basis of statements made by various legislators . . . would be incompatible with federal expression of a decent respect for the state authority's functions." (internal quotation marks omitted)).

While timing alone may indicate that a subpoena was issued for an improper purpose, in the cases that have found such impropriety, "the timing and other circumstances surrounding the issuance of the subpoena have been far more suggestive of abuse than are the circumstances here." Leung, 40 F.3d at 582. Without factual allegations supporting the claim that the District Attorney failed to negotiate in good faith, or facts tying the Mazars Subpoena to congressional Democrats, the Court cannot find that retaliation is a reasonable inference based solely on the timing of the issuance of the Mazars Subpoena. But because the Court is mindful that the allegations detailed above should be

56

considered not in isolation, but rather in conjunction with the SAC's other allegations, the Court now turns to those other allegations to examine whether they render the inferences of misconduct here reasonable.

### 2.   Copying of Congressional Subpoenas

The SAC's allegations turn in significant part on the District Attorney's choice to base the Mazars Subpoena almost entirely on two congressional subpoenas. As he did in the preliminary injunction proceedings before this Court, the President emphasizes that the Mazars Subpoena is copied almost entirely from the House Oversight Committee's subpoena to the Trump Organization and adds only a request for tax returns -- a request that the House Ways and Means Committee made in its subpoena to the Treasury Department and the IRS. (SAC ¶¶ 19-20.) During those initial proceedings, the Court rejected the President's arguments that the District Attorney's copying demonstrated bad faith in the context of abstention. See Trump v. Vance, 395 F. Supp. 3d at 298-300. The Court will nevertheless consider the President's allegations regarding copying as now framed in the SAC under the legal standards set forth above in Section II. Though the legal standards are not the same, the Court nonetheless concludes again that the President has failed to plausibly allege bad faith.

As an initial matter, the Court notes that the President has not cited any authority for the proposition that a grand jury subpoena is invalid because it is copied from another source. On the contrary, the Court's review of relevant case law suggests that the mere copying of other sources does not inherently render a grand jury subpoena overbroad or issued in bad faith. For example, one court in this District declined to quash a grand jury subpoena that "mirror[ed]" a rider to a search warrant, even where both documents sought "virtually every corporate document" of multiple corporate entities and the search warrant itself was found partially overbroad. See Vilar, 2007 WL 1075041, at *45-46. Though that court did modify the subpoena, it noted that the simple fact that the subpoena mirrored a search warrant did "not mean that even most of the categories [of documents] sought in the Subpoena [were] irrelevant"; on the contrary, the court held that because "the grand jury suspected at least some fraud going back nearly twenty years" by high ranking officers of the corporations, the defendants "[could not] say that the[] documents [had] 'no conceivable relevance' to the investigation." Id. at *46.[21] In light of cases such as Vilar,

---

[21] See also, e.g., Matter of Archuleta, 432 F. Supp. at 595-96 (a subpoena is not burdensome or oppressive merely because it "seek[s] identical information from the witness" as a subpoena in a different jurisdiction, though "at some point such successive or contemporaneous subpoenas might well become abusive in their cumulative impact").

the Court is not persuaded that mere allegations of copying alone would plausibly state a claim that a grand jury subpoena is overbroad or constitutes harassment.

Of course, the President does not rely on the mere fact of copying alone. Rather, he alleges that the District Attorney did not issue the Mazars Subpoena in good faith based on the District Attorney's representations that "the decision to mirror the [congressional] subpoena was about efficiency, meaning it was intended to facilitate the easy production by Mazars of a set of documents already collected, and to minimize any claim that the [District Attorney]'s request imposed new and different burdens." (SAC ¶ 22.) The SAC cites this justification as evidence of bad faith because "[t]here is nothing efficient -- let alone proper -- about demanding voluminous records that are irrelevant to the grand jury's work[,] . . . a subpoena's legitimacy is not defined by what is most efficient for the records custodian[,] [a]nd issuing a patently overbroad subpoena is obviously not efficient for the owner whose records are being demanded." (Id. ¶ 23.)

Putting aside the conclusory assertions that the subpoena is "patently overbroad" and demands records that are "irrelevant to the grand jury's work," the Court agrees that a "subpoena's legitimacy is not defined by what is most efficient for the records custodian." But that is largely

beside the point. A subpoena's legitimacy is presumed in this context. Rather than arguing that the District Attorney cannot rely upon efficiency as a good faith basis to issue the Mazars Subpoena, the President must allege that the efficiency rationale affirmatively demonstrates bad faith on the District Attorney's part. But the underlying law governing challenges to grand jury subpoenas undercuts the persuasive force of allegations to this effect. As the Appellate Division of the New York Supreme Court has indicated, the New York County district attorney's "efforts to make compliance with [a] subpoena less onerous" for a third-party records custodian tend to support the conclusion that a grand jury subpoena was not issued to harass or retaliate against the owner of the records. Hirschfield, 686 N.Y.S.2d at 370.

Viewed in this context, the President's arguments regarding efficiency do not raise a reasonable inference that the Mazars Subpoena was issued in bad faith. Taking as true the justifications attributed to the District Attorney above, the allegations plainly reflect that efficiency explains why the District Attorney *drafted* the Mazars Subpoena the way he did, rather than why he *issued* it.[22] Without further

---

[22] The Court is also not persuaded by the President's argument that the District Attorney has given "inconsistent" or "shifting" justifications for the Mazars Subpoena simply because the District Attorney claimed in

allegations supporting an improper purpose for issuing the subpoena, the allegations about the District Attorney's draftsmanship do little to state a claim for bad faith.

The SAC is not devoid of allegations that the copying of congressional subpoenas indicates the Mazars Subpoena was issued for purposes that are not legitimately within the grand jury's jurisdiction. The SAC appears to allege that the District Attorney could not have believed in good faith that the Mazars Subpoena requested documents that were relevant to the grand jury's investigation because the two underlying sources of the Mazars Subpoena's language were tailored to request documents relevant to the purposes of Federal legislative investigations. (See SAC ¶¶ 25-26, 36-45.) The Court readily accepts that the specific legislative purposes cited by the President in the SAC are not within the jurisdiction of a New York County grand jury.

The Court notes, however, that the SAC impermissibly conflates the Mazars Subpoena with the congressional subpoenas that it copies at various points. (See, e.g., id.

his Memo that he and Congress are investigating the same "potentially improper conduct," rather than focusing on "efficiency" per se. (Opposition at 23-24.) Whether or not the grand jury and Congress are actually investigating similar conduct (and the Court need not and does not decide that issue), it would obviously still be efficient for the District Attorney to copy congressional subpoenas addressed to the same records custodian. There is nothing inherently inconsistent about the two explanations.

¶ 5 ("[T]he Mazars subpoena . . . was not designed to meet the needs of the grand jury. It was drafted by a congressional committee . . . ."); id. ¶ 36 ("Of course, the incongruity between this subpoena and any investigation into particular state-law crimes makes sense. The original author of the subpoena (aside from the request for tax returns) -- the House Oversight Committee -- had no intention of it being used to facilitate a state-law criminal investigation.")). The House committees are not the authors of the Mazars Subpoena, as even the choice to copy and combine other subpoenas reflects the District Attorney's drafting decisions; the Court cannot reasonably infer that the purposes that Congress had in mind when drafting similar language somehow transferred to the Mazars Subpoena simply by virtue of copying.[23] The Court need not accept as true allegations that are not well-pled, and largely conclusory besides.

In a similar vein, the Court cannot reasonably infer that documents requested by the Mazars Subpoena are

---

[23] The Mazars Subpoena reflects other choices by the District Attorney as well, which the Court points out solely for the purpose of noting the President's improper conflation of the two subpoenas. In particular, request 1(e)(i) reaches communications between Bender and a much larger set of individuals -- "any employee or representative of the Trump Entities," as defined in paragraph 1 -- compared to corresponding request 4(a) of the House Committee's subpoena, which reaches only communications between Bender and the President or "any employee or representative of the Trump Organization." Request 1(e)(ii) of the Mazars Subpoena is similarly broader than the corresponding request 4(b) of the House Committee's subpoena.

irrelevant to legitimate grand jury purposes simply because they may also be relevant to the legislative purposes of the House committees that originally drafted similar requests. Put simply, a particular document may be desirable for multiple valid purposes. Countless precedents reflect that a state's criminal investigation of particular subject matter may legitimately overlap with the subject matter of federal criminal investigations, civil proceedings, and legislative inquiries.

Indeed, the notion that state and national interests may not overlap is in tension with well-established doctrine. In the criminal context, "the dual-sovereignty doctrine" provides that "a single act gives rise to distinct offenses -- and thus may subject a person to successive prosecutions -- if it violates the laws of separate sovereigns." Puerto Rico v. Sanchez Valle, 136 S. Ct. 1863, 1867 (2016) (pertaining to double jeopardy). Because "[t]he states and the national government are distinct political communities" empowered "independently to determine what shall be an offense . . . and to punish such offenses," a state may legitimately investigate the same conduct as a federal criminal authority as long as its investigation is not a "tool" or a "sham and a cover" for the federal proceeding.

United States v. Davis, 906 F.2d 829, 832 (2d Cir. 1990) (pertaining to suppression).[24]

Moreover, the Supreme Court has clearly stated that particular information may be relevant to both legitimate legislative purposes and legitimate state criminal purposes. See, e.g., Hutcheson v. United States, 369 U.S. 599, 613 (1962) (Opinion of Harlan, J.) (noting that "the authority of [Congress], directly or through its committees, to require pertinent disclosures in aid of its own constitutional power is not abridged because the information sought to be elicited may also be of use in" state criminal proceedings) (internal quotation marks omitted); id. at 624 (Brennan, J., concurring) ("[T]hat the conduct under inquiry may have some relevance to the subject matter of a pending state indictment cannot absolutely foreclose congressional inquiry."). Just as legislative inquiry cannot be foreclosed simply because the information requested might pertain to state criminal inquiries, a state criminal inquiry should not be foreclosed

---

[24] Similarly, the documents requested in criminal investigations may also be relevant for the purposes of civil proceedings. And as long as the grand jury is not collecting information predominantly for the purpose of aiding those civil proceedings, there is nothing inherently suspect about grand jury requests for the same documents. See, e.g., Harlem Teams for Self-Help, Inc., 472 N.Y.S. 2d at 971; Sec. & Exchange Comm'n v. Dresser Indus., Inc., 628 F.2d 1368, 1377 (D.C. Cir. 1980) ("Effective enforcement of the securities laws requires that the SEC and Justice be able to investigate possible violations simultaneously.").

simply because it seeks documents that Congress believes will advance its legislative purposes.

Thus, the Court cannot infer that the documents are irrelevant to the grand jury simply because Congress sought them pursuant to the legislative purposes cited in the SAC. Nor does the SAC plausibly allege that the grand jury is predominantly pursuing federal, civil, or legislative purposes instead of the traditional and presumptively legitimate goals of vindicating New York County laws. In fact, the President does not contest that "the true subject of the grand jury investigation falls within the criminal jurisdiction of the County of New York." (Opposition at 19.) In light of these deficiencies, the SAC does not supply the Court with a reasonable expectation that discovery would reveal illegal conduct by the District Attorney.

3.   Circumstances Suggesting the Grand Jury Is Investigating Only the 2016 Michael Cohen Payments

Finally, the President claims that the SAC's allegations regarding timing and preparation raise a reasonable inference that the scope of the grand jury investigation is more limited than the Mazars Subpoena's requests. Specifically, the President argues that the Mazars Subpoena "is overbroad in relation to an investigation into payments made in 2016, and [that] copying a congressional subpoena for nearly a decade's

worth of financial documents and issuing it for no legitimate
reason states a claim for bad faith." (Opposition at 2.) The
SAC certainly contains numerous allegations suggesting the
grand jury is investigating the 2016 Michael Cohen Payments.
(See, e.g., SAC ¶ 12 ("According to published reports, the
focus of the District Attorney's investigation is payments
made by Michael Cohen in 2016 to certain individuals.").)
Taking well-pleaded factual allegations as true and drawing
reasonable inferences therefrom, the Court accepts that the
grand jury is investigating the 2016 Michael Cohen Payments.

Nonetheless, the SAC does not support a reasonable
inference that the grand jury's investigation is *limited* to
those payments. The President claims that the "best evidence"
of the scope of the grand jury investigation is the Trump
Organization Subpoena. (Opposition at 5.) He asserts that
because that subpoena focused on the 2016 Michael Cohen
Payments, and the Mazars Subpoena was issued within a month
of that subpoena, the grand jury remains exclusively focused
on those payments. (See id. at 5-6.) This argument is
fundamentally flawed.

First, the Court cannot reasonably infer that a single
subpoena defines the entire scope of a grand jury inquiry. As
a matter of common sense and experience, a grand jury
routinely issues multiple subpoenas to multiple recipients

across the course of its investigation. And "the fact that the petitioner was served with one subpoena does not give it immunity from complying with the reasonable demands of a subsequent subpoena." In re Grand Jury Subpoena Duces Tecum Addressed to Provision Salesmen and Distribs. Union, Local 627, AFL-CIO, 203 F. Supp. 575, 582-83 (S.D.N.Y. 1961). The subsequent subpoena in question here was not even served on the President, and the President has cited no cases to suggest that a grand jury subpoena is issued in bad faith merely because it requests a broader range of documents than a prior subpoena. The SAC provides no plausible basis to support a reasonable inference that subpoenas issued 28 days apart address the same exact subject matter, particularly considering that the grand jury investigation had also already developed over the course of the prior year. (See SAC ¶¶ 1, 11 (noting the investigation began in "the summer of 2018").) Because the timing of the Mazars Subpoena's issuance is not otherwise suspicious for the reasons addressed in Section III.A.1., that the two subpoenas were issued in the same month does not raise a reasonable inference that they address the same conduct.

Second, the inference that a grand jury investigation into the 2016 Michael Cohen Payments must be limited to those payments is speculative in light of the obvious alternative

explanation that the grand jury's broader requests might simply indicate a broader investigation. Fully consistent with -- if not suggestive of -- this alternative, the SAC notes that the District Attorney claims to be investigating "business transactions involving multiple individuals whose conduct may have violated state law." (Id. ¶ 11.) In describing the investigation, the SAC also quotes the New York Times for the proposition that "[i]n New York, filing a false business record can be a crime." (Id. ¶ 12.)

At no point does the SAC provide plausible basis to support a reasonable inference that the grand jury investigation into business transactions or the filing of false business records could not include transactions and record filings beyond those related to the 2016 Michael Cohen Payments. Its own allegations raise the obvious alternative explanation that the investigation need not be so limited. Ultimately, the President merely asserts that the Court must accept his speculative limitation on the scope of the grand jury's investigation as the actual limits of that investigation. But the Court need not accept as true conclusory and speculative allegations that lack sufficient factual support under Rule 12(b)(6). And accepting speculative assertions regarding the scope of a grand jury investigation risks running afoul of the substantive law that

governs the President's claims. See Virag, 430 N.E.2d at 1253 (noting that "petitioners merely speculated as to what, in their view, was the Grand Jury's purpose in seeking the business records . . . . This allegation, without more, was insufficient to overcome the presumption that the materials sought were relevant to the Grand Jury's investigation . . .").

Third, the Court is obligated to assess the plausibility of factual assertions in light of common sense and experience as well as the legal and factual context. See supra Section II.A. Judicial experience readily confirms that the scope of an investigation may broaden in short order. Full Gospel Tabernacle, Inc. v. Attorney-General provides a helpful example. 536 N.Y.S.2d 201 (App. Div. 3d Dep't 1988). There, while New York's State Department of Taxation and Finance began an investigation focusing on "hush money" payments made by a televangelist to an individual with whom he had a sexual encounter, the "focus of the investigation shifted to other officers and employees" and the matter was referred to a grand jury for criminal investigation. Id. at 202. The grand jury subsequently served multiple subpoenas that eventually supported criminal charges as varied as falsifying business records, criminal solicitation, witness tampering, and filing false personal income tax returns. Id. at 203. Despite the

obviously broad and changing scope of the grand jury's investigation, the Appellate Division rejected the petitioners' claims to quash the subpoenas on the grounds of overbreadth and bad faith because the documents requested were relevant in light of "the broad investigatory function of the Grand Jury." Id. at 205–06.

Cases like Full Gospel Tabernacle remain relevant even at the pleading stage. The Court must assess the plausibility of claims of bad faith and overbreadth in light of the substantive law that governs them, and the President's allegations fail to address the readily apparent possibility that this grand jury investigation could be as ranging and exploratory as the many grand jury investigations that courts have approved in the past. Accord Virag, 430 N.E.2d at 1253 (explaining that grand jury investigations are "ranging, exploratory," and "necessarily broad" in nature).

In general, the President's allegations fail to adequately rebut the presumption of legitimacy that accords to grand jury subpoenas, even at the pleading stage. See, e.g., D'Alessandro v. City of N.Y., 713 F. App'x 1, 7 (2d Cir. 2017) (noting that claims did not cross the line "from conceivable to plausible" where they failed to rebut the presumption of regularity that attaches to grand jury proceedings). Twombly and Iqbal require courts to consider

70

the existence of clear alternatives that do not impugn the legitimacy of the defendants haled into court. The Court would be remiss to ignore these commands, particularly as applied to the presumptively legitimate investigations of a grand jury. Even though the President's burden to plausibly "allege" misconduct is less than the ultimate burden to affirmatively demonstrate or "show" that misconduct, the Court need not deem plausible the mere possibility of misconduct. <u>Iqbal</u>, 556 U.S. at 678-79 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility . . . where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.') (quoting Fed. R. Civ. P. 8(a)(2) ("Rule 8")).[25]

Fourth, the President asserts that the District Attorney has never publicly acknowledged that the grand jury investigation extends beyond the 2016 Michael Cohen Payments.

---

[25] The Court also rejects the President's assertion that the presumption of regularity is "weaker when employed against the President." (Opposition at 18.) As noted above in Section II.C., the Court does not interpret the high respect due to the President to alter the substantive legal standards that govern whether a grand jury has acted in bad faith or issued an overbroad subpoena. The many considerations that counsel against lightly attributing bad faith to the grand jury do not lose their force simply because the President says so, and the presumption of regularity that attaches to grand jury proceedings is not toothless at the pleading stage.

Assuming this assertion to be true, the Court cannot draw
from it a reasonable inference that the grand jury is
investigating only the 2016 Michael Cohen Payments, because
the District Attorney is under no obligation to affirmatively
describe the scope of his investigation. Quite to the
contrary, the grand jury's ability to perform its duties
"would be intolerably impeded if a District Attorney could be
compelled to divulge, before he is ready, the nature of an
investigation by the grand jury or the name of the person or
persons suspected." Virag, 430 N.E.2d at 1252 (internal
quotation marks omitted). The President cannot rely on the
District Attorney's silence "to set limits to the
investigation that the grand jury may conduct." Blair, 250
U.S. at 282.

For all of the reasons detailed above, the SAC's
allegations regarding the timing and copying of the Mazars
Subpoena do not plausibly suggest that the subpoena was
overbroad or issued in bad faith. The allegations fail to
address obvious alternative explanations for the conduct
described in the SAC, and they lack adequate factual support
to render reasonable the competing factual inferences that
the President claims this Court must accept. On its own terms,
the SAC fails to state a claim for relief.

The Court notes that it need not rely on the Shinerock Declaration, the news reports cited by the District Attorney, or the prior filings during the preliminary injunction phase of this proceeding to reach this conclusion. However, that does not mean the Court cannot be mindful of or refer to such matters short of converting the Motion to a motion for summary judgment. As noted above, matters of public record may be cited for purposes other than establishing the truth of the matters asserted, such as notice to a party or as illustrative examples suggesting a pleading's deficiency. See supra Section II.A. As an example, this Court previously observed that the grand jury investigation might be "substantially related to" matters other than the 2016 Michael Cohen Payments, such as bank and insurance fraud. See Trump v. Vance, 395 F. Supp. 3d at 300. Regardless of whether or not the Court's prior observation was true, the President was on notice that the scope of the grand jury's investigation might not be so limited as alleged in the SAC. Even if the scope of the investigation was not, in fact, broader, the possibility was plain enough that the President needed to allege further facts to render his competing inference plausible.[26]

---

[26] Because the Court need not consider the foregoing public matters for their truth or convert the Motion into a motion for summary judgment, the Court denies the President's request for discovery in the Letter as moot. See also infra Section III.C.1.

Accordingly, the Court concludes that the allegations regarding the timing and preparation of the Mazars Subpoena detailed above do not plausibly state a claim for either overbreadth or bad faith. The President has not alleged sufficient facts to permit a reasonable inference that the grand jury's investigation is limited to the 2016 Michael Cohen Payments, and neither the copying of congressional subpoenas nor the timing of the Mazars Subpoena's issuance plausibly suggest bad faith in light of the many obvious alternative explanations for the District Attorney's conduct and the presumptive legitimacy of grand jury subpoenas.

B.    THE BREADTH OF THE MAZARS SUBPOENA'S REQUESTS

While the Court is not persuaded that the allegations addressed above state a plausible claim for relief, the Court has yet to address whether the actual requests of the Mazars Subpoena might suggest overbreadth or bad faith, either on their own terms or in conjunction with the various allegations regarding the circumstances of the subpoena's preparation addressed in Section III.A. Accordingly, the Court addresses below allegations that might still suggest the Mazars Subpoena was issued in bad faith or is overbroad as to the timeframe, geographic scope, and documentary nature of its requests.

1.    The Timeframe of the Mazars Subpoena's Requests

The President alleges that the subpoena is overbroad because it orders the production of certain categories of documents from January 1, 2011, and requests production of other categories of documents "[r]egardless of time period." (SAC ¶ 18.) The Court finds that the President has not sufficiently pled that the subpoena is overbroad or was issued in bad faith on this basis.

"No magic figure limits the vintage of documents subject to a grand jury subpoena. The law requires only that the time bear some relation to the subject matter of the investigation." In re Rabbinical Seminary Netzach Israel Ramailis, 450 F. Supp. 1078, 1084 (E.D.N.Y. 1978) (citing Provision Salesmen, 203 F. Supp. 575). The timeframe of the records sought by the subpoena must, however, be "reasonable." Provision Salesmen, 203 F. Supp. at 578. Of course, this inquiry depends on the context and circumstances of each case, and the timeframe of the records sought "should bear some relation to the subject of the investigation." Id. (citations omitted). In Rabbinical Seminary, certain of the requested records predated (by six months) the seminary's participation in the program that was the subject of the investigation, and others postdated (by twenty-one months) the seminary's participation in that program. The court noted that "[t]he bona fides of the

75

Seminary's representations in entering the program and its subsequent use of the funds might not be subject to determination solely by inspection of records concerning the period of participation." 450 F. Supp. at 1085. Thus, it is clear that, in accordance with the grand jury's broad investigatory powers, a grand jury subpoena may seek documents dating from years outside of the specific time period during which a crime is thought to have been committed.

Furthermore, even if "some of the requested records are so old as to be beyond the potentially applicable statute of limitations," that "does not render the subpoena unreasonable." Id. n.5. Thus, the "subpoena need not be limited to calling for records from a period within the statute of limitations. The grand jury should be able to determine whether there were illegal activities which were begun before the statutory period and continued within it." Provision Salesmen, 203 F. Supp. at 578; see also United States v. Doe, 457 F.2d 895, 901 (2d Cir. 1972) ("[T]he grand jury's scope of inquiry is not limited to events which may themselves result in criminal prosecution, but is properly concerned with any evidence which may afford valuable leads for investigation of suspected criminal activity during the limitations period." (internal quotation marks and citations

omitted)); <u>United States v. Cohn</u>, 452 F.2d 881, 883 (2d Cir. 1971) (rejecting argument that witness's testimony, which related "to events which had occurred prior to the limitations period, could not be a basis for indictment"). The same logic applies to grand jury witness testimony, which is why New York courts have held that a witness may not refuse to answer questions regarding offenses that appear to be barred by the statute of limitations. <u>Johnson v. Keenan</u>, 396 N.Y.S.2d 232 (App. Div. 1st Dep't 1977).

The factors a court looks at to determine whether the timeframe of the records sought is reasonable include "the type and extent of the investigation; the materiality of the subject matter to the type of investigation; the particularity with which the documents are described; the good faith of the party demanding the broad coverage; and a showing of the need for such extended coverage." <u>Provision Salesmen</u>, 203 F. Supp. at 578 (internal quotation marks and alteration omitted). In general, "as the period of time covered by the subpoena lengthens, the particularity with which the documents are described must increase." <u>Id.</u> at 578-79 (citing <u>Application of Linen Supply Cos.</u>, 15 F.R.D. 115, 118 (S.D.N.Y. 1953); <u>In re United Shoe Mach. Corp.</u>, 73 F. Supp. 207, 211 (D. Mass. 1947)). The inquiry is necessarily case-specific, which explains why, although some courts have

77

suggested that the outer bound should generally be ten years, other courts have approved subpoenas duces tecum covering longer periods of time, while still other courts have held similar periods too extensive. Id. at 579 (collecting cases); Vilar, 2007 WL 1075041, at *43-44 (noting dispute over whether the reasonableness inquiry is governed by the Fourth Amendment, the Due Process clause of the Fifth Amendment, or Rule 17 of the Federal Rules of Criminal Procedure).

Here, the President points out that the District Attorney has not claimed the grand jury to be "fortuitously" investigating the same timeframe as the congressional committees. In fact, the District Attorney acknowledges that the grand jury's investigation is not coextensive with the committee's investigation, and concedes that the subpoena "does not define the scope of the grand jury investigation." (SAC ¶ 26.) The President further alleges that the District Attorney's authority is limited by the criminal statutes of limitation, and that the subpoena reaches far beyond this authority. Last, the President states -- without providing any factual support -- that the District Attorney has no reason to seek documents dating back to 2011.

The Court is not persuaded by these arguments and finds the timeframe of the subpoena to be reasonable. As an initial matter, the criminal statutes of limitation do not

necessarily limit the timeframe of the subpoena, as discussed above. Furthermore, considering the factors set forth in <u>Provision Salesmen</u>, the Court finds that the SAC does not plausibly allege an incongruence between the subpoena's timeframe and the District Attorney's investigation. As discussed above, the President may not, through the pleadings, "set limits to the investigation that the grand jury may conduct." <u>Blair</u>, 250 U.S. at 282. Investigating financial criminal activity such as filing false business records can be particularly complex, and determining whether or not there is any evidence that such a crime has been committed may require information from years before and after any single transaction of interest. The President pleads no facts to support his conclusory allegation that the records sought here are so old as to have no bearing on the grand jury's investigation. Furthermore, the records are sought with particularity, which counsels in favor of finding that the timeframe of the subpoena is reasonable. Finally, the period from which documents are sought under the Mazars Subpoena is not so long as to be otherwise unreasonable; as noted above, longer periods have been approved by other courts.  In short, the President's conclusory allegations are insufficient to support an inference that the subpoena is overbroad or issued in bad faith on this basis.

2.   The Geographic Scope of the Mazars Subpoena's Requests

The Mazars Subpoena requests records from Mazars pertaining to: "Donald J. Trump, the Donald J. Trump Revocable Trust, the Trump Organization Inc., the Trump Organization LLC, the Trump Corporation, DJT Holdings LLC, DJT Holdings Managing Member LLC, Trump Acquisition LLC, Trump Acquisition, Corp., the Trump Old Post Office LLC, the Trump Foundation, and any related parents, subsidiaries, affiliates, joint ventures, predecessors, or successors (collectively, the 'Trump Entities')." (SAC ¶ 18.) The President alleges that the Mazars Subpoena is overbroad because it calls for the production of documents pertaining to entities outside New York County, including entities in California, Florida, and other states, as well as in Turkey, Dubai, Canada, India, Indonesia, and other countries. (See SAC ¶ 32.)

The District Attorney has authority to prosecute a crime when "an element of [the] offense," or an attempt or conspiracy to commit the offense, occurred in New York County. N.Y. Crim. Proc. Law Ann. §§ 20.20, 20.40 (McKinney 2019). And, as the President acknowledges, the District Attorney may also prosecute crimes that occurred outside New York County in many instances, including, for example, when "the offense

committed was a result offense and the result occurred within"
New York County, when the offense was intended to have a
prohibited effect in New York County, or when the offense
constituted an attempt to commit a crime within New York
County. N.Y. Crim. Proc. Law Ann. §§ 20.20, 20.40 (McKinney
2019); see also People v. McLaughlin, 606 N.E.2d 1357, 1359
(N.Y. 1992).

This authority, coupled with the practical reality that
New York is "the preeminent commercial and financial nerve
center of the Nation and the world," Marine Midland Bank,
N.A. v. United Missouri Bank, N.A., 643 N.Y.S.2d 528, 531
(App. Div. 1st Dep't 1996) (citations omitted), often enables
the District Attorney to prosecute foreign entities and
crimes with an international dimension. For example, in
recent years, the District Attorney has prosecuted a number
of foreign banks for falsifying the business records of
financial institutions in Manhattan in violation of New York
state law.[27]

---

[27] D.A. Vance Announces $162.8 Million Payment From Société Générale to
New York City and State, Manhattan District Attorney's Office (Nov. 19,
2018),    https://www.manhattanda.org/d-a-vance-announces-162-8-million-
payment-from-societe-generale-to-new-york-city-and-state/; DA Vance: BNP
Paribas Bank Sentenced to Forfeiture of Nearly $8.9 Billion in Penalties
Following Guilty Plea to Criminal Charges, Manhattan District Attorney's
Office (Apr. 15, 2015), https://www.manhattanda.org/da-vance-bnp-
paribas-bank-sentenced-forfeiture-nearly-89-billion-penalties-
following-
g/#:~:text=Manhattan%20District%20Attorney%20Cyrus%20R,of%20financial%2
0institutions%20in%20Manhattan; Unicredit Bank AG To Plead Guilty and Pay
$316 Million to DA's Office Related to Illegal Transactions on Behalf of

Accordingly, that many of the requested records pertain to entities outside New York County does not render plausible the President's speculative claim that the records have no bearing on offenses within the District Attorney's jurisdiction. The President does not, for example, allege that the out-of-state businesses never engaged in transactions involving or affecting entities or individuals in New York County. Accord Matter of Grand Jury Subpoenas Dated June 26, 1986 (Kuriansky), 513 N.E.2d 239, 239 (N.Y. 1987) ("[A]n out-of-State corporation doing business in New York may be compelled to produce out-of-State documents at a criminal proceeding within New York."). Nor does he allege that the out-of-state entities lack financial and reporting obligations or corporate familial ties in New York County.[28] To the contrary, that the subpoena requests documents from Mazars, a "New York accounting firm" residing in this judicial district, suggests a connection between the requested records and New York County. (SAC ¶¶ 8, 10.)

---

Nuclear Weapons Proliferator, Manhattan District Attorney's Office (Apr. 15, 2019), https://www.manhattanda.org/unicredit-bank-ag-to-plead-guilty-and-pay-316-million-to-das-office-related-to-illegal-transactions-on-behalf-of-nuclear-weapons-proliferator/.

[28] President Trump is "the grantor and beneficiary of The Donald J. Trump Revocable Trust ('the Trust'). The Trust is the sole ultimate owner of The Trump Organization, Inc.; Trump Organization LLC; The Trump Corporation; DJT Holdings LLC; DJT Holdings Managing Member LLC; Trump Acquisition, LLC; and Trump Acquisition Corp. The Trust is [also] the majority ultimate owner of the Trump Old Post Office LLC." (SAC ¶ 6.) "[T]he Trump Organization . . . is headquartered in New York." (Opposition at 19.)

In sum, the President has not alleged facts indicating that the records of out-of-state entities "are so unrelated to the subject of [the Grand Jury's] inquiry as to make it obvious that their production would be futile as an aid to the grand jury's investigation." Virag, 430 N.E.2d at 1253 (internal quotation marks omitted). Assuming the truth of the facts alleged in the SAC, records regarding out-of-state entities may nonetheless be expected to shed light on legitimate objects of the Grand Jury investigation.

3.   The Nature of the Documents Requested

Finally, the President objects to the nature of documents requested, alleging that the requests amount to a "fishing expedition" intended to "pick apart the President and each related entity from the inside out." SAC ¶ 35. He points out that the Mazars Subpoena requests reports and statements that contain detailed breakdowns of the assets and liabilities of the Trump Entities and that are typically prepared on a quarterly basis, along with all drafts of such reports and statements and all documents relied upon to prepare them.[29] The President notes that the subpoena also

---

[29] Specifically, the subpoena calls for Mazars to produce, with respect to the Trump Entities:
   a. Tax returns and related schedules, in draft, as-filed, and amended form;
   b. Any and all statements of financial condition, annual statements, periodic financial reports, and independent

requests engagement letters and contracts concerning the preparation or review of the requested tax returns and financial statements, all work papers and communications regarding their preparation or review, and all communications between a named Mazars partner and any representative of the Trump Entities. With regard to the request for communications between any representative of the Trump Entities and the named Mazars partner, the President objects that the request potentially calls for the production of personal communications.

"The 'fishing expedition' argument has been consistently misunderstood and misinterpreted." <u>Bick</u>, 372 N.Y.S.2d at 450. When a grand jury "run[s] down" "every available clue . . .

---

auditors' reports prepared, compiled, reviewed, or audited by Mazars USA LLP or its predecessor, WeiserMazars LLP;

c. Regardless of time period, any and all engagement agreements or contracts related to the preparation, compilation, review, or auditing of the documents described in items (a) and (b);

d. All underlying, supporting, or source documents and records used in the preparation, compilation, review, or auditing of documents described in items (a) and (b), and any summaries of such documents and records; and

e. All work papers, memoranda, notes, and communications related to the preparation, compilation, review, or auditing of the documents described in items (a) and (b), including, but not limited to,

    i. All communications between Donald Bender and any employee or representative of the Trump Entities as defined above; and

    ii. All communications, whether internal or external, related to concerns about the completeness, accuracy, or authenticity of any records, documents, valuations, explanations, or other information provided by any employee or representative of the Trump Entities.

(SAC ¶ 18.)

to find if a crime has been committed," it fulfills its duty. Branzburg, 408 U.S. at 701 (internal quotation marks omitted). Instead, as discussed above, a grand jury subpoena is problematic if it seeks material clearly unrelated to a legitimate aim or calls for an unduly burdensome production, or if facts suggest improper motive.

Even when a subpoena requests all corporate records, the burden remains on the party challenging the subpoena to demonstrate -- here, to allege -- the irrelevance of particular categories of documents sought by the subpoena. See Vilar, 2007 WL 1075041, at *44-46. "The keystone of the analysis is not the quantity of the documents sought . . . but the potential connection between the materials requested and the investigation at the time the subpoena is issued." Id. at *45 (citations omitted). Courts reject claims of overbreadth where there is a "reasonable possibility . . . that the subpoenaed [documents] will be relevant to the grand jury's investigation." In re Grand Jury Proceedings No. 92-4, 42 F.3d 876, 878 (4th Cir. 1994); In re August, 1993 Regular Grand Jury (Med. Corp. Subpoena II), 854 F. Supp. 1392, 1400 (S.D. Ind. 1993) ("In other words, is there a logical connection between the subpoenaed documents and the charges that constitute the subject matter of the grand jury investigation[?]"); Bick, 372 N.Y.S.2d at 450 (holding that

85

a request for business records was not overbroad where the
documents sought "seem to bear directly upon the matters under
investigation").

The SAC does not plausibly allege that any category of
items sought by the Mazars Subpoena is unrelated to matters
the grand jury may legitimately be investigating. For
example, by comparing the Trump Entities' final tax returns,
financial statements, and independent auditors' reports to
one another, to draft versions, and to information relied
upon to prepare the returns and reports, the grand jury can
assess whether any Trump entity has falsely recorded any
financial transaction in violation of New York law. See In re
Berry, 521 F.2d 179, 182-83 & n.1 (10th Cir. 1975) (denying
motion to quash where subpoena required production of "any
and all financial records of any type or description which
relate, either directly or indirectly, to the financial
affairs" of a law firm); United States v. Raniere, 895 F.
Supp. 699, 701-03 & n.3 (D.N.J. 1995) (deeming IRS's request
for, among other things, all financial statements, tax
returns, general ledgers, bills, invoices, loan records, and
inventory records relevant to an investigation of potentially
unreported income by the corporation's president); Med. Corp.
Subpoena II, 854 F. Supp. at 1400-01 (holding that a request
for "virtually every business record" was "undeniably

related" to the grand jury's investigation of financial crimes and fraud); <u>Jordache Ents., Inc. v. United States</u>, No. 86 CR Misc. 1-pg-10, 1987 WL 9705, at *4 & n.3 (S.D.N.Y. Apr. 14, 1987) (in the context of a grand jury investigation into tax and customs violations, denying motion to quash where subpoena required production of records including "[a]ll bookkeeping and accounting records reflecting receipts and disbursements and otherwise pertaining to the flow of income, including, but not limited to . . . certified or qualified financial statements, accountant's workpapers, accountant reports, and all records pertaining to the preparation and/or filing of corporate tax returns"). Communications and work papers concerning the preparation of the returns and reports may likewise aid the Grand Jury in identifying inaccuracies in the returns and reports. <u>See</u> <u>Raniere</u>, 895 F. Supp. at 701-703 & n.3 (deeming IRS's request for "accounting work papers and correspondence with accountants" relevant to investigation of unreported income); <u>Jordache</u>, 1987 WL 9705, at *4 & n.3. To the extent any inaccuracies exist, the communications and work papers, along with the engagement agreements and contracts regarding the preparation and review of the returns and reports, may enable the Grand Jury to determine which persons are responsible for the inaccuracies. The communications and work papers may further assist the

Grand Jury with understanding the circumstances surrounding any inaccuracies, including the intent of any responsible persons.

Nor does the SAC adequately allege that the request for communications between the named Mazars partner and any representative of the Trump Entities is overbroad. The President contends that this request is not explicitly limited to communications regarding the requested returns and reports, and suggests that the request potentially requires the production of personal communications. It is true that a subpoena may be overbroad where its requests sweep in personal communications about "particularly private matters" unrelated to the subject of an investigation, such as communications about medical or family matters. See In re Grand Jury Subpoena, JK-15-029, 828 F.3d 1083, 1089-90 (9th Cir. 2016). But, even assuming the President's reading of this request is correct, the President does not allege any facts indicating that any employee or representative of the Trump Entities was likely to have been discussing anything unrelated to the requested returns and reports -- let alone intimate matters -- with the named Mazars partner. Cf. id. In this regard, the President has not met his burden of alleging facts suggesting that this request is overbroad.

Having addressed the relevance of the individual categories of requested documents, the Court further concludes that the President has not adequately alleged the impropriety of the requests collectively.[30] For the reasons discussed above, the allegations concerning the nature of the documents, considered alone and in combination with the other allegations in the SAC, do not support a reasonable inference of overbreadth or bad faith.

C. <u>DISCOVERY AND LEAVE TO AMEND</u>

The Court turns to two final items that merit discussion. The first pertains to discovery, and in particular, the President's supplemental letter seeking discovery in the event the Court elected to consider extrinsic evidence such as the Shinerock Declaration and various news reports. (<u>See</u> Letter.)  The second item relates to the final disposition of this matter.

1. <u>The President's Request for Discovery</u>

With respect to the first issue, the Court denies the Letter motion for discovery as moot given that the Court finds

---

[30] Of note, the SAC makes no attempt to quantify the volume of the requested production. Based on the facts alleged in the SAC, this is not a case in which the requests call for a production so voluminous as to be potentially indicative of overbreadth. <u>Cf.</u> <u>Application of Harry Alexander</u>, 8 F.R.D. 559, 560-61 (S.D.N.Y. 1949) (deeming subpoena that requested documents from 35 entities unreasonable where the records of a single department within one of the 35 entities would fill fifteen four-drawer cabinets).

it need not convert the Motion to Dismiss to a motion for
summary judgment in order to decide this case. For all the
reasons stated above, the Court is not persuaded that the SAC
raises a "reasonable expectation that discovery will reveal
evidence of illegal" conduct by the District Attorney or grand
jury, Twombly, 550 U.S. at 556, and so finds that the SAC
does not state a valid claim to relief. Because the SAC is
deficient, the President "is not entitled to discovery,
cabined or otherwise." Iqbal, 556 U.S. at 686.

The President, however, suggests that discovery would be
especially appropriate in this case because of the difficulty
of challenging a subpoena without knowing the general subject
matter of the investigation. The Court recognizes that "a
party to whom a grand jury subpoena is issued faces a
difficult situation," and that a lack of detailed information
regarding the grand jury's investigation may hamper a claim
that a subpoena should be quashed. See R. Enterprises, 498
U.S. at 300–301; Virag, 430 N.E.2d at 1253 ("Admittedly, this
presumption of validity imposes a difficult burden of proof
on one seeking to quash a Grand Jury subpoena duces tecum on
relevancy grounds."). But the longstanding rules governing
challenges to grand jury subpoenas already account for such
difficulties, which stem from the strong interest in avoiding
interference with the grand jury's longstanding duty to

vindicate the public interest through extensive investigations into possible criminal activity. That interest is no less present in this case.

Moreover, generally speaking, discovery is not an entitlement in federal civil actions, and the pleading standards under Rule 12(b)(6) are not a formality devoid of substance. The Court would be remiss to "relax the pleading requirements" of Rule 8 and allow even "minimally intrusive discovery" where the SAC has failed to state a claim. Iqbal, 556 U.S. at 686; Biro v. Conde Nast, 807 F.3d 541, 545 (2d Cir. 2015) (disagreeing that actual malice cannot be plausibly alleged without discovery at the pleading stage where pre-Iqbal Second Circuit cases stated that resolution of actual malice claims typically requires discovery); Podany v. Robertson Stephens, Inc., 350 F.Supp.2d 375, 378 (S.D.N.Y. 2004) ("[D]iscovery is authorized solely for parties to develop the facts in a lawsuit in which a plaintiff has stated a legally cognizable claim, not in order to permit a plaintiff to find out whether he has such a claim.").

The President also suggests that he "should be afforded even broader discovery rights" given the "special force" with which protections against overbroad and bad-faith subpoenas apply to the President. (Letter at 2.) While the high respect due to the President would inform the scope of

discovery, should this or any other case involving the President proceed to that stage, the Court does not interpret that respect to allow easier offensive discovery into the grand jury's investigation, particularly considering that -- for all litigants -- discovery typically does not start before the resolution of motion practice. As outlined above in Section II.C., the Court understands high respect to primarily govern the scope of defensive discovery, recognizing that compliance with discovery requests might place burdens on the President's time or risk disclosure of documents that may implicate privileges.

The Court is therefore not persuaded by the additional considerations raised in the President's letter, and finds that discovery is neither permitted by the Rules nor warranted by the facts of this case. The Court denies the Letter motion as moot.

2. <u>Leave to Amend</u>

Finally, the District Attorney requests that the Court dismiss the SAC with prejudice. The Court will grant this request.

As an initial matter, the President has not requested leave to file a third amended complaint in the event that the Court grants the District Attorney's motion to dismiss the SAC. <u>See</u> <u>Hu v. City of N.Y.</u>, 927 F.3d 81, 107 (2d Cir. 2019)

(affirming dismissal with prejudice and noting that "no court can be said to have erred in failing to grant a request that was not made" (internal quotation marks omitted)); Williams v. Citigroup Inc., 659 F.3d 208, 212–13 (2d Cir. 2011) ("We have described the contention that 'the District Court abused its discretion in not permitting an amendment that was never requested' as 'frivolous.'" (citations omitted)). Nor did the President indicate at any point in his Opposition that he intended to seek leave to file a third amended complaint. See Campo v. Sears Holdings Corp., 371 F. App'x 212, 218 (2d Cir. 2010); In Re Tamoxifen Citrate Antitrust Litig., 466 F.3d 187, 220 (2d Cir.2006), abrogated on other grounds by F.T.C. v. Actavis, Inc., 570 U.S. 136 (2013); United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C., 319 F. Supp. 3d 747, 752 (S.D.N.Y. 2018) (noting that the relator "failed to brief any opposition to dismissal with prejudice or to request leave to amend . . . despite ample notification" that defendants sought dismissal with prejudice).

Nevertheless, even assuming the President had requested leave to file a third amended complaint, the Court finds that leave to amend is not warranted  considering the standards of Federal Rule of Civil Procedure 15(a)(2) ("Rule 15"), and will therefore grant the District Attorney's request to dismiss the SAC with prejudice. See Bennett v. City of N.Y.,

425 F. App'x 79, 81 (2d Cir. 2011); Bui v. Indus. Ents. of Am., Inc., 594 F. Supp. 2d 364, 373 (S.D.N.Y. 2009). Rule 15 provides that a court "should freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2). This liberal standard tends to favor allowing leave to amend pleadings in the ordinary course, and it is common for district courts to grant leave to amend once after granting a motion to dismiss. See Bellikoff v. Eaton Vance Corp., 481 F.3d 110, 118 (2d Cir. 2007).

However, justice does not always require granting leave to amend. "Rule 15 is liberal, yes, but it is also temperate." Metzler Inv. Gmbh v. Chipotle Mexican Grill, Inc., 2020 WL 4644799, at *12 (2d Cir. Aug. 12, 2020). Under Rule 15, "leave to amend a pleading may only be given when factors such as undue delay or undue prejudice to the opposing party are absent." SCS Communications, Inc. v. Herrick Co., 360 F.3d 329, 345 (2d Cir. 2004) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)). The Supreme Court has detailed the factors that would constitute an "apparent or declared reason" not to grant leave to amend: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Foman, 371 U.S. at 182; Metzler, 2020

WL 4644799, at *12 n.4; Browning Debenture Holders' Committee v. DASA Corp., 560 F.2d 1078, 1086 (2d Cir. 1977) (whether to grant or deny leave to amend "usually depends on the presence or absence of such factors as" those identified in Foman).

Undue prejudice is "perhaps [the] most important" among the reasons to deny leave to amend. State Teachers Retirement Board v. Fluor Corp., 654 F.2d 843, 856 (2d Cir. 1981); see also Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331 (1971); AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., 626 F.3d 699, 725 (2d Cir. 2010). "In gauging prejudice," courts typically consider, "among other factors, whether an amendment would 'require the opponent to expend significant additional resources to conduct discovery and prepare for trial' or 'significantly delay the resolution of the dispute.'" Ruotolo v. City of N.Y., 514 F.3d 184, 192 (2d Cir. 2008) (quoting Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993)). Courts also consider the reasons that the party seeking amendment failed to include the material in the original pleading and the hardship to the moving party if leave to amend is denied.

This litigation, however, does not reflect the typical case, and the undue prejudice analysis is not necessarily limited to the usual considerations described above. "The district court is in the best position to decide whether an

amendment will inflict prejudice in the context of the trial dynamics and the full record." SCS Communications, 360 F.3d at 345. Courts may likewise assess prejudice "in light of the circumstances presented, the length and complexity of [the] proceedings, and the late stage of litigation at which the [motion for leave to amend is] made." AEP Energy, 626 F.3d at 727. Thus, even if a case is not at a late procedural phase, the passage of time may still inform whether a defendant would be unduly prejudiced by amendment. See GEOMC Co., Ltd. v. Calmare Therapeutics Inc., 918 F.3d 92, 100 (2d Cir. 2019) ("As a general rule, the risk of substantial prejudice increases with the passage of time.") (internal quotation marks omitted). The prejudice analysis may also account for the protections that underlying substantive laws accord to a defendant. See Broidy Cap. Mgmt. LLC v. Benomar, 944 F.3d 436, 447 (2d Cir. 2019) ("Allowing . . . a futile amendment would be particularly prejudicial where the defendant is a diplomat who possesses treaty-based immunity from suit."); Doe v. Cassel, 403 F.3d 986, 991 (8th Cir. 2005).

Against this backdrop, the undue prejudice to the District Attorney and grand jury investigation counsels in favor of denying leave to amend the SAC. Even though this case technically remains at the pleading stage, the litigation has prevented enforcement of the Mazars Subpoena

for very nearly a year. That passage of time implicates virtually every concern that underlies the presumption of validity accorded to grand jury subpoenas. "[A] Grand Jury is but a temporary body and the service of its members is of only limited duration. Constant delays occasioned by unmeritorious motions to quash followed by routine appeals can lead not only to the loss of evidence and the fading of witnesses' memories, but also may completely frustrate the course of legitimate investigation into potentially criminal activity." Virag, 430 N.E.2d 1252. And even though this case is not yet near trial, "[a]ny holding that would saddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." R. Enterprises, 498 U.S. at 298-99 (quoting Dionisio, 410 U.S. at 17).

These harms to the grand jury investigation are not diminished by the happenstance that this case comes to the Court by way of a motion to dismiss a claim under 42 U.S.C. Section 1983 instead of the more typical motion to quash. All three of the President's complaints thus far have sought injunctive relief quashing or otherwise preventing enforcement of the Mazars Subpoena, and both the Amended Complaint and SAC have occasioned minitrials directly

questioning the grand jury subpoena's validity. (See Complaint ¶ 60(f); Amended Complaint ¶ 60(f) (seeking "[a] temporary restraining order and preliminary injunction prohibiting the District Attorney's office from taking any action to enforce the subpoena, until the subpoena's validity has been finally adjudicated on the merits"); SAC ¶ 63(b-c) (seeking "[a] permanent injunction quashing or modifying the subpoena as necessary to protect the President's legal rights").) The grand jury "should not be hindered in its quest by witnesses who continually litigate the threshold validity of its subpoenas," Virag, 430 N.E.2d at 1253, and the Court cannot naively ignore the reality that granting leave to file a third amended complaint would occasion exactly that type of continual litigation. See Dep't of Commerce v. New York, 139 S. Ct. 2551, 2575 (2019) (noting that courts are "not required to exhibit a naiveté from which ordinary citizens are free." (internal quotation marks omitted)).

The Court also need not ignore that the President has now twice failed to present a valid cause for relief, despite guidance from the Supreme Court, which further counsels against allowing a third attempt at litigating the threshold validity of the Mazars Subpoena. Harvey v. Harvey, 108 F.3d 329, 1997 WL 92930, at *1 (2d Cir. Mar. 5, 1997) (table) (noting that "justice does not require that an amendment be

permitted here in light of [the plaintiff's] history of repeated institution of meritless charges in this and related litigation"); Saunders v. Coughlin, No. 92 Civ. 4289, 1995 WL 144107, at *6 (S.D.N.Y. Mar. 30, 1995) (dismissing the complaint with prejudice when the amended complaint failed to cure the deficiencies noted in the original complaint, and finding that granting leave to amend would be futile). And while the Court need not conclude as a matter of law that amendment of the SAC would be futile, the Court's prior experience with the Amended Complaint and SAC nevertheless weighs against granting leave to amend. See Yerdon v. Henry, 91 F.3d 370, 378 (2d Cir. 1996) ("Where it appears that granting leave to amend is unlikely to be productive, it is not an abuse of discretion to deny leave to amend."); see also Massey v. Fischer, No. 02 Civ. 10281, 2004 WL 1908220, at *5 (S.D.N.Y. Aug. 26, 2004) (finding leave to amend to be futile and dismissing claims with prejudice when the court had directed plaintiff "to include requisite facts to support his claims" and plaintiff failed to present such facts).

The Second Circuit noted recently that "[i]t seems . . . to be self-evident that a plaintiff afforded attempt after attempt -- and consequently, additional time to investigate -- might one day succeed in stating a claim. But the federal rules and policies behind them do not permit such limitless

possibility." Metzler, 2020 WL 4644799, at *12. The Court is not persuaded that such limitless possibility would justify the filing of a *third* amended complaint here, particularly considering that the attendant delay could involve the running of criminal statutes of limitations, the loss of evidence, or the fading of memories, resulting in prejudice to the District Attorney. See Fogel v. Vega, 759 F. App'x 18, 25 (2d Cir. 2018) (concluding "that the district court did not err in refusing to allow [the plaintiff] to file a Third Amended Complaint" where that plaintiff "failed to allege valid claims in each of his prior complaints"); Bellikoff, 481 F.3d at 118 (holding "that the district court's denial of the plaintiffs' motion for leave to file a third amended complaint was not an abuse of discretion," even though "the usual practice is to grant leave to amend" after granting a motion to dismiss (internal quotation marks omitted)).

At its heart, the fact pattern presented by the SAC is substantially the same as that presented in the Amended Complaint, even if the claims are different, and it relies upon too many unreasonable inferences for the Court to deem the claims of overbreadth and bad faith plausible: inferences that the Mazars Subpoena was issued as retaliation for the Trump Organization Subpoena, that the scope of the investigation is limited to the 2016 Michael Cohen Payments,

that the Mazars Subpoena aims at advancing the goals of
Congressional Democrats, and more. It is hard to see how the
SAC could adequately be amended to cure these defects. If the
President could cite new factual allegations that would
remedy all of the defects highlighted above mere weeks after
filing the SAC, the Court would be hard pressed to understand
why they could not have been alleged in the SAC, particularly
considering that the law on overbreadth and bad faith in the
grand jury subpoena context is well-developed in New York.
See Bui, 594 F. Supp. 2d at 373 (dismissing with prejudice a
complaint that inadequately plead claims governed by "well-
established" law). Such circumstances might suggest dilatory
motive, which would present another apparent reason to deny
leave to amend. See Krupski v. Costa Crociere S.p.A., 560
U.S. 538, 553 (2010) (noting "that a court may consider a
movant's 'undue delay' or 'dilatory motive' in deciding
whether to grant leave to amend under" Rule 15); Littlejohn
v. Artuz, 271 F.3d 360, 363 (2d Cir. 2001) (stating that
"although Rule 15 requires that leave to amend be 'freely
given,' district courts nonetheless retain the discretion to
deny that leave in order to thwart tactics that are dilatory,
unfairly prejudicial or otherwise abusive"). The District
Attorney has consistently suggested that the President has
been acting with a dilatory motive throughout the various

phases of this case. While the Court need not find here that the President has actually acted with a dilatory motive, the District Attorney's repeated assertions plainly support a finding that further amendment would be unduly prejudicial to the District Attorney in light of the other considerations highlighted above.

Finally, high respect for the President does not otherwise require leave to amend. The President began this action by invoking Article II to raise a sweeping claim of immunity rejected by every court to consider it. He then received guidance on potentially valid challenges to the Mazars Subpoena, including ones specifically tied to Article II, from no less an authority than the Supreme Court. He chose not to raise claims based on identifiable executive policies or specific Article II duties, but instead raised claims of bad faith and overbreadth available to the broader public and conclusorily asserted that these alleged defects in the grand jury process violated his Article II rights. The Court is not persuaded that the SAC states a claim for relief on these grounds, and it does not interpret high respect for the President to compel even more liberal leave to amend than Rule 15 already affords. Justice does not require granting leave to replead under these circumstances. Justice requires an end to this controversy.

## IV.  <u>ORDER</u>

For the reasons described above, it is hereby

**ORDERED** that the motion filed by defendant Cyrus R. Vance, Jr., in his official capacity as the District Attorney of the County of New York, to dismiss (Dkt. No. 62) the Second Amended Complaint of plaintiff Donald J. Trump (Dkt. No. 57) is GRANTED, and the Second Amended Complaint is dismissed with prejudice, and it is further

**ORDERED** that the motion filed by plaintiff Donald J. Trump for discovery (Dkt. No. 67) is DENIED as moot.

The Clerk of Court is directed to terminate any pending motions and to close this case.

**SO ORDERED.**

Dated:    New York, New York
          20 August 2020

                                    _____
                                        Victor Marrero
                                          U.S.D.J.