MANDATE

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 7th day of October, two thousand twenty.

Before:     Pierre N. Leval,
            Robert A. Katzmann,
            Raymond J. Lohier, Jr.,
            *Circuit Judges.*

_____

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Oct 28 2020

Donald J. Trump,

       Plaintiff - Appellant,

   v.

Cyrus R. Vance, Jr., in his official capacity as
District Attorney of the County of New York,
Mazars USA, LLP,

       Defendants - Appellees.

_____

**JUDGMENT**

Docket 20-2766

The appeal in the above captioned case from a judgment of the United States District Court for the Southern District of New York was argued on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the district court's judgment dismissing the Second Amended Complaint with prejudice is AFFIRMED, and enforcement of the subpoena is provisionally stayed as specified in this Court's opinion.

For the Court:

Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

MANDATE ISSUED ON 10/28/2020

20-2766
Trump v. Vance

## UNITED STATES COURT OF APPEALS

### FOR THE SECOND CIRCUIT

————————

August Term, 2020

(Argued: September 25, 2020     Decided: October 7, 2020)

Docket No. 20-2766

————————

DONALD J. TRUMP,

*Plaintiff-Appellant,*

—v.—

CYRUS R. VANCE, JR., in his official capacity as District Attorney of the County of New York, MAZARS USA, LLP,

*Defendants-Appellees.*

————————

Before: LEVAL, KATZMANN, and LOHIER, *Circuit Judge*s.

————————

Appeal from a judgment of the United States District Court for the Southern District of New York (Marrero, *J.*) granting a motion of defendant-appellee Cyrus R. Vance, Jr., the District Attorney of the County of New York (the "District Attorney") to dismiss the second amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). In the second amended complaint, plaintiff-appellant President Donald J. Trump alleges that a grand jury subpoena

issued on August 29, 2019 by the District Attorney to defendant-appellee Mazars USA, LLP, the President's accounting firm, is overbroad and was issued in bad faith. We find that the claim of overbreadth is not plausibly alleged for two interrelated reasons. First, the President's bare assertion that the scope of the grand jury's investigation is limited only to certain payments made by Michael Cohen in 2016 amounts to nothing more than implausible speculation. Second, without the benefit of this linchpin assumption, all other allegations of overbreadth—based on the types of documents sought, the types of entities covered, and the time period covered by the subpoena, as well as the subpoena's near identity to a prior Congressional subpoena—fall short of meeting the plausibility standard. Similarly, the President's allegations of bad faith fail to raise a plausible inference that the subpoena was issued out of malice or an intent to harass. Accordingly, we **AFFIRM**.

---

WILLIAM S. CONSOVOY, Consovoy McCarthy PLLC, Arlington, VA (Cameron T. Norris, Alexa R. Baltes, Consovoy McCarthy PLLC, Arlington, VA; Patrick Strawbridge, Consovoy McCarthy PLLC, Boston, MA; Marc L. Mukasey, Mukasey Frenchman & Sklaroff LLP, New York, NY; Alan S. Futerfas, Law Offices of Alan S. Futerfas, New York, NY, *on the brief*), *for Plaintiff-Appellant*.

CAREY R. DUNNE, General Counsel, New York County District Attorney's Office, New York, NY (Christopher Conroy, Julieta V. Lozano, Solomon B. Shinerock, James H. Graham, Allen J. Vickey, Sarah A. Walsh, New York County District Attorney's Office, New York, NY; Caitlin Halligan, Ryan W. Allison, David A. Coon, Selendy & Gay PLLC, New York, NY; Walter E. Dellinger III, Duke University Law School, Durham, NC, *on the brief*), *for Defendant-Appellee Cyrus R. Vance, Jr*.

---

PER CURIAM:

Plaintiff-appellant President Donald J. Trump appeals from a judgment of

the United States District Court for the Southern District of New York (Marrero,

2

*J.*) granting a motion of defendant-appellee Cyrus R. Vance., Jr., the District Attorney of the County of New York (the "District Attorney"), to dismiss the second amended complaint ("SAC") for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, we affirm.

## I.   Background

In 2018, the District Attorney opened a grand jury investigation into certain business transactions involving the Trump Organization and affiliated entities and individuals.[1] The Trump Organization is owned by The Donald J. Trump Revocable Trust, of which the President is the grantor and beneficiary. In the course of that investigation, on August 1, 2019, the grand jury issued a subpoena to the Trump Organization seeking documents from 2015 through 2018 relating to (1) payments made to certain individuals and (2) Michael Cohen's work for the President and for the Trump Organization. The Trump Organization produced documents in response to this subpoena. When the District Attorney expressed his view that the subpoena required the production of the Trump Organization's tax

---

[1]   Because this appeal comes to us from an order dismissing the President's suit for failure to state a claim, all facts are drawn from the SAC and documents incorporated into that complaint by reference. *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

returns, however, the Trump Organization refused, arguing that the subpoena could not be read to encompass tax returns.

Four weeks later, on August 29, 2019, the grand jury issued another subpoena, this one directed to Mazars USA LLP ("Mazars"), the President's accounting firm. This subpoena (the "Mazars subpoena") directed Mazars to produce a host of financial documents—including tax returns—relating to the President, the Trump Organization, and affiliated entities, dating back to 2011.[2]

---

[2]     Specifically, the Mazars subpoena requests the following:

1. For the period of January 1, 2011 to the present, with respect to Donald J. Trump, the Donald J. Trump Revocable Trust, the Trump Organization Inc., the Trump Organization LLC, the Trump Corporation, DJT Holdings LLC, DJT Holdings Managing Member LLC, Trump Acquisition LLC, Trump Acquisition, Corp., the Trump Old Post Office LLC, the Trump Foundation, and any related parents, subsidiaries, affiliates, joint ventures, predecessors, or successors (collectively, the "Trump Entities"):
    a. Tax returns and related schedules, in draft, as-filed, and amended form;
    b. Any and all statements of financial condition, annual statements, periodic financial reports, and independent auditors' reports prepared, compiled, reviewed, or audited by Mazars USA LLP or its predecessor, WeiserMazars LLP;
    c. Regardless of time period, any and all engagement agreements or contracts related to the preparation, compilation, review, or auditing of the documents described in items (a) and (b);

The President quickly filed suit in federal court to block enforcement of the Mazars subpoena, arguing that he was absolutely immune from state criminal process during his term in office. *See Trump v. Vance*, 395 F. Supp. 3d 283 (S.D.N.Y. 2019). The district court dismissed the President's complaint, concluding that the doctrine of *Younger v. Harris*, 401 U.S. 37 (1971), required it to abstain from exercising jurisdiction over a challenge to an ongoing state grand jury investigation. *See Trump*, 395 F. Supp. 3d at 293–301. In the alternative, the district court denied the President's motion for a preliminary injunction, concluding that the President had not demonstrated a likelihood of success on the merits or that

---

d. All underlying, supporting, or source documents and records used in the preparation, compilation, review, or auditing of documents described in items (a) and (b), and any summaries of such documents and records; and

e. All work papers, memoranda, notes, and communications related to the preparation, compilation, review, or auditing of the documents described in items (a) and (b), including, but not limited to,

i. All communications between Donald Bender and any employee or representative of the Trump Entities as defined above; and

ii. All communications, whether internal or external, related to concerns about the completeness, accuracy, or authenticity of any records, documents, valuations, explanations, or other information provided by any employee or representative of the Trump Entities.

he would suffer irreparable harm if the subpoenaed documents were produced to the grand jury. *See id.* at 302–16.

On appeal, this Court affirmed in part and vacated in part. We affirmed the district court's holding that the President was not entitled to preliminary injunctive relief, concluding that a state grand jury "may lawfully demand production by a third party of the President's personal financial records for use in a grand jury investigation while the President is in office." *Trump v. Vance*, 941 F.3d 631, 646 (2d Cir. 2019).[3] We also rejected the argument of the United States as amicus curiae that any such subpoena for the President's papers must satisfy a "heightened showing of need," reasoning that this standard applies only when a subpoena "demand[s] the production of documents protected by executive privilege." *Id.* at 645. We vacated the district court's order insofar as it dismissed the complaint on abstention grounds, reasoning that *Younger* abstention was not warranted under the unique circumstances of this case. *See id.* at 639.

The Supreme Court affirmed, holding that "absolute" presidential immunity from compliance with a state grand jury subpoena was neither "necessary [n]or appropriate under Article II or the Supremacy Clause." *Trump v.*

---

[3]    Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

*Vance*, 140 S. Ct. 2412, 2429 (2020). And the Supreme Court likewise refused to impose a "heightened" standard for subpoenas seeking the President's papers, holding that such a standard was not "necessary for the Executive to fulfill his Article II functions." *Id.*

But the Supreme Court stressed that the rejection of a heightened standard "does not leave Presidents with no real protection." *Id.* at 2430. Rather, "a President may avail himself of the same protections available to every other citizen[,] . . . includ[ing] the right to challenge the subpoena on any grounds permitted by state law, which usually include bad faith and undue burden or breadth." *Id.* Moreover, "[a] President can raise subpoena-specific constitutional challenges," such as "challeng[ing] the subpoena as an attempt to influence the performance of his official duties, in violation of the Supremacy Clause," or "argu[ing] that compliance with a particular subpoena would impede his constitutional duties." *Id.* Because the arguments on appeal focused solely on categorical immunity, the Supreme Court remanded the case so that the President could "raise further arguments as appropriate." *Id.* at 2431.

On remand, the President filed the SAC in district court, alleging that the Mazars subpoena is overbroad and was issued in bad faith. On overbreadth, the

SAC alleges that many of the requested documents bear no relation to the payments made by Michael Cohen in 2016—which the SAC, relying on a contemporaneous *New York Times* article and the earlier subpoena to the Trump Organization, characterizes as the "focus" of the grand jury investigation. The SAC also notes the broad scope and timeframe of the Mazars subpoena to argue that the subpoena exceeds the District Attorney's jurisdiction. Finally, the SAC alleges that the Mazars subpoena is overbroad and must have been issued in bad faith because it largely mirrors a legislative subpoena issued to Mazars by the House Committee on Oversight and Reform.

In a comprehensive opinion, the district court granted the District Attorney's motion to dismiss the SAC for failure to state a claim, holding that the SAC did not allege sufficient facts to render the allegations of bad faith or overbreadth plausible. *See Trump v. Vance*, No. 19-cv-8694 (VM), 2020 WL 4861980 (S.D.N.Y. Aug. 20, 2020). This appeal followed.[4]

---

[4]     On September 1, 2020, a panel of this Court granted the President's motion for a stay of the district court's order and judgment pending appeal and directed that the appeal be heard on an expedited basis.

## II. Discussion

### A. Legal Standards

We review *de novo* the district court's order dismissing the SAC for failure to state a claim. *See Elder v. McCarthy*, 967 F.3d 113, 123 (2d Cir. 2020).

The President asserts that the subpoena is unenforceable on two grounds: first, because it is overbroad, and second, because it was issued in bad faith. *See* Joint App'x 28 ¶¶ 53–63.

These defenses are well established under New York and federal law.[5] A subpoena *duces tecum* is overbroad if "the materials sought have no relation to the matter under investigation." *Virag v. Hynes*, 430 N.E.2d 1249, 1253 (N.Y. 1981). This standard of relatedness is necessarily looser in the context of a grand jury investigation than that applicable to evidence to be introduced at trial. *See id.* at 1252–53. Because a grand jury has the authority and duty to "inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred," *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 297 (1991), it need not "designate or call for what its exact needs

---

[5]    It is undisputed that the standards governing challenges to grand jury subpoenas on the grounds of overbreadth and bad faith are substantively identical under New York and federal law.

may ultimately turn out to be," *Virag*, 430 N.E.2d at 1252. To prevail on an overbreadth challenge in practice, then, the moving party must show that "a particular category of documents can have no conceivable relevance to any legitimate object of investigation by the grand jury." *Id.* at 1253; *accord In re Grand Jury Proceeding*, 971 F.3d 40, 54 (2d Cir. 2020) ("[A] grand jury subpoena is unreasonably broad only if there is no reasonable possibility that the category of materials the government seeks will produce information relevant to the general subject of the grand jury's investigation.").

Similarly, with respect to the defense of bad faith, "[g]rand juries are not licensed to engage in arbitrary fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass." *R. Enterprises*, 498 U.S. at 299. However, a grand jury subpoena "enjoys a presumption of validity" against these and other defenses to enforcement, *Virag*, 430 N.E.2d at 1253, a presumption that stems from the grand jury's unique and long-standing role in evaluating the sufficiency of a prosecutor's evidence against the accused and from the strong public interest in the just enforcement of the criminal laws, *see United States v. Johnson*, 319 U.S. 503, 513 (1943); *People v. Thompson*, 8 N.E.3d 803, 810 (N.Y. 2014). A party seeking to avoid a subpoena can overcome this presumption of validity

only through "a strong showing to the contrary." *R. Enterprises*, 498 U.S. at 300; *see also Virag*, 430 N.E.2d at 1252 (requiring "concrete evidence" of invalidity).

At bottom, then, the dispute between the President and the District Attorney turns on legal doctrines that are anything but novel. The procedural posture of this case, however, is unusual.

A party would ordinarily challenge a subpoena like the one at issue by filing a motion to quash before the state court that had impaneled the grand jury. As noted above, to prevail on an ordinary motion to quash, the moving party bears the burden to come forward with "concrete evidence" sufficient to rebut "the presumption of validity accorded to Grand Jury subpoenas." *Virag*, 430 N.E.2d at 1250, 1252. For most litigants, this is no small feat. *See id.* at 1253. Because the moving party faces such a difficult evidentiary burden, and because the scope of a grand jury's investigation is generally secret, "a party to whom a grand jury subpoena is issued faces a difficult situation." *R. Enterprises*, 498 U.S. at 300.

Here, in contrast, the President elected to challenge the state criminal subpoena by filing a civil complaint in federal court, seeking injunctive and declaratory relief against enforcement of the subpoena pursuant to 42 U.S.C.

11

§ 1983.[6] The District Attorney moved in the district court to dismiss the complaint. To survive the motion to dismiss, the President need only allege in his complaint "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To put it differently, the President must allege facts that are "suggestive of," and not "merely consistent with," overbreadth or bad faith. *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 121 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). A bare allegation of improper motive will not suffice if there is "an obvious alternative explanation for the conduct alleged." *Id.*

In other words, we apply the same standard to claims of overbreadth of a subpoena or bad faith in its issuance as we would for any other motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). The President contends that any recognition of the presumption of validity of grand jury subpoenas in assessing whether he has pleaded sufficient facts in his complaint would amount to imposing a "heightened pleading standard" beyond what Rule 12(b)(6) requires. We disagree. Regardless of whether the complaint seeks to quash a grand jury

---

[6]     Both parties appear to assume that the President's unique status allows him, alone, to bring a § 1983 action in federal court rather than a motion to quash in state court proceedings. We express no view on that question.

12

subpoena or seeks other relief, the standard under *Twombly* and *Iqbal* is the same.
The complaint must allege sufficient facts to make it plausible that relief can be
granted. It follows, then, that the presumption of validity of grand jury subpoenas
is not irrelevant to our analysis. To be sure, the President need not *rebut* the
presumption at this stage. But because "plausibility . . . depends on . . . the
particular cause of action and its elements," *L-7 Designs, Inc. v. Old Navy, LLC*, 647
F.3d 419, 430 (2d Cir. 2011), a complaint seeking to quash a grand jury subpoena
on the grounds of overbreadth or bad faith must include well-pled facts that, if
accepted as true, *would* be sufficient to rebut the presumption of validity—that is,
non-conclusory factual statements that would "permit the court to infer more than
the mere possibility" that the subpoena is overbroad or issued in bad faith, *Iqbal*,
556 U.S. at 679.

We further observe, for the purposes of our discussion below, that the
President has chosen only to "avail himself of the same protections available to
every other citizen," namely, state-law challenges of overbreadth and bad faith.
*Trump*, 140 S. Ct. at 2430. The President does not allege that the Mazars subpoena
represents "an attempt to influence the performance of [the President's] official
duties," nor "that compliance with [this] particular subpoena would impede his

13

constitutional duties." *Id.*[7] The SAC does allege that the purported overbreadth and bad faith of the subpoena "amounts to harassment of the President" in violation of Article II, Joint App'x 28 ¶¶ 57, 63, but we, like the district court, do not understand this to raise "separate and discrete constitutional claims," *Trump*, 2020 WL 4861980, at *7 n.13.

Nevertheless, although the President has raised only the ordinary challenges applicable to any grand jury subpoena, we are mindful here not to "proceed against the president as against an ordinary individual." *United States v. Burr*, 25 F. Cas. 187, 192 (Marshall, Circuit Justice, C.C.D. Va. 1807). Because the "high respect that is owed to the office of the Chief Executive should inform the conduct of [this] entire proceeding," *Trump*, 140 S. Ct. at 2430, we must consider the President's allegations with traditional Article II considerations in mind. Appellate review of "a subpoena directed to a President" must be "particularly meticulous," *id.* (quoting *United States v. Nixon*, 418 U.S. 683, 702 (1974)), "to ensure

---

[7]    We are mindful that the President is entitled to certain procedural accommodations not at issue here: courts are to "schedule proceedings so as to avoid significant interference with the President's ongoing discharge of his official responsibilities," *Trump*, 140 S. Ct. at 2430 (quoting *Clinton v. Jones*, 520 U.S. 681, 724 (1997) (Breyer, *J.*, concurring)), and adapt the "timing and scope of discovery" to permit a President to discharge his constitutional functions, *id.* (quoting *Clinton*, 520 U.S. at 707).

that the [applicable legal] standards . . . have been correctly applied," *Nixon*, 418 U.S. at 702. It follows that the status of the President should inform our analysis of the plausibility of his claims. We recognize that, because of "the visibility of his office and the effect of his actions on countless people," *Nixon v. Fitzgerald*, 457 U.S. 731, 753 (1982), the President may be an "'easily identifiable target[]' for harassment" by local prosecutors, *Trump*, 140 S. Ct. at 2427 (quoting *Nixon*, 457 U.S. at 753).

With these considerations in mind, we turn to the merits of the issues before us.

### B. Overbreadth

Whether the Mazars subpoena is overbroad is measured against "the general subject of the grand jury's investigation." *R. Enterprises*, 498 U.S. at 301. The SAC alleges that, "[a]ccording to published reports, the focus of the District Attorney's investigation is payments made by Michael Cohen in 2016 to certain individuals." Joint App'x 16 ¶ 12. Based on this allegation, the President first asserts that the scope of the grand jury's investigation is limited to the Michael Cohen payments, and that the Mazars subpoena, which asks for a wide range of documents, is therefore overbroad.

15

We hold that the SAC does not plausibly allege that the grand jury's investigation is limited only to the Michael Cohen payments.

First, the SAC never actually alleges that the Michael Cohen payments are the sole object of the investigation. The SAC states only that the grand jury was "investigating whether certain business transactions from 2016 violated New York law," Joint App'x 14 ¶ 1, and that the Michael Cohen payments were "the focus" of the investigation, Joint App'x 16 ¶ 12. The SAC never actually alleges that the grand jury was not investigating anything other than the 2016 Michael Cohen payments. Accordingly, the President, in his briefs, asks us to infer that, because the Cohen payments were *a* focus of the investigation, they must have been the *only* focus. We decline to take such a leap, particularly because the SAC itself does not even say as much.

Relatedly, and more generally, in evaluating the plausibility of this allegation, we must consider "the [substantive legal] principles implicated by the complaint." *Iqbal*, 556 U.S. at 675; *accord Ostrer v. Aronwald*, 567 F.2d 551, 552–54 (2d Cir. 1977) (per curiam) (affirming the dismissal of a complaint under Fed. R. Civ. P. 12(b)(6) on the grounds that, *inter alia*, "appellants' speculations that the grand jury has insufficient evidence on which to indict them are not enough to

overcome the presumption of regularity attached to grand jury proceedings"). We must therefore analyze the President's allegations in relation to the presumptive validity of grand jury subpoenas and the extremely broad nature of grand jury investigations. "As a necessary consequence of its investigatory function, the grand jury paints with a broad brush." *R. Enterprises*, 498 U.S. at 297. A grand jury "can . . . hardly be expected to be able to designate or call for what its exact needs may ultimately turn out to be. It obviously has a right to a fair margin of reach and material in seeking information, not merely direct but also as a matter of possible light on seemingly related aspects whose significance it is seeking to uncover." *Virag*, 430 N.E.2d at 1252. Indeed, we have recently described the grand jury's authority to "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *In re Grand Jury Proceeding*, 971 F.3d at 54 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43 (1950)). Judicial experience and common sense tell us that the scope of a grand jury investigation is "ranging, exploratory," and may easily expand over time. *Virag*, 430 N.E.2d at 1253; *see also Full Gospel Tabernacle, Inc. v. Att'y-Gen. of the State of N.Y.*, 536 N.Y.S.2d 201, 202–03 (App. Div. 3d Dep't 1988) (denying the petitioners' requests to quash subpoenas on overbreadth and bad faith grounds when "the focus of the

17

investigation shifted" from hush money payments made by a televangelist to conduct of "other officers and employers" involving business record falsification, criminal solicitation, witness tampering, and more). Furthermore, the President's allegation that, from the summer of 2018 to August 2019, the scope of the investigation remained limited to the Michael Cohen payments is simply speculation and, "without more, . . . insufficient to overcome the presumption that the materials sought [are] relevant to the Grand Jury's investigation." *Virag*, 430 N.E.2d at 1253.

In addition, we reject the President's argument that the scope of the investigation is largely defined by the scope of the Trump Organization subpoena, which was issued a month before the Mazars subpoena and which explicitly focused on the Michael Cohen payments. It is far from reasonable to infer that a single subpoena would define the entire scope of a grand jury's investigation, particularly in complex financial investigations. Grand juries routinely issue multiple subpoenas seeking different information from different recipients during the course of their investigations, because, after all, they have a duty to follow "every available clue" wherever it may lead. *United States v. Stone*, 429 F.2d 138, 140 (2d Cir. 1970).

Relatedly, the President's argument regarding the alleged scope of the investigation relies heavily on a *New York Times* article, which states that the District Attorney "is exploring whether the [Cohen payments] violated any New York state laws." Joint App'x 16 ¶ 12. That reliance is deficient in two respects. First, the article does not state that the grand jury investigation is limited to the Cohen payments. Second, the article states elsewhere that "[i]t was unclear if the broad scope of the subpoena indicated that that the [District Attorney] had expanded [his] investigation beyond actions taken during the 2016 campaign." William K. Rashbaum & Ben Protess, *8 Years of Trump Tax Returns Are Subpoenaed by Manhattan D.A.*, N.Y. Times (Sept. 16, 2019), https://nyti.ms/3aji2qQ.[8] This statement significantly undermines the plausibility of the President's assertion that the scope of the investigation is limited to the Michael Cohen payments.

---

[8]     We may properly consider the full contents of this article because it is incorporated by reference into the SAC. Although the SAC does not cite the specific passage of the article noted above, the SAC nevertheless makes "a clear, definite and substantial reference to" the article. *See Stolarik v. N.Y. Times Co.*, 323 F. Supp. 3d 523, 537 (S.D.N.Y. 2018). This citation is far more substantial than a mere passing reference that would not have allowed us to find the article to be incorporated by reference. *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004); *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985).

Having concluded that the complaint does not adequately allege that the investigation is limited to the Michael Cohen payments, we turn to the President's other specific arguments on overbreadth. The president argues that the subpoena is overbroad because, cumulatively, (1) it seeks materials from a broad array of entities; (2) it seeks materials from entities that have operations outside New York County; (3) it seeks many types of documents; (4) it seeks documents covering a nine-year period; and (5) it seeks documents that are relevant only to the Congressional inquiry and not to the criminal investigation.[9] Although these allegations generally hinge on the President's assumption that the grand jury's investigation is limited to the Michael Cohen payments, which we find implausible, the President maintains that, even if the grand jury's investigation is not so limited, a subpoena of such breadth cannot be "reasonably tailored to *any*

---

[9] We note that the President's overbreadth allegations refer only to the scope of the investigation, not the volume of documents to be produced. The SAC claims that a production would be "voluminous," *e.g.*, Joint App'x 15 ¶ 4, but makes no attempt to quantify the volume of the requested production and does not allege that production would be unduly burdensome as a practical matter.

particular investigation," and is instead just a "fishing expedition" for the President's records.[10] Appellant's Br. 27.

We disagree. Even if the subpoena is broad, the SAC does not plausibly allege that the subpoena is *over*broad. We discuss each of the President's arguments in turn:

<u>Number of entities named</u>. The subpoena seeks Mazars' documents with respect to (1) Donald J. Trump, (2) ten enumerated entities, each owned by the President, and (3) "any related parents, subsidiaries, affiliates, joint ventures, predecessors, or successors" of the above. Joint App'x ¶ 18.

The President's primary argument is that these entities have nothing to do with the Michael Cohen payments. That may be so. But, as discussed above, the President has not plausibly alleged that the investigation is limited to the Michael Cohen payments. The President argues that, even if the investigation is not limited to the Michael Cohen payments, he has still "plausibly alleged facts sufficient to support the inference that any such actors would not alone or together have a relevant relationship to *all* of the entities covered by the subpoena for the *entire*

---

[10]    In a similar vein, counsel for the President suggested at oral argument that *any* request for *any* documents described in the grand jury subpoena would be overbroad.

time period." Appellant's Br. 28. But even if that were true, it is neither unusual nor unlawful for grand juries to "paint[] with a broad brush," *R. Enterprises*, 498 U.S. at 297, especially in a complex financial investigation. The mere fact that the subpoena seeks information from a variety of related entities—all owned by the same individual—would not overcome the presumption of validity.

Out-of-state reach. The SAC alleges that the subpoena is overbroad because "[m]any of those entities operate wholly outside of New York County" and because some "entities whose documents are covered by the subpoena are not even in the United States." Joint App'x 22 ¶ 32.

But this, too, is neither unusual nor unlawful. New York law allows the District Attorney to prosecute a crime when "an element of [the] offense," or "[a]n attempt or a conspiracy to commit such offense," occurred within New York County. N.Y. Crim. Proc. Law § 20.40 (2019); *accord id.* § 20.20. The District Attorney may also prosecute crimes that occurred outside New York County if, for instance, "the offense committed was a result offense and the result occurred within" New York County or if the offense was intended to have a prohibited effect in New York County. *Id.* § 20.20(2)(a)–(b); *see also Blair v. United States*, 250 U.S. 273, 282–83 (1919) ("[W]itnesses are not entitled to take exception to the

22

jurisdiction of the grand jury or the court over the particular subject-matter that is under investigation . . . . [T]he court and grand jury have authority and jurisdiction to investigate the facts in order to determine the question whether the facts show a case within their jurisdiction."). There is nothing suspect about a grand jury demanding records relating to entities beyond the grand jury's territorial jurisdiction, especially in the context of a financial investigation. The President's allegations, accepted as true, would not plausibly overcome the presumption of validity.

Types of materials sought. The subpoena seeks five categories of documents: (1) tax returns; (2) financial statements and reports; (3) engagement agreements; (4) documents related to the preparation and review of the above-mentioned tax returns and reports; and (5) work papers and communications related to the above-mentioned tax returns and reports. The President alleges that this scope is too broad.

Here, too, the President's key argument is that these types of documents are irrelevant to the Michael Cohen payments. And, as before, without the benefit of the assumption that the investigation is limited only to those payments, the SAC fails to plausibly allege that there is no "reasonable possibility" that the categories

of documents sought would be "relevant to the general subject of the grand jury's investigation." *In re Grand Jury Proceeding*, 971 F.3d at 54. There is nothing to suggest that these are anything but run-of-the-mill documents typically relevant to a grand jury investigation into possible financial or corporate misconduct. The district court's decision cites a litany of cases upholding subpoenas of similar breadth and scope. *See Trump*, 2020 WL 4861980, at *28–29; *see also* Br. for *Amici Curiae* Washington State Tax Practitioners 7, *Trump v. Vance*, 140 S. Ct. 2412 (2020) (No. 19-635), 2020 WL 1433479, at *7 ("In Practitioners' experience, the scope of [the Mazars Subpoena] is not surprising.").

Time period. The Mazars subpoena seeks documents generally since January 1, 2011. The President alleges that this roughly nine-year period is overbroad, again relying mostly on the assumption that the investigation is limited only to the Michael Cohen payments, which took place in 2016.

"No magic figure limits the vintage of documents subject to a grand jury subpoena. The law requires only that the time bear some relation to the subject matter of the investigation." *In re Rabbinical Seminary Netzach Israel Ramailis*, 450 F. Supp. 1078, 1084 (E.D.N.Y. 1978). Analyzing the Mazars subpoena under this standard, we cannot make a reasonable inference that the timeframe of the

24

subpoena has no relation to the subject matter of the investigation. Even assuming *arguendo* that all transactions subject to the investigation occurred in 2016, the SAC does not make any well-pled allegations that such an investigation would have no use for documents from prior years or that the records sought are too old to have any bearing on the investigation. In fact, "the grand jury's scope of inquiry is not limited to events which may themselves result in criminal prosecution, but is properly concerned with any evidence which may afford valuable leads for investigation of suspected criminal activity during the limitations period." *United States v. Doe*, 457 F.2d 895, 901 (2d Cir. 1972); *see also United States v. Cohn*, 452 F.2d 881, 883 (2d Cir. 1971).[11] Without a plausible allegation about the nature of the ongoing investigation, we cannot say that the time period at issue—slightly under nine years—is per se too long a period for a grand jury subpoena to cover.

    Near-identity with a Congressional subpoena. Finally, we turn to the President's last argument on overbreadth: that the subpoena is inherently overbroad because it is copied from, and is substantially identical to, an earlier subpoena from the House Oversight Committee to Mazars that focused on an entirely different subject matter. But here, too, the President's allegations fall short.

---

[11]    For the same reason, the President's argument that the relevant period for the subpoena should be limited by the criminal statutes of limitation has no merit.

To begin, there is no logic to the proposition that the documents sought in the Mazars subpoena are irrelevant to legitimate state law enforcement purposes simply because a Congressional committee considered the same documents relevant to its own investigative purposes. The same set of documents could be useful for multiple purposes, and it is unreasonable to automatically assume that state law enforcement interests and federal legislative interests do not overlap. *See Hutcheson v. United States*, 369 U.S. 599, 613 (1962) ("[T]he authority of [Congress], directly or through its committees, to require pertinent disclosures in aid of its own constitutional power is not abridged because the information sought to be elicited may also be of use in" state criminal proceedings).

In response, the President argues that it is highly unlikely that *all* of the documents relevant to a federal legislative inquiry would also be relevant to a New York criminal investigation. As Justice Alito wrote, "it would be quite a coincidence if the records relevant to an investigation of possible violations of New York criminal law just so happened to be almost identical to the records thought by congressional Committees to be useful in considering federal legislation." *Trump*, 140 S. Ct. at 2449 (Alito, *J.*, dissenting).

But that is not enough. It would be impossible for grand juries and district attorneys advising them to fashion document subpoenas with such refinement and precision that every document called for is useful in the criminal investigation. Grand juries must necessarily paint with a "broad brush." *R. Enterprises*, 498 U.S. at 297. It is neither uncommon nor unlawful for grand jury subpoenas to seek categories of documents that may include some documents that ultimately prove to be unhelpful to the grand jury's investigation. "A grand jury has no catalog of what books and papers exist and are involved in a situation with which it is attempting to deal, nor will it ordinarily have any basis for knowing what their character or contents immediately are. It can therefore hardly be expected to be able to designate or call for what its exact needs may ultimately turn out to be." *Virag*, 430 N.E.2d at 1252. The SAC does not adequately allege that the subpoena is so overbroad that "there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation." *R. Enterprises*, 498 U.S. at 301.

<u>Cumulative breadth</u>. Having concluded that the President has not adequately alleged that the individual aspects of the subpoena are overbroad, we conclude by examining the subpoena as a whole. The sum of a subpoena can, of

course, be overbroad even if its individual components are not. But such is not the case here. Because the allegations concerning the Michael Cohen payments are not well pled, the President's remaining allegations amount to generic objections that the subpoena is wide-ranging in nature. Again, even if the subpoena is broad, the complaint does not adequately allege that it is *over*broad. Complex financial and corporate investigations are broad by default. A grand jury "has a right to a fair margin of reach and material in seeking information, not merely direct but also as a matter of possible light on seemingly related aspects whose significance it is seeking to uncover." *Virag*, 430 N.E.2d at 1252. None of the President's allegations, viewed separately or cumulatively, would overcome the presumption of validity.

The President has a "difficult" burden and an "unenviable" task: to make plausible allegations that could "persuade the court that the subpoena that has been served on him . . . could not possibly serve any investigative purpose that the grand jury could legitimately be pursuing." *R. Enterprises*, 498 U.S. at 300. His complaint fails to do so.

### C. Bad Faith

For similar reasons, we hold that none of the President's allegations, taken together or separately, are sufficient to raise a plausible inference that the subpoena was issued "out of malice or an intent to harass." *Trump*, 140 S. Ct. at

2428 (quoting *R. Enterprises*, 498 U.S. at 299). Even accounting for the public status and visibility of the President, as well as the political interest in his tax returns, none of the facts asserted in the SAC, accepted as true, would be sufficient for such a claim to prevail.

The President first alleges that the Mazars subpoena was issued in retaliatory bad faith because the District Attorney sought it soon after the President refused to produce his tax returns in response to the Trump Organization subpoena. In further support of this claim, the SAC alleges that the District Attorney issued the later subpoena to "Mazars, a neutral third-party custodian, in an effort to circumvent the President," Joint App'x 17–18 ¶ 16, during a time when "Democrats had become increasingly dismayed over their ongoing failure" to obtain the President's tax returns, Joint App'x 21 ¶ 24.

Even if true, none of this raises a plausible inference of retaliatory motive on the part of the District Attorney. In the President's telling, the District Attorney (1) misinterpreted the Trump Organization subpoena to cover the President's tax returns, but then (2) "declined to defend his implausible reading," Joint App'x 18 ¶ 16, and accordingly (3) issued a new subpoena. The President casts this as retaliatory, but the "obvious alternative explanation," *Twombly*, 550 U.S. at 567, is

29

that, if the original subpoena did not clearly call for the documents needed for the grand jury investigation, a new subpoena was issued that clearly called for them. *See N.J. Carpenters Health Fund*, 709 F.3d at 121. Even the President's account amounts to nothing more than "labels and conclusions" of improper motive, compelling us to find that this allegation fails the plausibility test. *Twombly*, 550 U.S. at 555.

We are similarly unpersuaded by the President's reference to the ambient political motivations of third parties. To be sure, if the SAC plausibly alleged that the District Attorney sought to obtain the President's tax returns for partisan political purposes, that would undoubtedly state a claim of bad faith. But as counsel to the President acknowledged at oral argument, the SAC nowhere alleges that the District Attorney was himself motivated by partisan considerations. The motivations of unspecified "Democrats" cannot be imputed to the District Attorney without specific factual allegations.

And the fact that the Mazars subpoena was issued to a third-party custodian adds nothing to the President's bad faith claim. Such subpoenas are routine. *See, e.g., Hirschfeld v. City of New York*, 686 N.Y.S.2d 367, 368 (App. Div. 1st Dep't 1999). And even if the District Attorney had directed this subpoena to Mazars with the

expectation that Mazars would be more likely than the President to comply, the expectation of cooperation signifies a legitimate investigation, not evidence of bad faith. *Cf. Blair*, 250 U.S. at 282 (providing that a party served with a subpoena "is not entitled to set limits to the investigation that the grand jury may conduct"). These facts, accordingly, do not allow us to draw any inference of improper motive on the part of the District Attorney. The direction of the subpoena to the President's accountant, rather than to the President himself, does not prevent the President from objecting to the subpoena. On the other hand, it relieves the President of the burden of supervising and being responsible for compliance, thus freeing the President from obligations that might otherwise interfere with his duties of office.

The President next argues that the Mazars subpoena is issued in bad faith because it is not properly tailored to the needs of the District Attorney's investigation. Here, the President relies on the allegation that the Mazars Subpoena largely tracks the language of a subpoena issued by the House oversight committee, as well as the allegation that the District Attorney justified this similarity on the ground of "efficiency," rather than on the needs of his

investigation. To the extent that this argument is another way to express a claim for overbreadth, it fails for all the same reasons as above.

But to the extent courts have held that the improper tailoring of a subpoena in itself gives rise to an inference of bad faith on the part of the prosecutor, we conclude that the alleged facts here are not so suggestive. For example, in *In re Grand Jury Subpoena, JK-15-029* (hereinafter *JK-15*), the Ninth Circuit quashed a subpoena that sought, in part, all personal and official emails sent from or to the former governor of Oregon regarding certain individuals over several years. 828 F.3d 1083, 1086–87 (9th Cir. 2016). Some of the emails at issue discussed "particularly private matters, including communications about medical issues and [the governor's] children." *Id.* at 1090. But the financial and business documents sought by the Mazars subpoena are not nearly so personal and thus do not give rise to an inference of improper motive.[12] Moreover, we note that any documents

---

[12] Insofar as the subpoena's request for "[a]ll communications between Donald Bender and any employee or representative of the Trump Entities" raises privacy concerns, Joint App'x 18 ¶ 18, we note that a request for communications *between* two particular parties is inherently narrower than a request for *all* communications sent to or from a single party. For that reason, the subpoena here is distinguishable from that in *JK-15* and more closely resembles the request we recently upheld in *In re Grand Jury Proceeding* for "all communications between [an individual] and eight reporters that in any way concerned [the subject of the investigation]." 971 F.3d at 54.

produced under the Mazars subpoena would be protected from public disclosure by grand jury secrecy rules, *see Trump*, 140 S. Ct. at 2427, which greatly reduces the plausibility of the allegation that the District Attorney is acting out of a desire to embarrass the President. Notwithstanding the political interest in the President's tax returns, then, we simply do not see how the District Attorney's statement that he copied the Congressional subpoena for "efficiency" allows us to infer bad faith.

Finally, the President's argument about the District Attorney's "shifting" explanations fares no better. Here, the President alleges that the District Attorney recently abandoned his "efficiency" explanation for the scope of the subpoena and instead told the district court that the Mazars and Congressional subpoenas are identical because "they both relate to public reports about the same potentially improper conduct." Appellant's Br. 32. From this, the President urges, we should infer that any explanation by the District Attorney is pretext for his improper motive. We cannot do so, however, because the District Attorney's two alleged statements are not inconsistent. Even construing these statements in the way most

---

We further note that the court in *JK-15* quashed the subpoena on the ground of overbreadth, rather than bad faith. *See JK-15*, 828 F.3d at 1088. Our point remains that, assuming the case can be read for the proposition that improper tailoring is akin to bad faith, the facts here are easily distinguishable.

favorable to the President's claim, we find that they do not "permit [us] to infer more than the mere possibility" of bad faith. *Iqbal*, 556 U.S. at 679.

**INTERIM STAY OF ENFORCEMENT**

The parties have previously agreed that, should the President seek interim relief from the Supreme Court after our instant affirmance of the district court's judgment, the District Attorney would "forbear enforcement of the Mazars subpoena until a decision is issued by the Supreme Court denying such a request for interim relief . . . provided [the President] complies with" a briefing schedule agreed to by the parties. Joint Letter dated October 2, 2020, from Counsel for Appellant & Counsel for Appellee. That briefing schedule is set forth in a letter submitted by the District Attorney to the Court on September 29, 2020. An interim stay of enforcement of the subpoena under the terms agreed to by the parties is hereby so ordered.

**CONCLUSION**

We have considered all of the President's remaining contentions on appeal and have found in them no basis for reversal.[13] Accordingly, we **AFFIRM** the

---

[13] Furthermore, because it is not necessary to rely on any evidence outside of the SAC to dismiss it and because there is no need to convert the instant motion to a motion for summary judgment, the district court did not err in dismissing as

district court's judgment dismissing the SAC with prejudice, and enforcement of

the subpoena is provisionally stayed as specified herein.

---

moot the President's request for a pre-motion conference on his anticipated motion for discovery into the redacted portion of the sworn declaration of Assistant District Attorney Solomon Shinerock.